**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL CENTER FOR LEARNING DISABILITIES, KNOWLEDGE ALLIANCE, BNP EDUCATION PARTNERS LLC, *and* MASSACHUSETTS TEACHERS ASSOCIATION,<br><br>     *Plaintiffs*,<br><br>   v.<br><br>OFFICE OF MANAGEMENT AND BUDGET, RUSSELL VOUGHT, *in his official capacity as OMB Director*, UNITED STATES DEPARTMENT OF EDUCATION, LINDA McMAHON, *in her official capacity as Secretary of Education*, MATTHEW SOLDNER, *in his official capacity as Acting Director of the Institute of Education Sciences*, *and* UNITED STATES OF AMERICA,<br><br>     *Defendants*. | Case No. |

<u>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

**INTRODUCTION**

1.      Congress alone possesses the constitutional power of the purse, and Congress does not "relinquish that weapon to another branch" lightly. *Learning Res., Inc. v. Trump*, 607 U.S. 229, 243 (2026) (Roberts, C.J., plurality op.). This case concerns the Executive Branch's usurpation of this "core congressional power," *id.*, with respect to funding of education research.

2.      Specifically, the Office of Management and Budget (OMB) and the Department of Education have taken various steps—including manipulating basic administrative processes—to prevent the Department's Institute of Education Sciences (IES) from spending four different education research appropriations in the amounts and for the purposes that Congress intended: (1) $793 million in appropriations for IES programs that will expire on September 30, 2026 if not legally committed, or "obligated," to awardees by that point; (2) $789 million in appropriations for IES programs that will expire on September 30, 2027; (3) $50 million in appropriations for a "Comprehensive Centers" program that will expire on September 30, 2026, and (4) $235 million in appropriations for the Education Innovation and Research program that will expire on December 31, 2026.

3.      OMB has misused the "apportionment" process to unlawfully wrest control of education research spending from Congress. Under the Anti-Deficiency Act, OMB must "apportion" congressional appropriations to agencies for the agencies to be able to obligate the funds, and OMB has refused to timely apportion hundreds of millions of dollars of the aforementioned education research funds. OMB has withheld apportioning several hundred million dollars of these funds entirely, has delayed apportioning hundreds of millions more so as to severely inhibit the Department from obligating the funds before they expire, and has used apportionments to restrict the programs and substantive purposes for which the education

research may funds may be used. OMB has taken all of these actions in contravention of the Anti-Deficiency Act, the Administrative Procedure Act, and the Constitution's allocation of powers among the branches.

4.    The Department of Education has been a more-than-willing participant in this effort to derail education research spending. It has agreed to "spend plans" with OMB that legally preclude the Department from spending IES funds in the amounts and for the purposes that Congress directed. And the Department has not undertaken other steps that would be needed to obligate the education research funds before they expire this year.

5.    For Plaintiffs National Center for Learning Disabilities, Knowledge Alliance, BNP Education Partners LLC, and Massachusetts Teachers Association, the Administration's failure to apportion and obligate these education research funds as Congress required will be devastating. They and their members compete for funding under these programs and depend on the research, data, and studies produced through these programs to carry out their organizational missions.

6.    This Court's intervention is now necessary to prevent the Executive Branch's interference with this critical research from becoming irreversible.

**PARTIES**

7.    Plaintiff National Center for Learning Disabilities (NCLD) is a nonprofit organization headquartered in Washington, D.C. NCLD works with educators, students, families, young adults, and allied organizations to advance research, share resources, build coalitions, and advocate for policies that reduce systemic barriers for individuals with learning and attention issues. NCLD's work includes creating and disseminating data and reports, shaping local and national policy, and supporting leaders, parents, young adults, employers, and other stakeholders

working to create lasting change for individuals with learning disabilities.

8.       Plaintiff Knowledge Alliance is a nonprofit, nonpartisan association, with its principal office in Washington, D.C. Knowledge Alliance is composed of leading education organizations that share the belief that high-quality, relevant research is essential to improving education policy and practice. Its mission is to elevate the creation and use of rigorous research and evidence to support systems change, sustainable resources, equitable public education, and access to opportunity. Knowledge Alliance is a membership organization; its members set the policy and direction of the organization, each member receives a seat on the Board, and members participate in determining the organization's agenda and priorities.

9.       Plaintiff BNP Education Partners LLC is a women-owned small business and certified benefit corporation with locations in Denver, Colorado and Portland, Oregon. BNP Education Partners works with educators, education agencies, and system leaders to provide applied education research, evaluation, technical assistance, professional learning, and consulting services. Its work focuses on helping schools, districts, states, and other education partners use practitioner-centered, evidence-informed research to improve educational systems and student outcomes.

10.      Plaintiff Massachusetts Teachers Association (MTA) is a labor organization headquartered in Quincy, Massachusetts. MTA is a state affiliate of the National Education Association and represents approximately 117,000 members in roughly 400 local associations throughout Massachusetts. Its members include teachers, faculty, professional staff, and education support professionals working in Massachusetts public schools, colleges, and universities. MTA is a member-driven organization that advances educators' professional and economic interests and advocates for high-quality public education statewide.

11.     Defendant Office of Management and Budget (OMB) is a federal agency headquartered in Washington, D.C.

12.     Defendant Russell Vought is the Director of OMB. He is sued in his official capacity.

13.     Defendant United States Department of Education ("the Department") is a cabinet agency within the Executive Branch of the federal government.

14.     Defendant Linda McMahon is the Secretary of Education, the agency's highest ranking official. As such, she is responsible for decisions of the agency. She is sued in her official capacity.

15.     Defendant Matthew Soldner is the Acting Director of the Institute of Education Sciences (IES). As such, he is responsible for decisions of IES and for carrying out IES's mandates. He is sued in his official capacity.

16.     Defendant the United States of America is responsible for the exercise of executive actions by the other named Defendants and all other agencies that are directed to take action with respect to the failure to release Department of Education funds. The United States of America is included as a defendant under 5 U.S.C. § 702.

**JURISDICTION AND VENUE**

17.     This Court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331; because Defendants are United States officials, 28 U.S.C. § 1346(a)(2); and because this case raises claims under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702, 704.

18.     This Court may grant declaratory, injunctive, and other relief pursuant to 28

U.S.C. §§ 2201-2202, 5 U.S.C. §§ 705–06, 28 U.S.C. § 1361, and the Court's inherent authority to enjoin federal officials from acting unlawfully.

19.     Venue is appropriate under 28 U.S.C. § 1391 in the District of Massachusetts because Plaintiff Massachusetts Teachers Association maintains its principal place of business in Massachusetts and a substantial part of the events giving rise to this Complaint have taken place in Massachusetts.

## FACTUAL AND LEGAL BACKGROUND

***Congress Establishes the Institute for Education Sciences and Directs it to Carry Out Certain Functions and Programs***

20.     In the Education Sciences Reform Act of 2002 (ESRA), Congress created IES to serve as the "statistics, research, and evaluation arm of the U.S. Department of Education." Pub. L. 107-279, 116 Stat. 1941, as amended by Pub. L. 117-286 (2022).

21.     IES's mission is "to provide national leadership in expanding fundamental knowledge and understanding of education from early childhood through postsecondary study, in order to provide parents, educators, students, researchers, policymakers, and the general public with reliable information" about the condition of education in the United States, practices that support educational access and improved learning, and the effectiveness of educational programs. 20 U.S.C. § 9511(b)(1). Likewise, IES's statutory priorities include "closing the achievement gap between high-performing and low-performing children," ensuring "access to, and opportunities for, postsecondary education," and assessing the "efficacy, impact on academic achievement, and cost-effectiveness of technology use." *Id.* § 9515(a)(1)–(2).

22.     IES executes its mission and priorities by compiling statistics, performing research, and conducting evaluations that support the development of widely disseminated materials and training to improve educational practices. *Id.* § 9511(b)(2); https://ies.ed.gov/about.

To this day, IES holds itself out as "the nation's leading source for rigorous, independent education research, evaluation, and statistics." https://ies.ed.gov.

23.    As relevant to this litigation, IES administers the following congressionally mandated and funded centers and programs, which either award federal grants, contracts, and cooperative agreements for which Plaintiffs and their members compete, or produce data, research, and evaluations on which Plaintiffs and their members rely. IES uses congressional appropriations to carry out these activities.

*National Center for Education Research*

24.    The National Center for Education Research (NCER), is an IES Center that focuses on investing in direct research and research programs to better understand how to improve education across the country for all kinds of learners.

25.    Underscoring this important task, Congress has directed NCER to, among other things, "sponsor sustained research that will lead to the accumulation of knowledge and understanding of education"; "support the synthesis and, as appropriate, the integration of education research"; and "promote scientifically valid research findings that can provide the basis for improving academic instruction and lifelong learning." 20 U.S.C. § 9531.

26.    Congress mandated that NCER undertake significant duties over time, including that it "carry out specific, long-term research activities that are consistent with the priorities and mission of the Institute, and are approved by the Director," and that it propose to the Director and then carry out a "scientifically valid" research plan using contracts, grants, and cooperative agreements. *Id.* § 9533(a), (b).

27.    To undertake its research responsibilities, Congress mandated that NCER "shall support not less than 8 national research and development centers" each assigned at least one of

11 research topics such as "[a]dult literacy," "[e]arly childhood development and education," "English language learners research," or "[t]eacher quality." *Id.* § 9533(c). Congress further directed NCER to support each national research and development center "for a period of not more than 5 years" and directed that financial support "shall be of sufficient size and scope to be effective." *Id.*

28.    Focusing on long-term research, Congress mandated that the "Research Commissioner shall ensure that not less than 50 percent of the funds made available for research for each fiscal year shall be used to fund long-term research programs of not less than 5 years." *Id.* § 9534(c).

29.    IES appropriations directed to "Research, Development, & Dissemination" fund NCER activities, among other programs.

*National Center for Education Statistics*

30.    Congress also established within IES the National Center for Education Statistics (NCES) with a mission to, among other things, "collect, analyze, and report education information and statistics in a manner that[] (A) is objective, secular, neutral, and nonideological and is free of partisan political influence and racial, cultural, gender, or regional bias; and (B) is relevant and useful to practitioners, researchers, policymakers, and the public." 20 U.S.C. § 9541(b).

31.    NCES is required to "collect, report, analyze, and disseminate statistical data" on, at minimum 15 categories of information ranging from "student achievement in … reading, mathematics, and science" to "the existence and use of school libraries." *Id.* § 9543(a)(1).

32.    By law, NCES must provide to the President and relevant Congressional committees, by June 1 of each year, "a statistical report on the condition and progress of

education in the United States." *Id.* § 9545(b).

33.     NCES also operates a statutory program to competitively award grants to States to "design, develop, and implement statewide, longitudinal data systems to efficiently and accurately manage, analyze, disaggregate, and use individual student data." *Id.* § 9607(a).

34.     Since 2005, the Statewide Longitudinal Data Systems (SLDS) grant program has issued over 8 rounds of funding; all 50 states and the District of Columbia have received at least one SLDS grant. NCES, Statewide Longitudinal Data Systems Grant Program, *Grantee States*, https://nces.ed.gov/programs/slds/stateinfo.asp. SLDS grants fund States to build the capacity to "manage, analyze, and use education data" in ways that help States, districts, schools, educators, and other stakeholders make data-informed decisions, improve student outcomes, and support research aimed at increasing achievement and closing achievement gaps. NCES, Statewide Longitudinal Data Systems Grant Program, *About the SLDS Grant Program*, https://nces.ed.gov/programs/slds/about_SLDS.asp.

35.     NCES activities are generally funded by IES appropriations directed to "Statistics." The SLDS grant program administered by NCES receives funding from IES appropriations specifically directed to "Statewide Longitudinal Data Systems."

*National Center for Special Education Research*

36.     Congress created within IES the National Center for Special Education Research ("NCSER") to "sponsor research to expand knowledge and understanding of the needs of infants, toddlers, and children with disabilities" and to "sponsor research to improve services provided under, and support the implementation of," and to "evaluate the implementation and effectiveness of" the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 9567.

37.     NCSER is required to "carry out research activities" in furtherance of this

9

mission, including in 17 congressionally identified areas of appropriate research. *Id.* § 9567b. These include research of essential importance to education policymakers, such as research to "identify scientifically based related services and interventions that promote participation and progress in the general education curriculum and general education settings" and to "examine the extent to which overidentification and underidentification of children with disabilities occurs, and the causes thereof." *Id.* § 9567b(a)(4), (8).

38.    Like other programs within IES, Congress has required that NCSER ensure that research is both scientifically sound and "objective, secular, neutral, and nonideological, and … free of partisan political influence, and racial, cultural, gender, regional, or disability bias." *Id.* § 9567b(b)(3).

39.    NCSER activities are funded by appropriations directed to "Research in Special Education" and "Special Education Studies and Evaluations."

*National Center for Education Evaluation and Regional Assistance*

40.    Congress has also created within IES the National Center for Education Evaluation and Regional Assistance (NCEE). 20 U.S.C. § 9561. NCEE's congressionally mandated statistical mission is: "(1) to provide technical assistance; (2) to conduct evaluations of Federal education programs … to determine the impact of such programs … ; (3) to support synthesis and wide dissemination of results of evaluation, research, and products developed; and (4) to encourage the use of scientifically valid education research and evaluation throughout the United States." *Id.*

41.    As part of those activities, NCEE is responsible for overseeing other congressionally mandated IES activities, including managing the Regional Education Laboratories and research activities relating to special education under the Individuals with

Disabilities Education Act ("IDEA"), as explained further below.

42.     NCEE activities are funded by IES appropriations directed to "Regional Education Laboratories," "Special Education Studies and Evaluations," and "Statewide Longitudinal Data Systems," each described below.

*Regional Education Laboratories*

43.     Congress created the Regional Education Laboratories (REL) program nearly 60 years ago to assist education practitioners and policymakers by using research, evidence, and evidence-based practices to improve student outcomes.

44.     To effectuate the program, Congress has mandated that the Director of IES "shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States." 20 U.S.C. § 9564(a).

45.     Each REL contractor shall "support applied research, development, wide dissemination, and technical assistance activities" in its region, *id.* § 9564(f), and must consult and collaborate with key federal, state, and local stakeholders, *id.* § 9564(g).

46.     RELs are funded by IES appropriations directed to "Regional Educational Laboratories."

*Special Education Studies and Evaluation*

47.     Through IDEA, Congress also directed the Secretary of Education to "delegate to the Director of [IES] the responsibility to" carry out particular research activities related to special education. 20 U.S.C. § 1464(a).

48.     Specifically, the Director of IES must "assess the progress in the implementation of [IDEA], including the effectiveness of State and local efforts to provide[] (A) a free appropriate public education to children with disabilities; and (B) early intervention services to

infants and toddlers with disabilities…." *Id.* The Director of IES may undertake responsibilities through direct research projects or through competitive grants, contracts, or cooperative agreements. *Id.*

49.    IES must carry out these important research priorities to "provide timely information to the President, Congress, the States, local educational agencies, and the public on how to implement [IDEA] more effectively" and "to provide the President and Congress with information that will be useful in developing legislation to achieve the purposes of [IDEA] more effectively." *Id.* § 1464(b)(1).

50.    Funding for Special Education Studies and Evaluations activities following these directives comes from appropriations directed to "Special Education Studies and Evaluations" carried out by NCEE and to the "Statewide Longitudinal Data Systems" carried out by NCES.

*Comprehensive Centers*

51.    Congress established the Comprehensive Centers program through the Improving America's Schools Act of 1994, Pub. L. No. 103-382, tit. I, § 101, 108 Stat. 3518, 3876, and reauthorized the program through the Educational Technical Assistance Act of 2002, Pub. L. No. 107-279, tit. II, § 203, 116 Stat. 1940, 1975 (codified as amended at 20 U.S.C. § 9602), part of the larger Education Sciences Reform Act of that year, Pub. L. No. 107-279, tit. I, 116 Stat. 1940, 1941.

52.    The Comprehensive Centers program is a federal technical-assistance program that funds expert centers to help States, districts, and schools implement federal education programs and improve teaching, assessment, and school performance. Its focus is capacity building, especially for high-poverty, Title I, and improvement-identified schools. Until recently, a different part of the Department administered the program, but on June 4, 2026, the

12

Department announced that it was moving the program to IES.[1]

53.    In creating the Comprehensive Centers program, Congress mandated that the Secretary of Education award "not less than" twenty grants to local entities or groups to serve as Comprehensive Centers. 20 U.S.C. § 9602(a)(1). The Act further directs that the Secretary of Education "shall ensure that not less than 1 comprehensive center is established in each of the 10 geographic regions served by the [RELs]." *Id.* § 9602(a)(2).

54.    Congress directed that the Comprehensive Centers "shall work with State educational agencies, local educational agencies, regional educational agencies, and schools in the region where such center is located on school improvement activities that take into account factors such as the proportion of economically disadvantaged students in the region." *Id.* § 9602(e). Congress provided that the Centers must "give priority to": "(1) schools in the region with high percentages or numbers of students from low-income families … including such schools in rural and urban areas, and schools receiving assistance under Title I" of the Elementary and Secondary Assistance Act of 1965, Pub. L. No. 89-10, 79 Stat. 27 (codified as amended at 20 U.S.C. § 6301 *et seq.*); "(2) local educational agencies in the region in which high percentages or numbers of school-age children are from low-income families;" and (3) schools in the region that have been identified for school improvement. *Id.*

55.    Congress anticipated multi-year grants, requiring each Comprehensive Center to submit an annual report to the Secretary summarizing its activities and listing the localities it assisted during the preceding year. *Id.* § 9602(h).

*Education Innovation and Research Program*

56.    Another congressionally established research program that the Department must

---

[1] *See* IES, *An Idea Whose Time Has Come: IES Welcomes New Programs to NCEE and NCER* (June 4, 2026), https://perma.cc/ZX7H-TQQ5.

13

administer is the Education Innovation and Research program (EIR). This program has historically sat outside of IES, instead being administered by the Department's Office of Elementary and Secondary Education (OESE), but the Department recently announced that the program is being moved to NCER.[2]

57.    Through EIR, the Department is required to issue grants to both study and implement innovative, evidence-based practices "to improve student achievement and attainment for high-need students." 20 U.S.C. § 7261(a)(1)(A).

58.    Specifically, the Department "shall" award grants at three separate phases: (A) "early-stage grants" to help develop and test feasibility of programs "for the purpose of determining whether the program can successfully improve student achievement or attainment for high-need students"; (B) "mid-phase grants" to implement and test programs that showed success through an early-phase grant; and (C) "expansion grants to fund implementation and a rigorous replication evaluation" of programs showing "sizable, important impacts" under mid-phase grants. *Id.* § 7261(a)(1), (a)(2).

59.    In issuing awards under the EIR program, the Department is required to focus on rural areas and to "ensure that not less than 25 percent of funds made available for any fiscal year" fund programs for rural schools. *Id.* § 7261(c)(1).

***Congress Appropriates Funds for IES Programs, the Comprehensive Centers, and EIR***

60.    For fiscal year 2025, Congress passed a Continuing Resolution rather than separate appropriations bills for each agency. Pub. L. 119-4, § 1101–1102 (2025) ("2025 Continuing Resolution"). The 2025 Continuing Resolution appropriated for fiscal year 2025 the same appropriations—at the same levels and under the same conditions—that Congress had appropriated in the Consolidated Appropriations Act of 2024, Pub. L. 118-47 (2024) ("2024

---

[2] *See* IES, *An Idea Whose Time Has Come*, *supra*.

14

Appropriations Act").

61.     The 2024 Appropriations Act appropriated $793 million for IES. Congress specified that the funds "shall remain available through September 30, 2025," meaning that, unlike with most appropriations which are available for one fiscal year only, the funds appropriated for IES were available for obligation for two fiscal years (FY2024 and FY2025). 138 Stat. at 690. The 2025 Continuing Resolution provided that, for appropriations in the 2024 Appropriations Act that "carried a multiple-year . . . period of availability," such as IES funds, the funds appropriated in the 2025 Continuing Resolution "retain a comparable period of availability." *Id.* § 1103. Accordingly, the 2025 Continuing Resolution appropriated another $793 million to IES, with another two-year period of availability, such that the funds expire at the end of fiscal year 2026 on September 30, 2026.

62.     When Congress enacts an annual appropriations bill, it appends an "explanatory statement" that sets forth how Congress intends for each agency to allocate a particular appropriation among the various programs that fall under that appropriation. The allocations in the explanatory statement are not formally binding on the agency unless the text of the appropriations bill specifically incorporates the explanatory statement by reference.

63.     The 2024 Appropriations Act, like prior appropriations acts, did not incorporate by reference the explanatory statement for IES funds. Nevertheless, on information and belief, prior to 2025, OMB has consistently apportioned and IES has generally obligated funds in line with the allocations in the explanatory statement, reflecting a policy of generally keeping with the division of funds that Congress intended in the explanatory statement.

64.     The explanatory statement appended to the 2024 Appropriations Act provided for the following allocation of IES funds:

15

DEPARTMENTS OF LABOR, HEALTH AND HUMAN SERVICES, EDUCATION, AND RELATED AGENCIES APPROPRIATIONS ACT, 2024
(Amounts in thousands)

|  | FY 2023 Enacted | FY 2024 Request | Final Bill | Final Bill vs Enacted | Final Bill vs Request |
|---|---|---|---|---|---|
| **INSTITUTE OF EDUCATION SCIENCES (IES)** |  |  |  |  |  |
| Research, Development and Dissemination | 245,000 | 291,877 | 245,000 | --- | -46,877 |
| Statistics | 121,500 | 127,000 | 121,500 | --- | -5,500 |
| Regional Educational Laboratories | 58,733 | 60,733 | 53,733 | -5,000 | -7,000 |
| Research in Special Education | 64,255 | 64,255 | 64,255 | --- | --- |
| Special Education Studies and Evaluations | 13,318 | 13,318 | 13,318 | --- | --- |
| Statewide Data Systems | 38,500 | 38,500 | 28,500 | -10,000 | -10,000 |
| Assessment: |  |  |  |  |  |
| National Assessment | 185,000 | 189,000 | 185,000 | --- | -4,000 |
| National Assessment Governing Board | 7,799 | 9,300 | 8,300 | +501 | -1,000 |
| Subtotal, Assessment | 192,799 | 198,300 | 193,300 | +501 | -5,000 |
| Program Administration | 73,500 | 76,885 | 73,500 | --- | -3,385 |
| Total, Institute of Education Sciences | 807,605 | 870,868 | 793,106 | -14,499 | -77,762 |

*See* Comm. on Appropriations, 118th Cong., H.R. 2882, Book II, Division D, at 959–60 (Comm. Print 2024).

65.     In the President's budget request to Congress for FY2026 appropriations, the Administration requested only $261 million for IES, roughly a third of the amount Congress had appropriated in prior years.[3]

66.     Congress rejected the Administration's proposal to shrink IES's funding in most respects. On February 3, 2026, Congress enacted the Consolidated Appropriations Act of 2026, Pub L. 119-75, 140 Stat. 173, 303 (the "2026 Appropriations Act"), appropriating $789 million to IES with a two-year period of availability across fiscal years 2026 and 2027 (the "FY2026/FY2027 funds"). The 2026 Appropriations Act also rescinded a small portion of amounts from the 2025 Continuing Resolution that remained unobligated—only $25 million for IES program administration, 140 Stat. 306.

67.     Unlike in the prior acts, Congress incorporated by reference into the 2026 Appropriations Act the funding allocations specified in the explanatory statement appended to

---

[3] https://perma.cc/5YVZ-FZN6.

the bill, providing that the obligation of IES funds "shall be for the purposes and in the amounts specified in the 'Final Bill' column for Institute of Education Sciences in the … table in the explanatory statement." *Id.*

68. The legally binding explanatory statement for the FY2026/FY2027 IES funds provides for the following allocations:

DEPARTMENTS OF LABOR, HEALTH AND HUMAN SERVICES, EDUCATION, AND
RELATED AGENCIES APPROPRIATIONS ACT, 2026
(Amounts in thousands)

|  | FINAL BILL |
|---|---|
| **INSTITUTE OF EDUCATION SCIENCES** | |
| Research, Development, and Dissemination | 245,000 |
| Statistics | 121,500 |
| Regional Educational Laboratories | 53,733 |
| Research in Special Education | 64,255 |
| Special Education Studies and Evaluations | 13,318 |
| Statewide Longitudinal Data Systems | 28,500 |
| Assessment: | |
| National Assessment | 185,000 |
| National Assessment Governing Board | 8,300 |
| Subtotal, Assessment | 193,300 |
| Program Administration | 70,000 |
| Total, Institute of Education Sciences | 789,606 |

*See* 172 Cong. Rec. H1353, H1656 (Jan. 22, 2026).

69. For the Comprehensive Centers program, the 2026 Appropriations Act provided $50 million that "shall be available" specifically for the program. *See* 140 Stat. 295 (appropriating $50 million "to carry out section 203 of the Educational Technical Assistance Act of 2002," which is the authorizing statute for the Comprehensive Centers program). The Comprehensive Centers appropriations are single-year funds, meaning they expire at the end of

17

FY2026 on September 30, 2026.

70.     For EIR, the 2026 Appropriations Act provided $235 million that "shall be available" for the EIR program specifically, with the funds to expire on December 31, 2026. *See* 140 Stat. 296 ("$235,000,000 shall be available through December 31, 2026 for subpart 1 of part F of title IV").

***OMB Must Apportion Funds for the Department to Use Them***

71.     The Constitution assigns Congress the power of the purse: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

72.     Prior to 1870, Congress's formal control over appropriations was often undermined when executive departments spent or obligated funds beyond appropriated levels, which resulted in agencies returning to Congress to seek a "deficiency" appropriation to back-fill the amounts that the agency overspent. Agencies also frequently spent their appropriations too quickly within a fiscal year, causing the agency to ask Congress for "supplemental" appropriations to maintain agency operations after the previously appropriated funds were spent. Congress responded in stages.

73.     In 1870, Congress first enacted what became known as the Anti-Deficiency Act, making it unlawful for officials and agencies to spend more funds in a fiscal year than Congress had appropriated for that year. Act of July 12, 1870, ch. 251, § 7, 16 Stat. 230, 251 (codified as amended at 31 U.S.C. § 1341(a)(1)(A)–(B)). In 1905, Congress added penalties for violations of the 1870 Act and created the apportionment process as a way for the President to help agencies prevent over-spending. Act of Mar. 3, 1905, ch. 1484, § 4, 33 Stat. 1214, 1257–58 (codified as amended at 31 U.S.C. §§ 1349(a), 1350, 1512(a), 1513(b)).

18

74.     The Anti-Deficiency Act prescribes the apportionment process. Before a federal executive agency such as the Department of Education may obligate most appropriated funds, OMB (by delegation from the President) must apportion those funds in writing. 31 U.S.C. § 1513(b). For appropriations that are available for a definite period, such as IES appropriations, OMB must apportion an appropriation "to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." *Id.* § 1512(a). In other words, the purpose of an apportionment is to prevent agencies from spending appropriations too quickly or in amounts greater than that which Congress appropriated, so that the agencies do not have to ask Congress for a "deficiency or supplemental appropriation." *Id.*

75.     To that end, apportionments may divide up an appropriation of a fixed duration into discrete pieces that agencies may spend across certain "months, calendar quarters, operating seasons, or other time periods." *Id.* § 1512(b)(1)(A). Apportionments may also divide up an appropriation by "activities, functions, projects, or objects." *Id.* § 1512(b)(1)(B).

76.     Under the Anti-Deficiency Act, agencies are legally prohibited from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding" the amount apportioned by OMB. *Id.* § 1517(a). The Anti-Deficiency Act goes so far as to impose administrative and criminal penalties on agencies officials who obligate more than the amounts apportioned by OMB. *See id.* §§ 1518–19.

77.     As relevant here, OMB must apportion all appropriations to agencies not later than "30 days after the date of enactment of the law by which the appropriation is made available." *Id.* § 1513(b)(2)(B).

78.     The Anti-Deficiency Act provides that OMB may hold back appropriations from its apportionments, so as to establish a "reserve," *only* "(A) to provide for contingencies; (B) to

19

achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (c) as specifically provided by law." *Id.* § 1512(c). Prior to 1974, the Anti-Deficiency Act had an additional provision allowing broader grounds for establishing reserves, but Congress repealed that provision to "preclude the President from relying on the Act as authority for implementing policy impoundments"—that is, to prevent the Executive Branch from using apportionment to withhold or delay the obligation of appropriated funds for policy reasons. *City of New Haven v. United States*, 809 F.2d 900, 906 & n.18 (D.C. Cir. 1987).

79.     OMB often includes binding "footnotes" in apportionments. *See Citizens for Resp. & Ethics in Washington v. OMB*, 791 F. Supp. 3d 29, 40 n.5, 54 (D.D.C. 2025). Footnotes designated with the letter "A" impose legally binding conditions, subject to the Anti-Deficiency Act, on the agency's use of the apportioned funds. *See* OMB Circular No. A-11, §§ 120.1, 120.34, https://perma.cc/H466-36D6.

80.     In the past, OMB has sometimes requested that an agency provide OMB a "spend plan" (also sometimes called a "spending plan") that reflects how the agency intends to utilize its apportionment funds, before the agency begins spending those funds. *See Protect Democracy Project v. OMB*, No. 25-cv-1111, Order Granting Mot. to Enforce at 5, Dkt. 48 (D.D.C. Jan. 28, 2026). Beginning in this Administration, OMB has used apportionments to control agency spending, specifically by providing that agency may only obligate funds in accordance with a spend plan that must be "agreed upon" by OMB and the agency. *See id.* at 5–6. OMB has imposed this restriction by incorporating by reference the contents of a spend plan into a binding A footnote, providing, for example, that "[a]mounts apportioned . . . are available for obligation consistent with the latest agreed-upon spending plan for Fiscal Year 2025 between the [agency] and [OMB]." *Id.* Such footnotes legally bar the agency and its officials—under pain of civil and

criminal liability for the officials under the Anti-Deficiency Act—from spending the agency's appropriated funds in a manner contrary to its agreed-upon spend plan.

81.    Pursuant to laws enacted in 2022 and 2023, OMB must post its apportionments on a publicly accessible database within two business days of making the apportionment. Pub. L. 117-103, div. E, tit. II, §§ 204(b)-(c), 136 Stat. 49, 256-57 (2022) (codified at 31 U.S.C. § 1513 note); Pub. L. 117-328, div. E, tit. II, § 204, 136 Stat. 4459, 4667 (2022) (codified at 31 U.S.C. § 1513 note). In January 2026, a federal court held that this requirement includes posting spend plans incorporated into binding footnotes as described above. *Protect Democracy*, No. 25-cv-1111, Dkt. 48. However, OMB's compliance with the court's order to post spend plans has been tardy and incomplete. *Id.*, Dkt. 49.

***Defendants Withhold Millions of Appropriated Funds and Fail to Run Mandatory Programs***

*FY2025/2026 IES Funds*

82.    Under the current Administration, OMB has refused to apportion IES funds on a timely basis, refused to apportion the full sum of IES funds appropriated by Congress, and not abided by Congress's guidance regarding the allocation of funds across IES programs.

83.    With respect to the $768 million (subtracting the $25 million that was later rescinded) in FY2025/2026 funds that Congress appropriated in the 2025 Continuing Resolution and that expire on September 30, 2026, OMB first apportioned the funds on May 13, 2025—a month after the April 14, 2025 deadline.[4] And OMB apportioned very few of the funds for actual IES programming.

84.    In particular, OMB apportioned $485 million of the FY2025/2026 funds to an "Unallocated" line of the apportionment, which effectively renders the funds unavailable to use for any purpose. OMB apportioned another $73.5 million for "Program Administration." On

---

[4] https://perma.cc/8HH7-SMMY.

information and belief, prior to March 2025, OMB had never before used an Unallocated line to withhold funds appropriated by Congress for the Department, other than for de minimus amounts, all of which have been apportioned later in the year.

85.    The funds that OMB did apportion for actual IES programming did not match or come close to approximating the allocations that Congress specified in its explanatory statement for the FY2025/2026 funds. For instance, OMB apportioned $0 for Research in Special Education (line 6013 in the apportionment document), $0 for Special Education Studies (line 6014), and just $12,493 for Research, Development, and Dissemination (line 6011).

86.    Moreover, the May 13, 2025 apportionment included a footnote specifying that, for all IES funds except those for National Assessment Governing Board and Program Administration, the Department could use the funds only as "consistent with the latest agreed-upon spending plan for Fiscal Year 2025 between the Department of Education (ED) and the Office of Management and Budget (OMB)."[5] OMB thus incorporated the contents of the agreed-upon spend plan into the binding footnote, meaning the spend plan reflected OMB's and the Department's decision as to the maximum amount the Department could obligate for each type of IES programming, regardless of whether those allocations were consistent with Congress's desired allocations. OMB further directed that "[a]ny revisions or additions to such spending plan shall be proposed to OMB in writing no later than five business days before the anticipated obligation of funds based on such revisions or additions."[6]

87.    On August 8, 2025, OMB issued a new apportionment for the same set of FY2025/2026 funds.[7] OMB *increased* the amount in the "Unallocated" line to $500 million, and apportioned the balance across IES's various programs (and for Program Administration). This

[5] May 13, 2025 Apportionment, footnote A2, https://perma.cc/8HH7-SMMY.
[6] *Id.*
[7] Aug. 8, 20205 Apportionment, https://perma.cc/3QS3-GT2F.

apportionment was for only the first fiscal year (FY2025) of the FY2025/2026 IES appropriation.

88.     The August 8, 2025 apportionment contained a similar spend-plan footnote as in the May 13, 2025 apportionment described above.

89.     Publicly reported data routinely submitted by the Department to OMB indicates that the Department obligated only $282.324 million of the $793 million in FY2025/2026 IES funds by the end of fiscal year 2025. *See* Fiscal Year 2025 Dep't of Educ. SF-133 for TAFS 091-2025-2026-1100.[8]

90.     On February 27, 2026, OMB apportioned $210.5 million of the $500 million previously relegated to the "Unallocated" line to cover the second and final year (FY2026) of the FY2025/2026 IES funds.[9] This apportionment kept $289.5 million apportioned to the "Unallocated" line, which legally prohibited the Department from obligating these funds for any purpose. The February 2026 apportionment again included a footnote limiting the Department's spending to that provided for in "the latest agreed-upon spending plan" for IES funds.

91.     On March 5, 2026, OMB and the Department agreed upon a new spend plan for the funds.[10] Assuming that this spend plan updated the February 2026 apportionment because that apportionment incorporated by reference the "latest-agreed upon spend plan," the March 2025 spend plan still left $277 million on the "Unallocated" line, meaning the Department was still legally prohibited from obligating all of these funds.

92.     On June 18, 2026, OMB released updated "SF-133 Reports" for federal agencies, including the Department of Education. SF-133 Reports are reports that experts typically reference for data on how much money agencies have obligated each month for various

---

[8] https://perma.cc/8K3U-S6PJ.
[9] https://openomb.org/file/11508577.
[10] https://openomb.org/file/pdf-19afcdb32f27a9ea84bb2bc3b015c6a5. The top spend plan chart is for FY2025/2026 funds expiring on September 30, 2026.

purposes, but the reports also include information about the amount apportioned for each account. The monthly SF-133 Reports are not meant to reveal new apportionments; rather, as described, OMB must disclose new apportionments in its statutorily required apportionment database within two business days of each apportionment.

93.    Nevertheless, the June 2026 SF-133 Report for the Department revealed an apparent new apportionment for FY2025/2026 IES funds that has not been uploaded to OMB's apportionment database. The SF-133 suggests that OMB apportioned roughly $250 million in FY2025/2026 IES funds at some point in May 2026. *See* Fiscal Year 2026 Dep't of Educ. SF-133 for TAFS 091-2025-2026-1100 (row 8759).[11] The SF-133 does not reveal the breakdown in how this amount was apportioned among the different IES programs, nor does it reveal the footnotes attached to the apportionments, both of which would be shown in an actual apportionment uploaded to the apportionment database.

94.    Even if OMB has now belatedly apportioned most or all FY2025/2026 IES funds, the Administration remains on track to fail to spend a sizable portion of these funds, by not obligating them before they expire on September 30, 2026. Per the June 2026 SF-133 Report, as of the end of May 2026, there were still *$316 million* in IES funds expiring on September 30, 2026 that have not been obligated, and for which IES has not publicly indicated any plans to obligate.

*FY2026 Comprehensive Centers Funds*

95.    OMB has not apportioned the vast majority of FY2026 appropriations for the Comprehensive Centers program. On April 9, 2026, OMB apportioned just $500,000 of the $50 million in FY2026 appropriations for the Comprehensive Centers program, leaving $49.5 million

---

[11] https://tinyurl.com/2s3p8t5k.

that the Department legally cannot obligate at present and will expire on September 30, 2026.[12]

96.    Defendants have a track record during this Administration of attempting to cause Comprehensive Centers funds (as well as certain IES funds) to expire unspent.

97.    On February 13, 2025, the Department of Education ceased operating RELs by terminating en masse all of the contracts required to maintain all ten of the statutorily required laboratories. Less than one week later, the Department ceased operating the Comprehensive Centers program almost entirely by terminating en masse the grants required to maintain 18 of the 20 statutorily required centers.

98.    On April 7, 2025, organizations that received Department funds to operate Comprehensive Centers and RELs brought suit challenging the Department's abdication of its statutory responsibility to operate the Comprehensive Centers and RELs by refusing to spend the funds congressionally appropriated to IES. *See Child Trends, Inc. v. U.S. Dep't of Educ.*, No. 8:25-cv-01145 (D. Md.) ("*Child Trends*"), Compl., Dkt. 1 (Apr. 7, 2025).

99.    As of July 9, 2025, when the plaintiffs in that case filed their motion for summary judgment, the Department still had not taken any steps to award new grants and reopen the Comprehensive Centers, even though a substantial amount of unused funds for the program expired on September 30, 2025. *Id.*, Pls.' Memo. in Supp. of Mot. for Summ. J. 7–8, Dkt. 48-1. Nor had the Department taken steps to recompete contracts and restart the RELs, even though a substantial amount of unused funds intended for that program expired on September 30, 2025. *Id.* at 8.

100.    On August 15, 2025, the district court granted the plaintiffs summary judgment, finding that the Department's failure to operate the statutorily required number of Comprehensive Centers and RELs, and refusal to spend the appropriations for these programs,

---

[12] Apr. 9, 2026 School Improvement Programs Apportionment, https://perma.cc/PX4E-P2Q7.

violated the statutes establishing those programs and the Constitution. *Id.*, Memo. Op., Dkt. 61. The Department in turn obligated the funds expiring for these programs in 2025 only under compulsion of a court order.

*FY2026 EIR Funds*

101.    OMB has also continued to withhold the FY2026 funds for the EIR program, which expire on December 31, 2026.[13]

102.    On April 9, 2026, OMB apportioned just $59,235 of the $235 million that Congress appropriated for the EIR program in the 2026 Appropriations Act.[14] OMB apportioned the remaining $234.94 million to an Unallocated line, legally prohibiting the Department from using these funds for their intended purposes. OMB added a legally binding "A" footnote on this line that made this impoundment explicit, stating funds apportioned on the Unallocated line "are available for obligation upon reapportionment to an applicable Category B line." This footnote and the apportionment of funds to Unallocated ensured the Department could not spend the $234.94 million unless and until OMB approves a reapportionment of this account.

*FY2026/2027 IES Funds*

103.    For the $789 million in FY2026/2027 IES funds that Congress appropriated in the 2026 Appropriations Act and that expire on September 30, 2027, OMB made an initial apportionment on February 18, 2026.[15] OMB apportioned $584 million of the funds to the "Unallocated" line and almost all of the rest to the National Assessment of Education Progress. OMB apportioned none of the FY2026/2027 funds to the following line items: Research,

---

[13] Congress appropriated the $235 million for EIR to remain available until December 31, 2026, which means technically, these EIR funds expire in FY2027, since the FY2027 fiscal year begins on October 1, 2026. But for simplicity, these funds are described only as FY2026 EIR funds because they are only available for a single quarter after the end of fiscal year 2026.

[14] Apportionment of Innovation and Improvement, TAFS 091-2026-2027-0204, Apr. 9, 2026, https://perma.cc/PX4E-P2Q7.

[15] https://openomb.org/file/11505291.

Development, and Dissemination; Statewide Data System; Research in Special Education; Special Education Studies; and Regional Educational Laboratories.

104.    OMB failed to apportion funds for these line items even though Congress made the allocations for these line items binding by incorporating the explanatory statement into the bill text for the 2026 Appropriations Act.

***OMB Adds Unlawful Conditions to Apportioned Funds***

105.    OMB has included additional, legally binding "A" footnotes with its IES, Comprehensive Centers, and EIR apportionments, beginning with its May 13, 2025 apportionment, which conditions the use of funds on compliance with policy directives in Executive Orders. On information and belief, prior to March 2025, OMB had never before used an apportionment footnote to impose policy directives unrelated to the authorizing and appropriations laws providing funding in an account.

106.    Specifically, the May 13, 2025 and August 8, 2025 IES apportionments contain a footnote stating: "As permissible by law, amounts apportioned shall be spent in a manner consistent with the directives provided in the following: Executive Order 14151, 'Ending Radical And Wasteful Government DEI Programs And Preferencing.'"[16]

107.    Among other things, Executive Order 14151 seeks to eliminate government programs and grants that, in the Administration's view, promote diversity, equity, inclusion, and accessibility initiatives. 3 C.F.R. 8339 (2025).

108.    The February 27, 2026 IES apportionment contains an updated footnote conditioning the use of IES funds not just on that Executive Order, but on another as well. The updated footnote states that funds must be obligated consistent with Executive Order 14151,

---

[16] *See* May 13, 2025 Apportionment, footnote A3, https://openomb.org/file/11429619; Aug. 8, 2022 Apportionment, footnote A3, https://openomb.org/file/11447667.

"Ending Radical and Wasteful Government DEI Programs And Preferencing," and Executive Order 14332, "Improving Oversight of Federal Grantmaking."[17]

109.    Among other things, Executive Order 14332 directs agencies to embed senior, politically appointed officials into the grantmaking process and to ensure that competitive grants advance the Administration's priorities. 90 Fed. Reg. 38929 (Aug. 12, 2025).

110.    OMB has imposed these conditions on the use of apportioned funds for Comprehensive Centers and the EIR program as well. The April 9, 2026 apportionments allocating only $500,000 to Comprehensive Centers and $59,235 to the EIR Program also included footnotes conditioning the obligation of funds on compliance with Executive Orders 14151 and 14332.

111.    Neither Executive Order has any statutory foundation. Rather, the Executive Orders create requirements that Congress has not authorized. Thus, OMB has imposed substantive conditions on the use of congressionally appropriated funds without congressional authorization.

112.    These conditions not only lack congressional authorization, but they also conflict with some of the statutory requirements governing the IES, Comprehensive Centers, and EIR programs.

113.    For example, the General Education Provisions Act, applicable to the Comprehensive Centers and EIR programs and to each IES program at issue in this case, mandates that the Secretary of Education, with few exceptions, require grant applicants to include information about how the applicants will "ensure equitable access to, and equitable participation in" the relevant project "by addressing the special needs of students, teachers, and

---

[17] *See* Footnote A2 of apportionment, https://openomb.org/file/11508577.

other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age." 20 U.S.C. § 1228a.

114.    Similarly, the Director of IES must propose research priorities "such as … closing the achievement gap between high-performing and low-performing children, especially achievement gaps between minority and nonminority children and between disadvantaged children and such children's more advantaged peers." *Id.* § 9515.

115.    Further, research conducted by NCER's mandatory National Research and Development Centers must, when feasible, "be disaggregated by age, race, gender, and socioeconomic background." *Id.* § 9533(c)(7). NCES is likewise directed to collect and disseminate statistics disaggregated by "gender, race, ethnicity, socioeconomic status, limited English proficiency, mobility, disability, urban, rural, suburban districts, and other population characteristics . . . on the condition and progress of education." *Id.* § 9543(a)(1),(3).

116.    The Executive Order footnotes also conflict with NSCER's duty to evaluate the implementation and effectiveness of IDEA. That statute requires that each state receiving assistance under IDEA "shall provide for the collection and examination of data to determine if significant disproportionality based on race and ethnicity is occurring in the State and the local educational agencies of the State with respect to" certain matters affecting children with disabilities, including the identification of children with disabilities. *Id.* § 1418(d)(1). To that end, NSCER is specifically tasked with examining "the extent to which overidentification and underidentification of children with disabilities occurs, and the causes thereof." *Id.* § 9567b(a)(8).

117.    Similarly, compliance with Executive Order 14332, which requires that "senior appointees"—defined to include only political appointees—play a significant role in competitive

grant determinations, conflicts with requirements under several of the IES programs at issue here that grant determinations be "nonideological" and "free of partisan political influence." *See Id.* §§ 9567b(b)(3), 9541(b)(3).

***Plaintiffs are Harmed by Defendants' Failure to Obligate Funds for IES Programs and the Comprehensive Centers and Defendants' Imposition of Unlawful Spending Restrictions***

118. Through IES programs, the Comprehensive Centers program, and the EIR program, Defendants administer federal funding opportunities for which Plaintiffs and their members compete. Moreover, these programs produce and widely disseminate data, research, technical assistance, and evaluations on which Plaintiffs and their members directly rely.

119. Defendants' failure to timely apportion and obligate funds appropriated for the IES, Comprehensive Centers, and EIR programs harms Plaintiffs and their members in several concrete ways.

120. First, Defendants' actions deprive Plaintiffs and their members of a fair opportunity to compete for congressionally funded grants, contracts, cooperative agreements, and other awards that Congress required or authorized IES and the Department to enter. Plaintiffs and their members need not show that they would necessarily receive any particular award. They are injured by the denial and distortion of the competitive process itself: Defendants have reduced or eliminated the pool of funds available for awards; compressed application timelines; delayed disbursement of funds; or otherwise made it impossible for Plaintiffs and their members to plan for and compete in future IES funding opportunities.

121. Second, Defendants' actions injure Plaintiffs and their members by disrupting their research, technical assistance, policy, advocacy, and programmatic work. Plaintiffs and their members rely on these programs not only as sources of funding, but also as sources of rigorous and independent education data, research syntheses, and evaluations. By withholding

appropriated funds and preventing IES and the Department from carrying out the programs Congress funded, Defendants are degrading and threatening the continued availability of the data and research infrastructure on which Plaintiffs and their members depend.

122. Third, Defendants' actions impose immediate planning, staffing, partnership, and resource-diversion harms.

123. Fourth, Defendants' Executive Order footnotes independently harm Plaintiffs and their members by imposing unlawful, arbitrary, unexplained, and extra-statutory conditions on the use of IES and Comprehensive Centers funds. As a result, Plaintiffs and their members face a distorted and unlawful funding environment in which competitions, continuation awards, contracts, cooperative agreements, data products, research activities, and technical-assistance programs will be denied based on Administration policy preferences rather than the statutes Congress enacted. The footnotes also injure Plaintiffs and their members by creating uncertainty over whether work involving equity, disability, achievement gaps, disaggregated data, or other statutorily relevant subjects will be disfavored; by injecting political-appointee control into competitive grant decisions; and by forcing Plaintiffs and their members to divert resources to assessing, responding to, and attempting to mitigate the risks created by Defendants' unlawful funding conditions.

124. Plaintiff NCLD is harmed by Defendants' failure to apportion and obligate funds for the IES, Comprehensive Centers, and EIR programs. NCLD uses IES-created data, research, and evaluations to craft evidence-based policy briefs, research products and state snapshots that highlight what works for high-need students. For instance, NCLD's signature research products, including *State of Learning Disabilities* reports and *Data Snapshots* integrate impact findings from EIR to illustrate the critical need for evidence-based reading and math interventions rooted

31

in the Science of Reading. NCLD also uses IES data to produce annual white papers focused on issues such as disproportionate educational opportunities for students with learning disabilities; an annual 50-state scan that evaluates the relative success of students with learning disabilities; and actionable guidelines for families and educators regarding the practices and assistive technologies that most effectively improve achievement for individuals with disabilities. NCLD relies on IES data to advocate for better policies, including during its annual "LD Day of Action," when NCLD meets with legislators and staffers to help them understand the particular needs of individuals with learning disabilities and the funding gaps that must be filled in order to address those needs. And while NCLD uses data and evaluations produced by many other IES programs, data from NCSER is especially critical to NCLD's work, as NSCER is uniquely dedicated to research on special education.

125.    NCLD is also harmed because it has had to divert its resources to monitor EIR funding delays and analyze how the delays in awards will impact research data used in NCLD policy, research, and professional development resources for their constituency groups and external stakeholders.

126.    Defendants' withholding of appropriated funds and imposition of unlawful restrictions on funds threatens access to this important data and thus interferes with NCLD's ability to continue carrying out critical research, education, and advocacy activities that support improved education for individuals with learning disabilities. Disability programs have been targeted by this Administration for purportedly promoting diversity, equity, and inclusion. For instance, the Administration already has taken steps to cancel grants that assist individuals with learning disabilities because they seek to address inequities, on grounds that such grants are in conflict with agency policy and priorities. Kara Arundel, *Education Department terminates some*

*grants for deafblind students*, K-12 DIVE, https://perma.cc/D3A9-6VWN; *see also* Lexi Lonas

Cochran, *Children with Disabilities Swept Up in DEI Fight, Advocates Say*, The Hill,

https://perma.cc/KH62-WKVY.

127.    Plaintiff Knowledge Alliance's members are harmed by Defendants' failure to

apportion and obligate funds for the IES, Comprehensive Centers, and EIR programs.

Knowledge Alliance's members rely on IES and Department programs as sources of competitive

funding, research infrastructure, data, evidence standards, and evaluations. Knowledge Alliance's

members would have standing to sue in their own right because they compete for, have received,

and would continue to compete for awards under the IES, Comprehensive Centers, and EIR

programs. Defendants' withholding of appropriated funds and imposition of unlawful restrictions

on funds reduces the number, size, timing, and availability of those awards and deprives

Knowledge Alliance's members of a fair opportunity to compete for congressionally funded

work.

128.    For IES programs, Knowledge Alliance's members previously received awards

funded by Research, Development and Dissemination; Statistics; State Longitudinal Data

Systems; Special Education Research; and the RELs program. One of Knowledge Alliance's

members has successfully competed for, received, and operated at least one research center grant

(funded by Research, Development and Dissemination) each year from 2019 to 2024 and plans

to compete for research center grants for the FY2026 competition cycle and beyond. The same

member has operated a National Research & Development Center and plans to compete for

future Research & Development Center opportunities. Another member has worked with IES

since its founding, serving as a prime contractor on 7 IES contracts and a subcontractor on many

more; this member intends to compete for contracts during the FY2026 competition cycle and

beyond. One member has previously received research grants for Special Education Research and State Longitudinal Data Systems and intends to compete for future opportunities to conduct research under these grant programs. Several Knowledge Alliance members have either operated a REL with direct funds or assisted with REL operations under subagreements and plan to do so again in the future. In fact, all but one of the contractors who compete for REL contracts are Knowledge Alliance members.

129.    For the Comprehensive Centers program, Knowledge Alliance members have successfully competed for and received awards to operate Comprehensive Centers during multiple funding cycles and plan to compete for these awards in FY2026 and beyond. One member has served as a prime contractor and subcontractor for RELs and Comprehensive Centers for four decades, and these programs currently constitute 40–50% of its business base. This member currently serves as the prime for one regional Comprehensive Center and the subcontractor for three other centers and intends to bid in the FY2026 cycle for a prime contract for one regional Comprehensive Center and a subcontractor on three other centers.

130.    For the EIR program, over the last four years at least nine Knowledge Alliance members have been the prime grantee or the evaluator on an EIR grant. For instance, one Knowledge Alliance member competed for and successfully won and operated an EIR grant in all but two years between 2018 and 2025. That member intends to compete again if EIR funds are made available in 2026.

131.    Knowledge Alliance's members are also harmed because they use IES data, research, and evaluations in their own work. Knowledge Alliance's members rely on evidence produced by NCER (the center created specifically to sponsor sustained research on a broad spectrum of education topics) to effectively compete for IES funds and operate programs using

those funds. For instance, programs funded with EIR funds must be "evidence-based" under the EIR statute, and NCER provides all of the evidence necessary to design EIR programs that meet that statutory requirement. Without the data, research, and evaluations produced by IES, Knowledge Alliance members could not do their work at all or would incur substantially greater time and costs to carry out their work. Defendants' withholding of funds thus threatens the continued viability of a host of IES- and EIR-funded programs and the nation's understanding of the state of education and effective means of improving education.

132.    Knowledge Alliance is also injured in its own right. Defendants' actions have forced Knowledge Alliance to divert staff time and organizational resources from its regular membership, policy, and education-research activities to monitor Defendants' apportionments and spending restrictions; assess which funding streams and IES programs are affected; communicate with members about lost or delayed opportunities; collect information about member harms; and respond to uncertainty created by Defendants' refusal to carry out Congress's appropriations. Those diversions impair Knowledge Alliance's ability to perform its core organizational work.

133.    Plaintiff BNP Education Partners LLC is harmed by Defendants' failure to apportion and obligate funds for IES programs and the Comprehensive Centers. BNP Education Partners competes for, receives, and participates in federally funded awards, including IES awards. For example, BNP Education Partners has competed for, received, or intends to compete for, IES and Department awards funded through the Regional Educational Laboratories (REL) program, the Comprehensive Centers program, and opportunities released under the Procurement of Research Evaluation and Statistics Task Orders (PRESTO) multiple-award Indefinite Delivery Indefinite Quantity (IDIQ) contract vehicle. BNP Education Partners previously received awards

35

including as a prime contractor for REL Central from 2017 to 2022, as a major subcontractor in the current REL program, as an ID/IQ holder for PRESTO from 2023 to 2033, and as a prime contractor for two task order contracts from 2024 to 2028. Defendants' withholding of appropriated funds and imposition of unlawful restrictions on funds reduces the number, size, timing, and availability of those awards and deprives BNP Education Partners of a fair opportunity to compete for congressionally funded work.

134. BNP Education Partners also relies on IES data, research, and evidence-based resources in its own work. For example, BNP Education Partners relies on sources such as the NCES Digest of Education Statistics, NCES Reports on the Condition of Education, and NCES topical reports to understand and define the education context and landscape of states with which it works, including such information as the number of schools and colleges, teachers, enrollments, and graduates, in addition to educational attainment, finances, and federal funds for education and libraries, as well as information on population trends, attitudes on education, education characteristics of the labor force, government finances, and economic trends that provides background for evaluating education data and understanding needs. For example, these data help identify where technical assistance services are most needed in a State or region and for which populations of students. BNP Education Partners relies on the What Works Clearinghouse, including the Practice Guides, intervention reports, and reviews of individual studies, as a source for research and data on a given intervention or practice in education and evidence-based recommendations for educators that inform its work in the field with state and local education agencies to identify relevant, evidence-based programs, practices, and interventions; implement these programs, practices and interventions; and monitor and improve. Defendants' withholding of appropriated funds threatens the continued production and availability of those resources and

36

interferes with BNP Education Partners' ability to provide rigorous, evidence-informed services to its education partners.

135.   Defendants' actions further impose planning, staffing, partnership, and resource-diversion harms on BNP Education Partners. BNP Education Partners must decide whether to maintain staff capacity, continue partnerships, and prepare proposals for opportunities that may not be opened, may be delayed, may be competed but not funded, or may be subject to unlawful extra-statutory restrictions. BNP Education Partners has also had to divert staff time from its ordinary research, evaluation, technical-assistance, and proposal-development work to monitor Defendants' funding decisions, assess their effect on BNP Education Partners and its partners, identify alternative sources of funding or data, and respond to the resulting uncertainty.

136.   Plaintiff MTA and its members are harmed by Defendants' failure to apportion and obligate funds for IES programs and the Comprehensive Centers. MTA is injured in its own right, because losing access to IES data, research, and evaluations would impair its ability to carry out its organizational activities. For instance, MTA has used data from NCES's Integrated Postsecondary Education Data System to have wage analyses conducted that compare the salaries of faculty and staff at public colleges and universities at public colleges and universities in Massachusetts with counterparts in other states and at the national level to advocate for higher salaries for faculty and staff at public colleges and universities in Massachusetts.

137.    MTA's members also would have standing to sue in their own right due to a loss of IES data, research, and evaluations. MTA's members rely on MTA's evaluation and use of IES data to improve the settings in which they teach.

138.   Plaintiffs injuries are traceable to Defendants' unlawful actions and would be redressed by the relief Plaintiffs seek. If Defendants are required to apportion and obligate the

funds Congress appropriated, rescind unlawful spending restrictions, and administer IES and Comprehensive Centers programs consistent with law, Plaintiffs and their members will have restored access to the competitive funding opportunities, research infrastructure, data, and evaluations that Congress funded.

139.    The harms described above are ongoing and imminent. Many of the funds at issue expire on September 30, 2026. Unless Defendants are ordered to apportion and obligate those funds consistent with law, the funds will lapse, and Plaintiffs and their members will permanently lose the opportunity to compete for, participate in, and benefit from the awards, research, data, and evaluations Congress funded.

## CLAIMS FOR RELIEF

### COUNT ONE

**ALL RELEVANT FUNDS: FAILURE TO APPORTION**
**APA — AGENCY ACTION CONTRARY TO LAW**
**5 U.S.C. § 706(2)(A)–(C)**
**(Against Defendants OMB, Director Vought, and USA)**

140.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

141.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

142.    OMB has repeatedly failed to apportion the full amounts of FY2025/2026 IES appropriations, FY2026 Comprehensive Centers appropriations, FY2026 EIR appropriations, and FY2026-2027 IES appropriations. For the first three appropriations, OMB has still not

38

apportioned the full amounts of the appropriations even though the funds expire on September 30, 2026 (IES and Comprehensive Centers) and December 31, 2026 (EIR).

143.    For the FY2025/2026 IES funds, the most recent apportionment uploaded to the OMB apportionment database, dated February 27, 2026, kept $289.5 million of these funds apportioned to the Unallocated line. According to the June 2026 SF-133 Report for the Department of Education, OMB apportioned most or all of these remaining funds at some undisclosed point in May 2026, but OMB has not uploaded any such apportionment to its apportionment database.

144.    For the FY2026 Comprehensive Centers funds, OMB's March 24 and April 9, 2026 apportionments apportioned just $500,000 of the $50 million that Congress provided for the Comprehensive Centers in FY2026.

145.    For the FY2026 EIR funds, on April 9, 2026, OMB apportioned just $59,235 of the $235 million that Congress appropriated for the EIR program in the 2026 Appropriations Act,[18] placing the remaining $234.94 million on an Unallocated line.

146.    For the FY2026/2027 IES funds, on February 18, 2026, OMB apportioned only a small fraction of the funds for usable purposes, apportioning $584 million to Unallocated.

147.    OMB's apportionments of the FY2025/2026 IES funds, the FY2026/2027 IES funds, and the FY2026 Comprehensive Centers funds also violate the Anti-Deficiency Act by unlawfully establishing reserves for policy reasons not permitted by the Act. *See* 31 U.S.C. § 1512(c)(1). In general, OMB has no authority to apportion appropriated funds to an "Unallocated" line except for one of the three permissible reasons for establishing a reserve under 31 U.S.C. § 1512(c)(1).

---

[18] Apr. 9, 2026, Innovation and Improvement, https://openomb.org/file/11515513.

39

148.    OMB's apportionments of the FY2025/2026 IES funds, the FY2026 Comprehensive Centers funds, the FY2026 EIR funds, and the FY2026/2027 IES funds violate the Anti-Deficiency Act in numerous ways.

149.    First, OMB violated the Anti-Deficiency Act by failing to apportion the funds within "30 days after the date of enactment of the law by which the appropriation is made available." 31 U.S.C. § 1513(b)(2)(B). OMB did not apportion the FY2025/2026 IES funds at all until 60 days following the 2025 Continuing Resolution that appropriated the funds, and for all the relevant appropriations OMB did not apportion the full amount of funds within 30 days as required.

150.    Second, OMB's repeated apportionments of the relevant funds to "Unallocated" violate the Anti-Deficiency Act. Apportioning money to Unallocated is the same as not apportioning the money at all, because an apportionment to Unallocated legally prohibits IES from using the funds for any purpose. The Anti-Deficiency Act does not permit OMB to use apportionments to indefinitely prohibit an agency from spending a fixed-duration appropriation.

151.    Third, OMB's designating portions of the relevant funds as Unallocated violates the Anti-Deficiency Act by unlawfully establishing a reserve for policy reasons not permitted by the Act. *See* 31 U.S.C. § 1512(c)(1). In general, OMB has no authority to apportion appropriated funds to an "Unallocated" line except for one of the three permissible reasons for establishing a reserve under 31 U.S.C. § 1512(c)(1).

152.    Fourth, OMB's apportionments of the relevant funds violate the Anti-Deficiency Act by apportioning amounts based on policy considerations, rather than "prevent[ing] obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." 31 U.S.C. § 1512(a).

40

153. OMB's apportionments also violate the 2025 Continuing Resolution and the 2026 Appropriations Act in preventing the timely obligation of the FY2025/2026 IES funds, the FY2026 Comprehensive Centers funds, and the FY2026 EIR funds before those funds expire on September 30, 2026 and December 31, 2026. The 2025 Continuing Resolution and the 2026 Appropriations Act appropriated fixed sums of money for IES programs, the Comprehensive Centers program, and the EIR program, and Congress did not provide discretion in the statutory text for the Department to obligate less than the amounts appropriated. "[I]t is black letter appropriation law that, absent an express indication to the contrary, an appropriation is a mandate that the Executive Branch spend the full amount appropriated by Congress for a particular project or program." *Child Trends, Inc. v. U.S. Dep't of Educ.*, 795 F. Supp. 3d 700, 721 (D. Md. 2025) (citation omitted); *see In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). OMB's apportionments, which are for less than the full amounts congressionally appropriated, legally prohibit the Department of Education from obligating the full amounts of FY2025/2026 IES funds, FY2026 Comprehensive Centers funds, and FY2026 EIR funds, in violation of the 2025 Continuing Resolution and the 2026 Appropriations Act.

154. OMB has additionally violated the 2026 Appropriations Act in apportioning FY2026/2027 IES funds in a manner not consistent with the allocations across IES programs set forth in the explanatory statement appended to the 2026 Appropriations Act. The 2026 Appropriations Act incorporated by reference the allocations in the IES table in the explanatory statement, providing that the use of IES funds "shall be for the purposes and in the amounts specified in the 'Final Bill' column for Institute of Education Sciences in the … table in the explanatory statement." 140 Stat. 306. OMB's apportionment of the FY2026/2027 IES funds violates this legislative mandate by not allocating the funds consistent with that column.

155.    OMB's apportionments of the FY2025/2026 IES funds, the FY2026 Comprehensive Centers funds, and the FY2026 EIR funds, also violate the constitutional separation of powers by unlawfully preventing the obligation and expenditure of funds in derogation of Congress' power of the purse and without constitutional authority. The Constitution vests lawmaking power in Congress, including exclusive power over federal spending. The Executive Branch lacks inherent constitutional power to ignore statutory mandates and decline to spend funds that Congress has appropriated. By refusing to apportion these funds to the Department, OMB has contravened and usurped Congress' power of the purse, in violation of the constitutional separation of powers.

**COUNT TWO**

**ALL RELEVANT FUNDS: FAILURE TO APPORTION**
**APA — AGENCY ACTION UNLAWFULLY WITHHELD OR**
**UNREASONABLY DELAYED**
**5 U.S.C. § 706(1)**
**(Against Defendants OMB, Director Vought, and USA)**

156.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

157.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

158.    OMB has a mandatory duty to apportion funds within 30 days of the enactment of the relevant appropriations laws appropriating the funds. 31 U.S.C. § 1513(b)(2)(B).

159.    OMB has not complied with this mandatory duty. It did not apportion all of the FY2025/2026 IES funds, the FY2026 Comprehensive Centers funds, the FY2026 EIR funds, and the FY2026/2027 IES funds within 30 days of the 2025 Continuing Resolution and the 2026 Appropriations Act, as applicable.

160. Even when OMB has belatedly apportioned the funds, it apportioned substantial amounts to "Unallocated," which is not apportioning the money at all.

161. OMB therefore has unlawfully withheld the apportionment of funds.

162. In the alternative, OMB's failure to apportion the relevant appropriations constitutes agency action unreasonably delayed.

## COUNT THREE

### ALL RELEVANT FUNDS: APPORTIONMENT EO FOOTNOTES
### APA — AGENCY ACTION CONTRARY TO LAW
### 5 U.S.C. § 706(2)(A)–(C)
### (Against Defendants OMB, Director Vought, and USA)

163. Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

164. The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

165. The footnotes that OMB included in its apportionments of the FY2025/2026 IES funds, the FY2026 Comprehensive Centers funds, the FY2026 EIR funds, and the FY2026/2027 IES funds that require the Department to use the funds "in a manner consistent with the directives provided in" Executive Order 14151, "Ending Radical and Wasteful Government DEI Programs And Preferencing," and/or Executive Order 14332, "Improving Oversight of Federal Grantmaking," are contrary to law and in excess of statutory authority.

166. The Executive Order footnotes are contrary to, and in excess of OMB's authority under, the Anti-Deficiency Act, because the imposition of these non-statutory conditions have nothing to do with preventing the need for a deficiency or supplemental appropriation.

43

167.    The Executive Order footnotes are also contrary to Congress's requirements for Department of Education grant programs and contrary to relevant authorizing statutes. Several statutes applicable to Department of Education grants generally and the particular programs at issue here specifically require the Department to consider how grant programs will promote equity, including racial and economic equity, in direct conflict with the requirements of Executive Order 14151. Those include, but are not limited to, provisions of the General Education Provisions Act that require the Department to promote equity (e.g., 20 U.S.C. § 1228a), and other provisions applicable to the IES programs that require consideration of racial factors or other considerations that Defendants may deem relate to diversity, equity or inclusion (e.g., 20 U.S.C. §§ 9533(c)(7), 9543(a)(1)–(3), 9515). Similarly, compliance with Executive Order 14332, which requires that "senior appointees"—defined to include only political appointees—play a significant role in competitive grant determinations, conflicts with requirements under several of the IES programs at issue here that grant determinations be "nonideological" and "free of partisan political influence." *See* 20 U.S.C. §§ 9541(b)(3), 9567b(b)(3).

168.    OMB's inclusion of the Executive Order footnotes also violates the separation of powers and the Spending Clause. The Constitution empowers Congress to make laws, U.S. Const. art. I, § 1, and requires the President to faithfully execute those laws, *id.* art. II, § 3. The President lacks the unilateral authority to modify or amend duly enacted Legislation. Moreover, the Spending Clause of the Constitution vests the power of the purse exclusively with Congress, and that power includes the exclusive authority to attach conditions to the expenditure of federal funds.

169. Congress has created the IES, Comprehensive Centers, and EIR programs for specified purposes and has consistently appropriated funds for these programs. Nothing in those laws authorizes the Executive Branch to impose conditions on that funding that Congress did not impose, including conditions intended to advance the President's unrelated policy goals.

170. OMB's imposition of restrictions on the Department's use of appropriated funds violates the separation of powers and the Spending Clause in infringing on Congress's legislative authority and power of the purse, in failing to faithfully execute Congress's laws, and in attempting to amend, modify, or partially veto duly enacted legislation.

**COUNT FOUR**

**ALL RELEVANT FUNDS: APPORTIONMENT EO FOOTNOTES**
**APA — ARBITRARY AND CAPRICIOUS AGENCY ACTION**
**5 U.S.C. § 706(2)(A)**
**(Against Defendants OMB, Director Vought, and USA)**

171. Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

172. The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

173. The Executive Order footnotes that OMB included in the apportionments for the FY2025/2026 IES funds, the FY2026 Comprehensive Centers funds, the FY2026 EIR funds, and the FY2026/2027 IES funds constitute arbitrary and capricious agency actions.

174. The Executive Order footnotes are arbitrary and capricious because, among other things, OMB has not provided a reasoned explanation for its inclusion of the Executive Order footnotes. OMB failed to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle*

45

*Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). OMB provided no explanation for including these Executive Order footnotes at all, much less a satisfactory explanation for why and how the Executive Order should apply to these specific funds given the statutory purposes and mandates of the underlying programs.

175.    OMB's action is also arbitrary and capricious because it is substantively unreasonable. *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.) (distinguishing between claims that agency action "was substantively unreasonable" and claims that "the agency has failed to adequately address all of the relevant factors or to adequately explain its [decision]").

176.    OMB's action is also arbitrary and capricious because it relied on factors which Congress has not intended it to consider, failed to consider an important aspect of the problem, and offered an explanation for its decision that runs counter to the evidence before the agency. OMB failed to consider, however, how the Department could fulfil its mandates under the relevant statutory programs, some of which require consideration of equity and diversity or prohibit partisan influence.

**COUNT FIVE**

**FY2025/2026 IES FUNDS: NON-DISCLOSURE OF APPORTIONMENT**
**APA — AGENCY ACTION CONTRARY TO LAW AND UNLAWFULLY WITHHELD**
**5 U.S.C. §§ 706(1), 706(2)(A), (C)**
**(Against Defendants OMB, Director Vought, and USA)**

177.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

178.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short

of statutory right." 5 U.S.C. § 706(2)(A)–(C). The APA further provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

179.    The June 2026 SF-133 Report for the Department of Education suggests that, at some point in May 2026, OMB apportioned an additional $250 million in FY2025/2026 IES funds to the Department.

180.    To the extent such an apportionment occurred in May 2026, or any other apportionments have occurred or will occur, without being uploaded to OMB's public apportionment database within two business days of the apportionment, OMB's actions violate the disclosure requirements of the 2022 and 2023 Appropriations Acts, codified at 31 U.S.C. § 1513 note. If apportionments occurred via updated or newly agreed-upon spend plans between OMB and the Department of Education, OMB has violated the disclosure requirements of the 2022 and 2023 Appropriations Acts by not uploading the spend plans to OMB's public apportionment database within two business days.

### COUNT SIX

**POLICY OF APPORTIONING DEPARTMENT OF EDUCATION FUNDS TO UNALLOCATED LINES**
**APA — AGENCY ACTION CONTRARY TO LAW**
**5 U.S.C. § 706(2)(A)–(C)**
**(Against Defendants OMB, Director Vought, and USA)**

181.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

182.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

47

183.    OMB's apportionments of IES, Comprehensive Centers, and EIR funds reflects a broader policy that OMB has adopted of apportioning Department of Education appropriations to "Unallocated" lines when OMB has policy objections to the Department programs that Congress has chosen to fund or the amounts that Congress has appropriated for Department programs.

184.    OMB's policy violates the Anti-Deficiency Act in two ways. First, the policy violates the Act's requirements for when OMB must apportion the full amount of appropriated funds following the enactment of an appropriations act. *See* 31 U.S.C. § 1513. Second, the policy provides for the creation of reserves for reasons not permissible under the Anti-Deficiency Act. *Id.* § 1512(c).

185.    OMB's policy of apportioning appropriations to Unallocated lines for programs that OMB disfavors also violates the constitutional separation of powers. Under the Constitution, Congress maintains the exclusive power of the purse, and the Executive Branch may not refuse to carry out Congress' spending commands for policy reasons.

## COUNT SEVEN

### FY2025/2026 AND FY2026/2027 IES FUNDS: FAILURE TO APPORTION AND OBLIGATE CONSISTENT WITH EXPLANATORY STATEMENT
### APA — ARBITRARY AND CAPRICIOUS AGENCY ACTION:
### 5 U.S.C. § 706(2)(A)
### (Against All Defendants)

186.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

187.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

188.    Defendants have long maintained a policy of apportioning and obligating IES funds in a manner generally consistent with the explanatory statements accompanying

48

appropriations acts, even where those explanatory statements were not legally binding because they were not incorporated by reference into the bill text.

189.    With respect to the FY2025/2026 and FY2026/2027 funds, Defendants have changed the policy and made final decisions not to apportion and obligate IES funds in accordance with the relevant explanatory statements, as made clear by the spending plans agreed-upon by the Department and OMB and the apportionments from OMB.

190.    Defendants' change in policies constitutes final agency action reviewable under 5 U.S.C. § 704.

191.    Defendants' actions are arbitrary and capricious because, among other things, they have not provided a reasoned explanation for the new policy. They failed to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com.*, 588 U.S. at 773 (quoting *State Farm*, 463 U.S. at 43).

192.    Defendants' actions are also arbitrary and capricious because they are substantively unreasonable. *Multicultural Media*, 873 F.3d at 936.

193.    The allocations in the relevant explanatory statements reflect Congress's judgment as to the required spending levels for each IES program to fulfill the purposes and mandates of each program as set forth in their respective authorizing statutes. Defendants have not considered these congressional judgments, or explained their departures from them, and it is substantively unreasonable for Defendants to refuse to allocate sufficient funds necessary to carry out particular statutory programs, such as those in special education.

194.    Defendants' actions are also arbitrary and capricious because Defendants relied on factors that Congress has not intended them to consider, failed to consider an important aspect

of the problem, and offered an explanation for its decision that runs counter to the evidence before the agencies. For instance, Defendants failed to consider how the Department would fulfill the purposes and mandates of each statutory IES program under the funding levels reflected in the agreed-upon spend plans and OMB apportionments.

195.    Defendants' actions are also arbitrary and capricious because Defendants did not acknowledge that they were changing policies, *see FCC v. Fox Television Stations*, 566 U.S. 502 (2009), and because they failed to consider the reliance interests of relevant stakeholders, including applicants for IES funds, recipients of IES funds and their subrecipients, and the students, teachers, and communities impacted. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quotation and citations omitted)).

## COUNT EIGHT

**FY2025/2026 IES, FY2026 COMPREHENSIVE CENTERS, AND 2026 EIR FUNDS:
FAILURE TO OBLIGATE BEFORE EXPIRATION
APA — AGENCY ACTION UNLAWFULLY WITHHELD OR
UNREASONABLY DELAYED**:
**5 U.S.C. § 706(1)**
**(Against All Defendants)**

196.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

197.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

198.    The Department has mandatory duties to obligate the full amount of FY2025/2026 IES appropriations, FY2026 Comprehensive Centers appropriations, and FY2026

50

EIR appropriations before those funds expire on September 30, 2026 (for IES and Comprehensive Centers) and December 31, 2026 (for EIR).

199.    As of this filing, just three months before the funds expire, the Department has obligated just $476 million of the $768 million in FY2025/2026 IES funds and just $442,000 of the $50 million in FY2026 Comprehensive Centers funds. For EIR, the Department has obligated just $59,235 of the $235 million in appropriations that expire on December 31, 2026.

200.    Moreover, the Department legally cannot obligate the full amounts of these appropriations because OMB has not apportioned the full amount, and, for IES, because the spend plans that the Department and OMB agreed upon do not permit the Department to obligate the full amounts.

201.    Defendants have unlawfully withheld the obligation of FY2025/2026 IES, FY2026 Comprehensive Centers, and FY2026 EIR appropriations.

202.    In the alternative, OMB's failure to obligate these appropriations constitutes agency action unreasonably delayed.

**COUNT NINE**

**FY2025/2026 IES, FY2026 COMPREHENSIVE CENTERS, AND 2026 EIR FUNDS:
FAILURE TO OBLIGATE BEFORE EXPIRATION
APA — AGENCY ACTION CONTRARY TO LAW
5 U.S.C. § 706(2)(A)–(C)
(Against All Defendants)**

203.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

204.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

51

205.    Defendants have adopted policies and taken final agency actions to not obligate the full amounts of FY2025/2026 IES, FY2026 Comprehensive Centers, and FY2026 EIR appropriations before they each expire in 2026.

206.    These actions and policies are contrary to the 2025 Continuing Resolution and the 2026 Appropriations Act.

207.    The 2025 Continuing Resolution and the 2026 Appropriations Act appropriated fixed sums of money for the IES, Comprehensive Centers, and EIR program, and Congress did not provide discretion in the statutory text for the Department to spend less than the amounts appropriated. "[I]t is black letter appropriation law that, absent an express indication to the contrary, an appropriation is a mandate that the Executive Branch spend 'the full amount appropriated by Congress for a particular project or program.'" *Child Trends*, 795 F. Supp. 3d at 721 (quoting *Aiken County*, 725 F.3d at 261 n.1).

208.    The Department's and OMB's agreeing to spend plans for the FY2025/2026 appropriations constitute final agency actions. Each agency's agreeing to a spend plan that prohibits the Department from obligating the full amount of FY2025/2026 IES funds appropriated violates the 2025 Continuing Resolution.

209.    The spend plan for FY2025/2026 IES funds also reflects a policy that Defendants have adopted to not obligate the full amount of these funds before they expire.

210.    Indeed, Defendants have submitted budget requests to Congress to substantially lower appropriations for IES programs, but Congress rejected almost all of those requests. The spend plans reflect Defendants' decision to unilaterally implement their proposal by refusing to obligate large portions of IES appropriations in violation of the 2025 Continuation Resolution.

52

211.    Defendants have also made a final decision and adopted a policy to not obligate the full amount of FY2026 Comprehensive Centers appropriations, which expire on September 30, 2026. In FY2025, a federal court found that the Department violated the 2025 Continuing Resolution in refusing to obligate FY2025 Comprehensive Centers funds before they were set to expire in September 2025, *Child Trends*, 795 F. Supp. 3d at 720–22, and Defendants are now committing the same legal violation for the FY2026 Comprehensive Centers funds.

212.    Indeed, Defendants' FY2026 budget request for the Comprehensive Centers program was $0, and Defendants justified this request on the ground that "States and localities, not the Federal government, are best suited to determine whether to support the activities authorized under this program or similar activities within their own budgets and without unnecessary administrative burden imposed by the Federal government."[19] With Congress having rejected this request, Defendants are unilaterally implementing their proposal by refusing to obligate all or nearly all Comprehensive Centers appropriations, in violation of the 2026 Appropriations Act.[20]

213.    Defendants have also made a final decision and adopted a policy to not obligate the full amount of FY2026 EIR appropriations, which expire on December 31, 2026. Defendants' FY2026 budget request for the EIR program was $0, with Defendants explaining that "[e]limination of this program is part of the Administration's overall effort to restore fiscal discipline and reduce the Federal role in education."[21] With Congress having rejected this

---

[19] U.S. Department of Education, *Fiscal Year 2026 Budget Summary* at 15 (June 4, 2025), https://perma.cc/7XRM-F37A.

[20] The Department of Education did release a notice of funding opportunity for Comprehensive Center grants in May 2026. *See* 92 Fed. Reg. 27038 (May 12, 2026). However, that funding opportunity does not commit the Department to awarding grants and obligating funds, and the Department cannot do so under the current apportionment from OMB.

[21] *Id.* at 9.

request, Defendants are unilaterally implementing their proposal by refusing to obligate all or nearly all Comprehensive Centers appropriations, in violation of the 2026 Appropriations Act.

214.    Defendants' decisions to not spend substantial amounts of IES, Comprehensive Centers, and EIR appropriations also violate the constitutional separation of powers by vitiating Congress' power of the purse and control over agency spending.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.    Declare unlawful and set aside OMB's decisions to not timely apportion the full amount of FY2025/2026 IES appropriations, FY2026 Comprehensive Centers appropriations, FY2026 EIR appropriations, and FY2026/2027 IES appropriations.

B.    Compel OMB to immediately apportion the full amount of FY2025/2026 IES appropriations, FY2026 Comprehensive Centers appropriations, FY2026 EIR appropriations, and FY2026/2027 IES appropriations for substantive purposes and not to an Unallocated line.

C.    Declare unlawful and set aside OMB's decision to not publicly disclose its apportionment of IES funds in May 2026 in the OMB apportionment database.

D.    Compel OMB to publicly disclose its apportionment of IES funds in May 2026 in the OMB apportionment database.

E.    Declare unlawful and set aside OMB's policy of apportioning Department of Education funds for programs that OMB disfavors to Unallocated lines.

F.    Declare unlawful and set aside Defendants' agreement upon spend plans that preclude the Department from obligating the full amount of FY2025/2026 IES appropriations, and Defendants' decisions not to obligate the full amount of FY2025/2026 IES appropriations and FY2026 Comprehensive Centers appropriations before those funds expire on September 30,

54

2026, and the full amount of FY2026 EIR appropriations before they expire on December 31, 2026.

G.      Compel Defendants to obligate the full amount of FY2025/2026 IES, FY2026 Comprehensive Centers, and FY2026 EIR appropriation before they each expire in 2026.

H.      Declare unlawful and set aside OMB's inclusion of footnotes in the relevant apportionments mandating that the Department comply with Executives Order 14151 and/or Executive Order 14332 in obligating and otherwise utilizing the FY2025/2026 IES, FY2026 Comprehensive Centers, FY2026 EIR, and and FY2026/2027 IES appropriations.

I.      Declare unlawful and set aside Defendants' decision not to apportion or obligate FY2025/2026 IES appropriations and FY2026/2027 IES appropriations in accordance with the allocations in the explanatory statements for these funds.

J.      Issue preliminary and permanent relief, including but not limited to injunctive relief: (1) ordering Defendants to apportion the full amounts of the relevant appropriations for use for substantive purposes; (2) requiring Defendants to obligate the full amount of FY2025/2026 IES appropriations FY2026 Comprehensive Centers appropriations by September 30, 2026; (3) prohibiting operation or enforcement of the apportionment footnotes requiring compliance with Executives Order 14151 and/or Executive Order 14332 for the relevant funds; (4) barring OMB from apportioning Department of Education funds to Unallocated lines for policy reasons; (5) requiring the apportionment and obligation of FY2025/2026 IES appropriations and FY2026/2027 IES appropriations in accordance with the allocations in the explanatory statements for these funds; and (6) prohibiting Defendants from taking the same or similar actions with respect to the same funds in the future.

K.      Award Plaintiffs reasonable costs and attorneys' fees; and

55

L.    Grant any other relief that the Court deems fit and proper.


June 30, 2026                                        Respectfully submitted,

                                                    */s/ Benjamin L. Berwick*
                                                    Benjamin L. Berwick (MA Bar No. 679207)
                                                    15 Main Street, Suite 312
                                                    Watertown, MA 02472
                                                    Tel.: (202) 579-4582
                                                    ben.berwick@protectdemocracy.org

                                                    Cerin Lindgrensavage*
                                                    Jacek Pruski*
                                                    2020 Pennsylvania Ave. NW, Suite # 163
                                                    Washington DC 20006
                                                    Tel.: (202) 579-4582
                                                    cerin.lindgrensavage@protectdemocracy.org
                                                    jacek.pruski@protectdemocracy.org

                                                    Daniel F. Jacobson*
                                                    Lynn D. Eisenberg*
                                                    Stephen Wirth*
                                                    Kyla M. Snow*
                                                    JACOBSON LAWYERS GROUP PLLC
                                                    5100 Wisconsin Avenue NW, Suite 301
                                                    Washington, DC 20016
                                                    (301) 823-1148
                                                    Dan@jacobsonlawyersgroup.com

                                                    *Counsel for Plaintiffs*


                                                    Alice O'Brien*
                                                    Marissa Marandola (BBO #705609)
                                                    National Education Association
                                                    1201 16th Street NW
                                                    Washington, DC 20036
                                                    (202) 822-7035
                                                    aobrien@nea.org
                                                    mmarandola@nea.org

                                                    Ryan Leach (BBO # 706159)
                                                    Massachusetts Teachers Association
                                                    2 Heritage Drive, 8th Floor

56

Quincy, MA 02178
(617) 504-8774
rleach@massteacher.org

*Counsel for Plaintiff MTA*


\* Pro hac vice application forthcoming