**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| NATIONAL CENTER FOR LEARNING DISABILITIES, *et al.*,<br><br>　　　　　*Plaintiffs*,<br><br>　　v.<br><br>OFFICE OF MANAGEMENT AND BUDGET, *et al.*,<br><br>　　　　　*Defendants*. | Case No. 1:26-cv-13019 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

I. Congress Creates and Assigns Mandatory Duties to IES.............................................2

    A. National Center for Education Research...............................................................3

    B. National Center for Education Statistics .............................................................3

    C. National Center for Special Education Research ................................................4

    D. Regional Educational Laboratories......................................................................4

    E. Special Education Studies and Evaluation ...........................................................4

    F. Comprehensive Centers........................................................................................5

    G. Education Innovation and Research Program.......................................................5

II. Congress Funds IES, Comprehensive Centers, and EIR Activities ............................6

    A. IES Appropriations ..............................................................................................6

    B. Comprehensive Centers Appropriations .............................................................7

    C. EIR Appropriations .............................................................................................8

III. OMB Must Apportion Funds for the Department to Use Them. ................................8

IV. OMB Has Delayed Apportioning or Failed to Apportion the Relevant Funds .................10

    A. FY2025/2026 IES Funds...................................................................................10

    B. FY2026 Comprehensive Centers Funds............................................................13

    C. FY2026 EIR Funds............................................................................................13

    D. FY2026/2027 IES Funds...................................................................................13

V. OMB Adds Unlawful Conditions to Apportioned Funds. .........................................14

VI. Plaintiffs Compete for the Relevant Funds or Rely on the Programs Being Funded ........15

ARGUMENT.......................................................................................................................15

I. OMB's Failure to Timely Apportion the Relevant Funds Violates the APA.......................15

    A. OMB's Failures to Apportion Funds Are Actionable under the APA..........................16

    B. OMB's Failures to Apportion Funds Are Contrary to Law .........................................18

        1. The Comprehensive Centers and IES Funds ............................................18

        2. The FY2026 EIR Funds and FY2025/2026 IES Funds .............................19

II. OMB is Unlawfully Imposing Extra-Statutory Conditions Through Footnotes.................21

    A.  The Executive Order Footnotes Exceed Statutory Authority and Violate the
        Separation of Powers ...............................................................................22

B. The Executive Order Footnotes Are Arbitrary and Capricious.....................................25

III. OMB Has Failed to Publicly Disclose Apportionments as Required by Statute...............25

IV. OMB's Policy of Designating Department Funds As Unallocated Is Unlawful...............26

V. OMB's Failures to Comply with the Explanatory Statements Violate the APA.................28

VI. OMB Is Unlawfully Withholding or Unreasonably Delaying Obligating Funds..............30

VII. The Court Should Enter a Permanent Injunction In Addition to Other Relief.................32

CONCLUSION........................................................................................................................35

## TABLE OF AUTHORITIES

**Cases**

*AGMA Sec. Serv., Inc. v. United States*,
   152 Fed. Cl. 706 (2021) ........................................................................... 32

*Child Trends, Inc. v. U.S. Dep't of Educ.*,
   795 F. Supp. 3d 700 (D. Md. 2025) .......................................... 30, 31, 35

*Citizens for Resp. & Ethics in Washington v. OMB*,
   791 F. Supp. 3d 29 (D.D.C. 2025) .............................................................. 9

*City & Cnty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ................................................................... 24

*City of Chicago v. Barr*,
   961 F.3d 882 (7th Cir. 2020) ..................................................................... 24

*City of Chicago v. Dep't of Just.*,
   822 F. Supp. 3d 873 (N.D. Ill. 2026) .................................................. 24, 28

*City of New Haven v. United States*,
   809 F.2d 900 (D.C. Cir. 1987) ...................................................... 9, 18, 22

*City of Providence v. Barr*,
   954 F.3d 23 (1st Cir. 2020) ....................................................................... 22

*Cnty. of Santa Clara v. Noem*,
   815 F. Supp. 3d 979 (N.D. Cal. 2025) ...................................................... 24

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
   143 F.4th 518 (D.C. Cir. 2025) ................................................................. 20

*Glob. Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025) ..................................................................... 32

*Hous. Auth. of City & Cnty. of San Francisco v. Turner*,
   2025 WL 3187761 (N.D. Cal. Nov. 14, 2025) ........................................... 24

*In re Aiken Cnty.*, 725 F.3d 255
   (D.C. Cir. 2013) ......................................................................................... 30

*Martin Luther King, Jr. Cnty. v. Turner*,
   785 F. Supp. 3d 863 (W.D. Wash. 2025) .................................................. 25

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................................... 25

*New York v. Trump*,
   171 F.4th 1 (1st Cir. 2026) .................................................................. 20, 35

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................... 35

*Norton v. Southern Utah Wilderness Alliance,*
  542 U.S. 55 (2004) .................................................................................................... 35

*Oxfam Am., Inc. v. United States Sec. & Exch. Comm'n,*
  126 F. Supp. 3d 168 (D. Mass. 2015) ......................................................................... 18

*Rhode Island v. Trump,*
  155 F.4th 35 (1st Cir. 2025) ....................................................................................... 35

*Super Tire Engineering Co. v. McCorkle,*
  416 U.S. 115 (1974) .................................................................................................... 21

*U.S. Dep't of Navy v. FLRA,*
  665 F.3d 1339 (D.C. Cir. 2012) .................................................................................. 25

*W. Virginia v. EPA,*
  597 U.S. 697 (2022) .................................................................................................... 23

*Washington v. Trump,*
  766 F. Supp. 3d 1138 (W.D. Wash. 2025) .................................................................. 25

*Woonasquatucket River Watershed Council v. USDA,*
  No. 25-1428, 2026 WL 2279789 (1st Cir. Aug. 7, 2026) ........................................... 34

**Statutes**

5 U.S.C.
  § 706(1) ....................................................................................................................... 19
  § 706(2) .................................................................................................................. 18, 24

20 U.S.C.
  § 1228a ........................................................................................................................ 25
  § 1418(d)(1)................................................................................................................. 26
  § 1464(a) ........................................................................................................................ 3
  § 7261(a)(1)(A) .............................................................................................................. 4
  § 7261(c)(1)..................................................................................................................... 4
  § 9511(b)(2)................................................................................................................ 1, 2
  § 9515 .......................................................................................................................... 26
  § 9533(c)................................................................................................................... 1, 26
  § 9541(b) .................................................................................................................. 2, 26
  § 9543(a)(1),(3) ............................................................................................................ 26
  § 9545(b) ........................................................................................................................ 2
  § 9564(a) ........................................................................................................................ 3
  §§ 9564(f), (g) ................................................................................................................ 3
  § 9567........................................................................................................................ 2, 26
  § 9567b....................................................................................................................... 2, 26
  § 9567b(b)(3)............................................................................................................. 2, 26
  § 9602(a)(1)..................................................................................................................... 3
  § 9602(e) ......................................................................................................................... 4
  § 9607(a) ......................................................................................................................... 2

31 U.S.C.
§ 1341(a)(1)(A)–(B) ................................................................................................. 8
§ 1512 ................................................................................................ 8, 9, 18, 24, 25
§ 1513 ........................................................................................................... *passim*
§ 1517(a) ............................................................................................................ 9, 24
§ 1518 .................................................................................................................... 9

**Other Authorities**

Comptroller General of the United States, B163628, at 2 (Jan. 4, 1974) ..................................... 27

Executive Order 14151, "Ending Radical And Wasteful Government DEI Programs" ........ *passim*

Executive Order 14332, "Improving Oversight of Federal Grantmaking" ................. 12, 16, 24, 26

GAO, *Principles of Federal Appropriations Law* (3d ed. 2006) ............................................ 18, 20

**INTRODUCTION**

Plaintiffs bring this motion for summary judgment to bring a stop to the Executive Branch's usurpation of Congress's exclusive power to set the terms for federal educational research spending. For decades, Congress has chosen to provide significant sums of money each year to the Department of Education, and in particular its Institute of Education Sciences (IES), to carry out a vast range of educational research programs. These programs benefit students nationwide, with a special focus on the most vulnerable children in our nation's schools, including those with disabilities or from high-poverty areas.

The current Administration disfavors many of these statutory programs. It has repeatedly asked Congress to eliminate or substantially reduce them, arguing that the spending is too wasteful, or the programs are too woke, or that this work should simply be left to the states. But Congress has not abided. Unable to succeed through the constitutional means of altering statutory commands, Defendants have resorted to unlawful administrative machinations.

Most significantly, the Office of Management and Budget (OMB) has misused the apportionment process to wrest control of education research spending from Congress. Under the Anti-Deficiency Act, OMB must "apportion" appropriations to agencies for them to spend the funds, and OMB has refused to timely apportion hundreds of millions of dollars of education research funds. OMB has done so largely through a new policy of issuing apportionments to the Department of Education that designate large sums as "Unallocated," which legally prohibits the Department from using the funds for any purpose. OMB has maintained this stranglehold on appropriations for months or even years after Congress appropriated the funds, and OMB continues to hold back money in this way for one of the programs at issue here, the Comprehensive Centers, for which funds expire on September 30.

1

Where OMB has permitted the Department to actually use its funds, OMB has used its apportionment powers to unilaterally control the substance of the spending, in ways that Congress has not authorized. OMB has issued "footnotes" with its apportionments of education research footnotes that prohibit the Department from using the funds for purported "DEI" activities, and that require the Department to give political appointees unprecedented control of selecting which organizations will receive awards and for what purposes. Nothing in the Anti-Deficiency Act gives OMB authority to leverage apportionments to usurp Congress's role in dictating the terms of federal spending.

The Department of Education has been a willing participant in this effort to derail education research spending. The Department has delayed obligating, or even taking interim steps toward obligating, hundreds of millions of dollars in education research funds that will expire in less than two months. The Department's delay is historically anomalous—its current rate of obligating IES funds for programming is well below anything seen in prior years. Now, the money is at severe risk of expiring unspent, in defiance of Congress's spending commands.

Defendants' actions violate myriad laws, including the Anti-Deficiency Act and the Administrative Procedure Act, and they strike at the core of the Constitution's allocation of powers among the branches. The Court should enter summary judgment for Plaintiffs.

## BACKGROUND

### I.    Congress Creates and Assigns Mandatory Duties to IES.

Congress created IES to serve as the statistics, research, and evaluation arm of the U.S. Department of Education. *See* Education Sciences Reform Act of 2002 (ESRA), Pub. L. 107-279, 116 Stat. 1941, as amended by Pub. L. 117-286 (2022). IES must carry out its mission by compiling statistics, performing research, and conducting evaluations that support the development of widely disseminated materials and training to improve educational practices. 20

2

U.S.C. § 9511(b)(2). And Congress mandated that in performing this work, IES must ensure that the activities it supports "(A) conform to high standards of quality, integrity, and accuracy; and (B) are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias." *Id.*

In furtherance of IES's mandate, Congress has also directed IES to administer four statutorily mandated and funded research centers and a range of programs that either directly produce data, research, and evaluations, or award federal grants, contracts, and cooperative agreements to do so. The work of these centers and programs is briefly outlined below.

### A.    National Center for Education Research

IES's National Center for Education Research (NCER) promotes research aimed at better understanding how to improve education across the country for all kinds of learners. Congress mandated that NCER take on several specific tasks in furtherance of this goal. For instance, NCER "shall support not less than 8 national research and development centers," each assigned at least one of 11 research topics such as "[a]dult literacy," "[e]arly childhood development and education," "English language learners research," or "[t]eacher quality." 20 U.S.C. § 9533(c).

### B.    National Center for Education Statistics

Congress established IES's National Center for Education Statistics (NCES) to, among other things, "collect, analyze, and report education information and statistics in a manner that[] (A) is objective, secular, neutral, and nonideological and is free of partisan political influence and racial, cultural, gender, or regional bias; and (B) is relevant and useful to practitioners, researchers, policymakers, and the public." 20 U.S.C. § 9541(b). NCES must annually provide the President and relevant Congressional committees "a statistical report on the condition and progress of education in the United States." *Id.* § 9545(b). NCES also operates a statutory program known as the Statewide Longitudinal Data Systems (SLDS) to award grants to States to

"design, develop, and implement statewide, longitudinal data systems to efficiently and accurately manage, analyze, disaggregate, and use individual student data." *Id.* § 9607(a).

### C.        National Center for Special Education Research

Congress created IES's National Center for Special Education Research (NCSER) to sponsor research regarding children with disabilities, as well as research to support implementation of the Individuals with Disabilities Education Act (IDEA). 20 U.S.C. § 9567.

In furtherance of this mission, NCSER is required to "carry out research activities" designed to achieve 17 congressionally identified objectives. *Id.* § 9567b. Like other programs within IES, Congress has required that NCSER ensure that research is both scientifically sound and "objective, secular, neutral, and nonideological, and … free of partisan political influence, and racial, cultural, gender, regional, or disability bias." *Id.* § 9567b(b)(3).

### D.        Regional Educational Laboratories

The Regional Educational Laboratories (REL) program administered by IES, through the National Center for Education Evaluation and Regional Assistance (NCEE), assists education practitioners and policymakers by using research, evidence, and evidence-based practices to improve student outcomes. The Director of IES "shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States." 20 U.S.C. § 9564(a). Each REL contractor shall "support applied research, development, wide dissemination, and technical assistance activities" in its region and collaborate with key federal, state, and local stakeholders. *Id.* §§ 9564(f), (g).

### E.        Special Education Studies and Evaluation

Through IDEA, Congress directed the Secretary of Education to "delegate to the Director of [IES] the responsibility to" carry out particular research activities related to special education. 20 U.S.C. § 1464(a). Specifically, the Director of IES must "assess the progress in the

4

implementation of [IDEA], including the effectiveness of State and local efforts to provide[] (A) a free appropriate public education to children with disabilities; and (B) early intervention services to infants and toddlers with disabilities." *Id.* The Director of IES may undertake these responsibilities through direct research projects or through competitive awards. *Id.*

### F.   Comprehensive Centers

The Comprehensive Centers program is a technical-assistance program that funds expert centers to help States, districts, and schools implement federal education programs and improve teaching, assessment, and school performance. On June 4, 2026, the Department announced that it was moving the program from another component of the Department to IES.

Congress mandated that the Secretary of Education award "not less than" twenty grants to local entities or groups to serve as Comprehensive Centers. 20 U.S.C. § 9602(a)(1). These Comprehensive Centers must work with state and local educational agencies "on school improvement activities that take into account factors such as the proportion of economically disadvantaged students in the region." *Id.* § 9602(e). The Centers must "give priority to": "(1) schools in the region with high percentages or numbers of students from low-income families … including such schools in rural and urban areas, and schools receiving [certain federal] assistance"; "(2) local educational agencies in the region in which high percentages or numbers of school-age children are from low-income families"; and (3) schools in the region that have been identified for school improvement. *Id.*

### G.   Education Innovation and Research Program

Congress also mandated that the Department administer the Education Innovation and Research (EIR) program. The Department recently moved this program to IES, under the management of IES's NCER. Through EIR, the Department must issue grants to both study and implement innovative, evidence-based practices "to improve student achievement and attainment

for high-need students." 20 U.S.C. § 7261(a)(1)(A). The Department must ensure that EIR program awards focus on rural areas and "that not less than 25 percent of funds made available for any fiscal year" go to programs for rural schools. *Id.* § 7261(c)(1).

## II. Congress Funds IES, Comprehensive Centers, and EIR Activities

### A. IES Appropriations

In its continuing resolution of 2025, Congress appropriated funds to IES at the same levels and subject to the same conditions as it had appropriated to IES in the Consolidated Appropriations Act of 2024, Pub. L. 118-47 (2024) ("2024 Appropriations Act"). *See* Pub. L. 119-4, §§ 1101–1102 (2025) ("2025 Continuing Resolution"). The 2024 Appropriations Act had appropriated $793 million for IES and directed that the funds "shall remain available through September 30, 2025." 2024 Appropriations Act, 138 Stat. at 690–91. So, unlike most appropriations that are available only for one fiscal year, the IES appropriations were made available for use over two fiscal years (*i.e.*, FY2024 and FY2025). The 2025 Continuing Resolution carried forward the two-year period of availability for IES funds. 2025 Continuing Resolution, 139 Stat. 12, § 1103. Thus, in 2025, Congress appropriated another $793 million to IES, available over a two-year period until September 30, 2026 (the "FY2025/2026 IES funds").

In 2026, Congress appropriated $789 million to IES, again making the funds available over a two-year period, until September 30, 2027 (the "FY2026/FY2027 IES funds"). *See* Consolidated Appropriations Act of 2026, Pub L. 119-75, 140 Stat. 173, 303 (the "2026 Appropriations Act"). In so doing, Congress rejected the President's proposal to substantially reduce IES's funding to only $261 million total. *See* Dep't of Educ., Institute of Educ. Sciences, Fiscal Year 2026 Budget Request 1, https://perma.cc/5YVZ-FZN6.

Congress has also included with the appropriation acts "explanatory statements" that set forth how it intends each agency to allocate funds among the programs that fall under each

appropriation. Although Congress has not always made those explanatory statements binding on the agencies by incorporating them by reference into the text of the appropriations act, OMB has consistently apportioned, and IES has generally obligated, funds in line with Congress's intentions expressed in the explanatory statements.

The explanatory statement accompanying the 2024 Act included a table allocating IES funds. Ex. 1.[1] The "Final Bill" column reflects Congress's intended allocation of the $793 million  in IES funds that Congress appropriated in the 2024 Appropriations Act, which Congress then appropriated again in the 2025 Continuing Resolution for the FY2025/2026 IES funds. *See id.*

In the 2026 Appropriations Act, Congress made the table in the explanatory statement for IES funds legally binding on IES, by expressly incorporating it into the Act. The Act provides that the obligation of IES funds "shall be for the purposes and in the amounts specified in the 'Final Bill' column for Institute of Education Sciences in the … table in the explanatory statement." 2026 Appropriations Act, 140 Stat. 303; *see* Ex. 2 (table).

**B.    Comprehensive Centers Appropriations**

Congress appropriated money for the Comprehensive Centers program separately from the other IES programs. In the 2026 Appropriations Act, Congress provided that $50 million "shall be available" for the Comprehensive Centers program. *See* 140 Stat. 295 (appropriating $50 million "to carry out section 203 of the Educational Technical Assistance Act of 2002," which is the authorizing statute for the Comprehensive Centers). The Comprehensive Centers appropriations are single-year funds, meaning they expire on September 30, 2026.

---

[1] All exhibit citations are to exhibits attached to the Declaration of Daniel Jacobson.

### C.     EIR Appropriations

Congress also separately appropriates funds for the EIR program. Congress provided in the 2026 Appropriations Act that $235 million "shall be available" for the EIR program. *See* 140 Stat. 296 ("$235,000,000 shall be available through December 31, 2026 for subpart 1 of part F of title IV"). EIR funds expire on December 31, 2026.

### III.     OMB Must Apportion Funds for the Department to Use Them.

The Anti-Deficiency Act governs the process by which OMB must "apportion" congressionally appropriated funds to agencies, to enable agencies to use the funds. Prior to the Anti-Deficiency Act, Congress's formal control over appropriations was often undermined as executive departments spent or obligated funds beyond appropriated levels and then returned to Congress to seek a "deficiency" or "supplemental" appropriation. Congress responded by enacting the Anti-Deficiency Act in 1870, and has amended the law several times since, most recently in 1982. *See* Pub. L. 97-258, 96 Stat. 877.

Under the Anti-Deficiency Act, when Congress appropriates funds for an agency, OMB must apportion the funds to the agency in writing before the agency may obligate (*i.e.*, commit to spend) those funds. 31 U.S.C. § 1513(b). For "definite period" appropriations like those, OMB must apportion funds with the goal "to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." *Id.* § 1512(a). In other words, OMB's mandate is to apportion funds to prevent agencies from spending appropriations too quickly or in excess of Congress's appropriations in order to avoid the need for agencies to ask Congress for a "deficiency or supplemental appropriation." *Id.*

The Anti-Deficiency Act sets a firm deadline for OMB to apportion all appropriations. As relevant here, OMB must apportion an appropriation "not later than … 30 days after the date of enactment of the law by which the appropriation is made available." *Id.* § 1513(b)(2)(B).

Although OMB must apportion the full amount of appropriations by that date (with a narrow exception for "reserves" as described below), the apportionment may detail when tranches of funding become available for use over time, to prevent the agency from using all the funds too quickly. OMB thus may apportion funds to become available across "months, calendar quarters, operating seasons, or other time periods." *Id.* § 1512(b)(1)(A). OMB also may apportion funds by "activities, functions, projects, or objects," specifying when different portions of the funds will be available for the various purposes Congress authorized. *Id.* § 1512(b)(1)(B).

Agencies are legally prohibited from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding" the amount apportioned by OMB or otherwise departing from the apportionment's terms. *Id.* § 1517(a). The Act imposes both administrative and *criminal* penalties on agency officials who violate these restrictions. *See id.* §§ 1518–19. The sole exception to the mandate that OMB apportion all funds no later than 30 days after enactment of the law appropriating the funds is that OMB may establish a "reserve" in the following three limited circumstances: "(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." *Id.* § 1512(c). Prior to 1974, the Anti-Deficiency Act had an additional provision allowing reserves on broader grounds. *City of New Haven v. United States*, 809 F.2d 900, 906 & n.18 (D.C. Cir. 1987). Congress repealed that provision to "preclude the President from relying on the Act as authority for implementing policy impoundments." *Id.*

Additionally, OMB often includes "footnotes" in apportionments. *See CREW v. OMB*, 791 F. Supp. 3d 29, 40 n.5, 54 (D.D.C. 2025). Footnotes designated with the letter "A" impose legally binding conditions on the agency's use of the funds under the Anti-Deficiency Act. *See* OMB Circular No. A-11, §§ 120.1, 120.34, https://perma.cc/H466-36D6. Sometimes these

binding footnotes refer to agency "spend plans." An agency spend plan reflects how the agency intends to use apportioned funds. Beginning with this Administration, OMB has incorporated spend plans into apportionment footnotes in a manner that enables OMB to interfere with or micromanage agency spending. Specifically, OMB has mandated in binding "A" footnotes that agencies may spend apportioned funds only in accordance with a spend plan that must be "agreed upon" by OMB and the agency. *See Protect Democracy Project v. OMB*, No. 25-cv-1111, Order Granting Mot. to Enforce at 5–6, Dkt. 48 (D.D.C. Jan. 28, 2026).

Pursuant to laws enacted in 2022 and 2023, OMB must post its apportionments on a publicly accessible database within two business days. Pub. L. 117-103, div. E, tit. II, §§ 204(b)-(c), 136 Stat. 49, 256-57 (2022) (codified at 31 U.S.C. § 1513 note); Pub. L. 117-328, div. E, tit. II, § 204, 136 Stat. 4459, 4667 (2023) (codified at 31 U.S.C. § 1513 note). In January 2026, a federal court held that this requirement includes posting spend plans incorporated into binding footnotes. *Protect Democracy*, No. 25-cv-1111, Dkt. 48. However, OMB's compliance with the Court's order to post spend plans has been tardy and incomplete. *Id.*, Dkt. 49.

## IV.     OMB Has Delayed Apportioning or Failed to Apportion the Relevant Funds

### A.     FY2025/2026 IES Funds

The Anti-Deficiency Act's 30-day deadline to apportion the FY2025/2026 IES funds expired on April 14, 2025. But OMB did not apportion the funds until May 13, 2025, a full month after the statutory deadline. *See* Ex. 4 (May 13 IES Apportionment).

When OMB did apportion the funds, very few were actually made available for obligation on actual IES programming. OMB apportioned $485 million of the FY2025/2026 funds to an "Unallocated" line of the apportionment, which renders the funds unavailable to use for any purpose. And the funds that OMB did apportion for actual IES programming did not match or come close to approximating the allocations that Congress specified in its explanatory

statement for the FY2025/2026 funds. For instance, OMB apportioned $0 for Research in Special Education, $0 for Special Education Studies, and just $12,493 for Research, Development, and Dissemination. *See* Ex. 4. The apportionment also included several binding footnotes. One binding footnote directed that the Department could use the funds only as "consistent with the latest agreed-upon spending plan for Fiscal Year 2025 between the Department of Education (ED) and the Office of Management and Budget (OMB)." *See id.* n.A2. OMB also included a footnote directing that, "[a]s permissible by law, amounts apportioned shall be spent in a manner consistent with … Executive Order 14151, 'Ending Radical And Wasteful Government DEI Programs.'" *Id.* n.A3.

On August 8, 2025, OMB issued a new apportionment for the same FY2025/2026 funds, increasing the amount "Unallocated" to $500 million and apportioning the balance across IES's various programs and Program Administration. *See* Ex. 5. The August 8, 2025 apportionment contained the same footnotes as in the May 13, 2025 apportionment. On February 27, 2026, OMB apportioned $210.5 million of the $500 million previously relegated to the "Unallocated" line for the second and final year (FY2026) of the FY2025/2026 IES appropriation in the 2025 Continuing Resolution. *See* Ex. 6. This apportionment kept $289.5 million apportioned to the "Unallocated" line. *See id.* The February 27, 2026 Apportionment again included a spend-plan footnote, and it expanded the footnotes that limit spending to also mandate compliance with Executive Order 14332, "Improving Oversight of Federal Grantmaking." *Id.* n.A2.

On June 18, 2026, OMB released a monthly "SF-133 Report" for the Department of Education. This report provides monthly data about how much money agencies have obligated, and for what purpose. The report also includes information about the amounts apportioned for each account, but these reports do not apportion funds, and the notation of apportionments in

11

these reports do not carry out OMB's statutory mandate to post apportionments and spend plans incorporated therein within two business days in OMB's public apportionment database.

Even though OMB did not disclose any apportionments or new spend plans in May 2026 in that required database, the June 2026 SF-133 Report indicated it had apportioned roughly $250 million in FY2025/2026 IES funds at some point in May 2026. *See* Fiscal Year 2026 Dep't of Educ. SF-133 for TAFS 091-2025-2026-1100 (row 8759), https://tinyurl.com/2s3p8t5k. The June 2026 SF-133 did not reveal how this amount was apportioned among the different IES programs, nor does it reveal the footnotes attached to the purported apportionments.

On August 1, 2026, after the filing of this case detailing this undisclosed apportionment, OMB posted to its database a "May Update" to its "FY 2026 IES spend plan." OMB015. By virtue of having been incorporated by reference into the February 2026 apportionment, the agreement upon this spend plan apportioned the FY2025/2026 IES funds. The spend plan appears to reflect OMB has apportioned all but about $10 million of the remaining FY2025/2026 IES funds.[2] This means that either those $10 million remain unapportioned, or there is an additional apportionment or spend plan that has not been disclosed. The apparent total final allocations of FY 2025/2026 IES funds across IES are set forth in the attached declaration of Joseph Carlile. *See* Carlile Decl., tbl. 4.

---

[2] This calculation assumes that the numbers in the March 5, 2026 spend plan, OMB014, totalling $232,904,876, are added to the numbers on the first sheet of the May Update, OMB015, which total $141,828,458, and those numbers in turn are added to the lines of funds apportioned for June, July, and August in the supporting sheets of the May Update, OMB015 at 4-11, totaling $100,164,311. In total, this makes approximately $475 million of the FY2025/2026 IES funds available for obligation. As the account originally had $510 million before the $25 million rescission in Program Administration funds in the FY2026 Appropriations Act, that leaves a gap of about $10 million. Plaintiffs have sought clarification from Defendants on this calculation but Defendants have not provided it as of this filing.

### B.      FY2026 Comprehensive Centers Funds

The Anti-Deficiency Act's deadline for apportioning the FY2026 Comprehensive Centers program funds passed on March 5, 2026. Yet as of today's date, OMB has apportioned only $500,000 of the $50 million appropriated for that program. Ex. 7. This leaves $49.5 million unapportioned and legally unavailable for obligation. Those unapportioned funds will expire on September 30, 2026. The April 9, 2026 apportionment included a binding footnotes requiring that the Department comply with the same two Executive Orders in using these funds as with the FY2025/2026 IES funds. *Id.*, n.A3. Those footnotes were removed when the account was reapportioned on July 21, 2026. Exs. 8, 9.

### C.      FY2026 EIR Funds

For the FY2026 EIR funds, the Anti-Deficiency Act's deadline for apportioning the funds was March 5, 2026, but OMB did not apportion any of the EIR funds by that date. On April 9, 2026, OMB apportioned a paltry $59,235 of the $235 million appropriated for the EIR program. Ex. 10. The remaining $234.94 million was apportioned to an "Unallocated line," legally prohibiting the Department from using these funds for their intended purposes. *Id.* On July 21, 2026, three weeks after this lawsuit was filed, OMB finally apportioned the remaining EIR funds. Ex. 11. OMB included a binding footnote requiring that the Department comply with the same two Executive Orders in using these funds as with the FY2025/2026 IES funds. *Id.*, n.A3.

### D.      FY2026/2027 IES Funds

Congress appropriated $789 million in FY2026/2027 IES funds in the 2026 Appropriations Act, and these funds expire on September 30, 2027. On February 18, 2026, OMB apportioned a small portion of these funds, designating $584 million as "Unallocated" and apportioning almost all of the rest to the National Assessment of Education Progress. *See* Ex. 12

13

On July 27, 2026, OMB apportioned an additional $118.65 million for programmatic use, although OMB still apportioned *zero* FY2026/2027 IES funds for the Regional Educational Laboratories, Statistics, and Statewide Longitudinal Data System, and only $403,622 for Special Education Studies. Ex. 13. OMB kept $465.6 million of the FY2026/2027 IES funds as Unallocated, except now OMB changed the name of this line to "Undistributed," after Plaintiffs had challenged OMB's policy of apportioning funds to "Unallocated" lines. But the July 27, 2026 apportionment made clear that this change was in name only; OMB kept a footnote saying that "[a]mounts apportioned on this line are available for obligation" not as of this apportionment, but only "upon reapportionment to an applicable [program]." *Id.* n.A4. OMB included a binding footnote requiring that the Department comply in using these funds with Executive Order 14151, one of the two Executive Orders whose policy directives were imposed on the FY2025/2026 IES funds. *Id.*, n.A3.

## V.    OMB Adds Unlawful Conditions to Apportioned Funds.

As mentioned, OMB has included legally binding "A" footnotes in its apportionments of the relevant funds conditioning the Department of Education's use of funds on compliance with policy directives in Executive Order 14151, 'Ending Radical And Wasteful Government DEI Programs And Preferencing,' and/or Executive Order 14332, 'Improving Oversight of Federal Grantmaking.'" *See* Ex. 6, n.A2. The first Executive Order directs all agencies to eliminate government programs, grants, and contracts that, in the Administration's view, promote diversity, equity, inclusion, and accessibility initiatives. The second Executive Order directs agencies to (among other things) embed senior, politically appointed officials into the grantmaking process and to ensure that competitive grants advance the Administration's priorities.

14

**VI.    Plaintiffs Compete for the Relevant Funds or Rely on the Programs Being Funded**

Plaintiffs and their members are organizations and associations dedicated to educators and education research. They compete for funding under the programs at issue and depend on the research, data, and studies produced through these programs to carry out their missions.

Plaintiff Knowledge Alliance is a nonprofit, nonpartisan association composed of 19 education organizations that share the belief that high-quality, timely, and relevant research is essential to improving student outcomes. Decl. of Rachel Dinkes ¶¶ 2–3. Knowledge Alliance members operate under grants and contracts under the programs at issue here. *Id.* ¶ 9. Plaintiff BNP Partners has received awards under the REL program, has competed for awards through the Comprehensive Centers program, and relies on NCES data in its own work. Norford Decl. ¶¶ 4–5, 7. Plaintiff National Center for Learning Disabilities (NCLD) is a nonprofit that works with educators, students, families, and others to "advance research, share resources, build coalitions, and advocate for policies that reduce systemic barriers for individuals with learning disabilities." Decl. of Jacqueline Rodriguez ¶ 2. To do this, NCLD relies on IES-created data, research, and evaluations—primarily but not limited to data from NCSER and NCES—to undertake its own research and develop policy briefs. *Id.* ¶¶ 3–6. Plaintiff Massachusetts Teachers Association (MTA) represents 117,000 members including more than 12,000 members who work in higher education as, for example, faculty in the University of Massachusetts's colleges of education. Decl. of Mike Fadel ¶ 5. MTA's members and staff rely on IES data and research projects in their work, apply for IES-funded grants, and receive benefits through REL projects. *Id.* ¶¶ 10, 12.

**ARGUMENT**

**I.    OMB's Failure to Timely Apportion the Relevant Funds Violates the APA**

For all four buckets of relevant funds—FY2025/2026 IES funds, FY2026 EIR funds, FY2026 Comprehensive Centers funds, and FY2026/2027 IES funds—OMB has violated the

15

Anti-Deficiency Act in failing to timely apportion the funds to the Department of Education. For at least the latter two buckets, OMB's refusal to apportion the funds remains ongoing today.

OMB's actions violate two related provisions of the Anti-Deficiency Act. First, with the exception of permissible "reserves," OMB "shall apportion in writing an appropriation" to agencies, and it must notify agencies that it has completed such action "not later than … 30 days after the date of enactment of the law by which the appropriation is made available." 31 U.S.C. § 1513(b).[3] Second, "[i]n apportioning … an appropriation, a reserve may be established only— (A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." *Id.* § 1512(c)(1). OMB's violations of both of these provisions are actionable under the APA, as final agency actions that are contrary to law and as agency action unlawfully withheld.

### A.      OMB's Failures to Apportion Funds Are Actionable under the APA

OMB's apportionments all reflect final agency actions for purposes of 5 U.S.C. § 706(2). As OMB itself states, each apportionment is a final "OMB-approved plan" that is "legally binding" the moment OMB issues it. *CREW*, 791 F. Supp. 3d at 54 (quoting OMB Circular No. A-11 §§ 20.3, 120.1). Each apportionment is the "consummation" of OMB's decisionmaking process regarding how much of an appropriation to make available to an agency at a particular point in time, and for what purposes the funds may be used at that time, *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). And "legal will consequences flow" directly from each apportionment. *Id.* An apportionment is both a legal authorization and a legally binding prohibition: it authorizes agencies to obligate the amount apportioned, and legally bars agency officials—at risk of

---

[3] Section 1513(b)(2) provides a deadline of the later of 30 days after the relevant appropriations act, or "20 days before the beginning of the fiscal year for which the appropriation is available." The latter provision does not apply to the funds here.

criminal prosecution—from spending more than the amount apportioned or using the funds differently than OMB has permitted. Another court has held for these reasons that OMB apportionments are neither predecisional nor deliberative. *See CREW*, 791 F. Supp. 3d at 54–55.

And when OMB apportions funds to the "Unallocated" line, that is a final decision to establish a "reserve." The Government Accountability Office (GAO) has explained that a "reserve" in this context is a "circumstance[] in which the full appropriation is not apportioned or utilized." 2 GAO, *Principles of Federal Appropriations Law* 6-123 (3d ed. 2006). Dictionary definitions are in accord. *See* Dictionary.com (defining "reserve" as "to keep back or save for future use"). Here, OMB has reserved funds by holding them back from the agency, by prohibiting the agency from using the Unallocated funds for any purpose until further notice.

By way of example, on March 24, 2026, OMB apportioned only $500,000 for the Comprehensive Centers program, reserving the remainder of the $50 million in appropriations as "Unallocated." Ex. 14. That action reflected a final decision that, as of that date and indefinitely until any new apportionment, OMB was authorizing the Department to obligate just $500,000 toward the Comprehensive Centers. And OMB's placement of the remaining $49.5 million on the Unallocated line reflected a final decision to establish a reserve in that amount. Indeed, OMB included a footnote specifying that the Unallocated funds are not "available for obligation" unless and until there is "reapportionment to an applicable" program or purpose. *Id.* at n.A3.

OMB's failure to apportion all of the relevant funds on the timeline required also constitutes agency action "unlawfully withheld" under 5 U.S.C. § 706(1). The requirement that OMB "*shall* apportion an appropriation" to an agency "not later than … 30 days after" the relevant appropriations act, 31 U.S.C. § 1513(b)(2), is "a discrete agency action that [the agency] is required to take." *Ahadian v. Rubio*, No. 24-CV-12168-ADB, 2025 WL 1617224, at *5 (D.

17

Mass. June 6, 2025). Because the statute "sets a specific deadline," OMB's failure to comply is properly analyzed as action "unlawfully withheld" rather than "unreasonably delayed." *Oxfam Am., Inc. v. SEC*, 126 F. Supp. 3d 168, 175 (D. Mass. 2015) (quotations omitted).

    **B.**     **OMB's Failures to Apportion Funds Are Contrary to Law**

        *1.*     *The Comprehensive Centers and IES Funds*

For the FY2026 Comprehensive Centers funds, FY2026/2027 IES funds, and apparently FY2025/2026 IES funds, OMB failed to apportion the funds by the 30-day deadline and still has not apportioned all of them to this day.

Congress enacted the FY2026 Comprehensive Centers funds and FY2026/2027 IES funds in the 2026 Appropriations Act, which became law on February 3, 2026. OMB thus had until March 5, 2026 to apportion the funds. For the Comprehensive Centers, OMB did not issue any apportionment until March 24, 2026. Ex. 14. Even then, OMB designated $49.5 million of the $50 million in appropriations as Unallocated, which by terms of the apportionment, rendered these funds indefinitely unavailable for obligation for any use. *Id.* n.A4. OMB has kept this initial apportionment in place—even though these funds expire on September 30, 2026—with $49.5 million on the Unallocated line as of this filing. OMB's failure to apportion the full amount of FY2026 Comprehensive Centers appropriations, by the 30-day deadline and even today, violates 31 U.S.C. § 1513(b)(2) and constitutes agency action unlawfully withheld. And OMB's designation of $49.5 million as Unallocated constitutes an unlawful "reserve" for purposes of 31 U.S.C. § 1513(c)(1). There is no evidence in the administrative record that OMB reserved these funds for any of the narrow permissible purposes under § 1513(c)(1). *See New Haven*, 809 F.2d at 906 & n.18; *see also* GAO, *Principles of Federal Appropriations Law* 6-123–125 (reserve authority does not extend to "general economic, fiscal, or policy considerations").

The same legal violations are present for the FY2026/2027 IES funds. Although OMB apportioned a small percentage of these funds on February 18, 2026, within 30 days of the 2026 Appropriations Act, it placed $584 million of the $789 million on the Unallocated line, Ex. 12, which is the same as not apportioning the funds at all because they cannot be put to any use. On July 27, 2026, OMB apportioned $118.7 million of the Unallocated funds toward substantive programs, but kept $465.6 million on the Unallocated line. Ex. 13. Both apportionments violate the deadline to apportion funds and establish unlawful reserves.

As described *supra* Section IV.A, OMB apparently still has not apportioned $10 million of the FY2025/2026 IES funds that expire on September 30, 2026. The apparent failure to apportion the full amount of these appropriations constitutes agency action unlawfully withheld.

2.      *The FY2026 EIR Funds and FY2025/2026 IES Funds*

For the FY2026 EIR funds and apparently all but $10 million of the FY2025/2026 IES funds, OMB has now finally apportioned the full amounts appropriated, but their prior apportionments of these appropriations constituted unlawful final agency action for which declaratory relief remains warranted.

OMB did not apportion any funds for the EIR program until April 9, 2026, more than a month after the 30-day deadline of March 5, 2026. That belated apportionment was barely an apportionment at all: OMB apportioned just $59,235 of the $235 million in EIR appropriations, relegating the balance to the Unallocated line. OMB finally apportioned those funds for substantive use on July 21, 2026, after Plaintiffs filed this suit. But the April 9, 2026 apportionment violated the Anti-Deficiency Act in the ways described above.

With regard to the FY2025/2026 IES funds, the 30-day deadline to apportion these funds was April 13, 2025, yet OMB did not issue any apportionment until May 13, 2025. Ex. 4. That apportionment left the majority of the appropriations, $485 million, Unallocated, and provided

19

no funds at all for Research in Special Education and the Regional Educational Laboratories. *Id.* OMB issued a new apportionment on August 8, 2025, that actually *increased* the amount Unallocated. Ex. 5. In February 2026, OMB released some of the funds for substantive programming, but kept $289.5 million Unallocated. Ex. 6.

It was at this point that delay turned to obfuscation. In May 2026, OMB did not post any new apportionment or spend plan incorporated into an apportionment. Yet, when OMB released a separate SF-133 financial report in late June 2026 containing mostly non-apportionment information, it indicated that OMB had apportioned the full balance of FY2025/2026 IES funds in May 2026. Around that same time, the CEO of Plaintiff Knowledge Alliance spoke with Defendant Soldner, the Director of IES, who indicated that "there would not be any public record of the apportionment." Dinkes Decl. ¶ 36. Not until August 1, 2026, after Plaintiffs filed suit, did OMB post a purported new spend plan from May 2026 incorporated by reference in the earlier apportionment (because that apportionment incorporates by reference any new spend plan that OMB approves). The spend plan appears to leave $10 million still unapportioned, unlawfully creating a reserve. And even if it did apportion the full amount of FY2025/2026 IES funds, that does not undo the illegality of the May 2025, August 2025, and February 2026 apportionments.

Plaintiffs are entitled to declaratory relief as to the unlawful apportionment of the FY2025/2026 IES and FY2026 EIR apportionments. Although OMB has since made belated apportionments and shifted some amounts out of Unallocated, those revisions do not moot Plaintiffs' claims. A declaratory judgment claim remains live when there is an "immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest." *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 125–26 (1974). "[I]f a plaintiff's allegations go not only to a specific agency action, but to an ongoing policy as well,

20

the plaintiff may seek declaratory relief notwithstanding a moot or otherwise fully resolved claim, so long as the plaintiff has standing and the claim is ripe for review." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 143 F.4th 518, 530 (D.C. Cir. 2025) (citations omitted). Thus, in *New York v. Trump*, 171 F.4th 1, 16–17 (1st Cir. 2026), the First Circuit held that the plaintiffs' claims remained live where the government had rescinded an OMB memorandum but the underlying policy continued nonetheless.

The same reasoning applies here. As described *infra*, Plaintiffs challenge a continuing OMB policy, implemented through the above and other apportionments of delaying apportionment of Department funds by apportioning funds to Unallocated lines. The record shows that OMB applied those practices repeatedly across the appropriations at issue, withholding significant amounts of congressionally appropriated funds for FY2025/2026 IES (Exs. 4, 5, 6, 15), and for FY2026 EIR funds (Ex. 10). OMB continued applying them as particular apportionments changed  and has neither rescinded nor disavowed that policy. Indeed, some challenged funds remain Unallocated. OMB015.

The policy also continues to harm Plaintiffs. OMB's shifting treatment of the FY2025/2026 IES funds has forced Plaintiffs and their members to plan against a moving target—without knowing which funding opportunities will open, and when, or what funding will be available. Knowledge Alliance's members must make present staffing, partnership, and proposal-development decisions under that uncertainty. Dinkes Decl. ¶¶ 10, 30. NCLD likewise has diverted staff time to monitor the delayed release of EIR funds and assess the consequences for the research on which it relies. Rodriguez Decl. ¶ 14. These are present effects of this policy.

## II.    OMB is Unlawfully Imposing Extra-Statutory Conditions Through Footnotes

Where OMB has apportioned funds, it has included in those apportionments legally binding footnotes that unlawfully add conditions on the Department's process for awarding funds

and the substance of those awards, restricting the Department's ability to carry out its statutory functions.[4] These footnotes violate the APA thrice-over: they exceed statutory authority, violate the separation of powers, and are arbitrary and capricious.

### A.     The Executive Order Footnotes Exceed Statutory Authority and Violate the Separation of Powers

**1.** OMB's imposition of policy footnotes must be set aside because they exceed statutory authority. 5 U.S.C. § 706(2)(C). "Any action that an agency takes outside the bounds of its statutory authority … violates the Administrative Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020). Congress has appropriated funds to the Department to carry out specific programs under congressionally directed parameters. Through the Anti-Deficiency Act, Congress has separately directed OMB to apportion appropriated funds before an agency can obligate them "to prevent obligation or expenditure at a rate" that would create "a deficiency" or require "supplemental appropriation for the period." 31 U.S.C. §§ 1512, 1513(b), 1517(a).

Nothing in the Anti-Deficiency Act or any other statute provides OMB with authority to add legally binding, policy-focused conditions on an agency's use of funds appropriated to carry out statutory programs. OMB certainly cannot point to "clear congressional authorization for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). To the contrary, it has long been established that OMB cannot use "[t]he apportionment power … as a form of executive control or influence over agency functions." *See, e.g.*, Comptroller General of the United States, B-163628, at 2 (Jan. 4, 1974), https://www.gao.gov/assets/890/884750.pdf. Indeed, Congress

---

[4] Although the Executive Order Footnotes have been altered through subsequent apportionments, the footnote relating to Executive Order 14151 remains attached to obligations of all funds at issue in this litigation but the Comprehensive Centers funds, and the footnote relating to Executive Order 14332 remains attached to EIR funds and FY2025/2026 IES funds. Ex. 11, n.A3 (EIR); Ex. 6, n.A2 (FY2025/2026 IES); Ex. 13, n.A3 (FY2026/2027 IES).

specifically "amended the Anti-Deficiency Act to preclude the President from relying on that Act as authority for implementing policy impoundments." *City of New Haven*, 809 F.2d at 906.

Yet through legally binding footnotes, OMB has leveraged its apportionment power to prohibit the Department from obligating education research funds on vaguely defined DEI initiatives or activities. And OMB has prohibited the Department from awarding education research funds unless the Department gives senior, politically appointed officials control of the grantmaking process and ensures that competitive grants advance the Administration's priorities, even when those priorities conflict with Congress's. Congress has authorized OMB to apportion funds "to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." 31 U.S.C. § 1512(a). But the Executive Order–related footnotes do not relate to the timing of agency expenditures in any way.

OMB's acting beyond its statutory authority in imposing these conditions is particularly stark in this case—because the conditions conflict with Congress's mandates for the Department's use of these funds. Executive Order 14151's prohibition on the Department advancing "equity" and "diversity" with the funds conflicts with the General Education Provisions Act (GEPA), which mandates that the Secretary of Education, with few exceptions, require grant applicants to include information about how the applicants will "ensure equitable access to, and equitable participation in" the relevant project "by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age." 20 U.S.C. § 1228a. And IES programs have additional, similar requirements that funded projects collect information on and evaluate data based on race and other characteristics. *See id.* §§ 9515, 9533(c)(7), 9543(a)(1),(3), 1418(d)(1). Moreover, for NCSER, Congress has expressly required

23

the Department to ensure there is no "disability bias" in its programs, *id.* §§ 9567b(b)(3)-(c); § 9567(b), and yet the Department has already targeted such disability programs as focused on "diversity, equity, and inclusion" for violating E.O. 14151's requirements. Exs. 19, 20.

The footnote requiring compliance with Executive Order 14332—which requires funding decisions be approved by a political appointee—also conflicts with IES requirements. For instance, IES must fund research that is "objective, secular, neutral, and nonideological and free of partisan political influence," 20 U.S.C. § 9511(b)(2)(B); *see also id.* §§ 9541(b), 9567b(b)(3).

**2.** Not only do the footnotes exceed statutory authority; they violate the separation of powers. "The United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). The Spending Clause gives Congress exclusive power to enact federal spending programs for the "general welfare," U.S. Const. art. I, § 8, cl. 1, which includes the power to "attach conditions on federal funds." *San Francisco*, 897 F.3d at 1231. Under the Appropriations Clause, agencies may only spend funds that Congress provides, and must spend those funds as Congress directs. *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.).

Here, OMB has hijacked Congress's constitutional power of the purse through the apportionment process, including in imposing binding, substantive conditions in footnotes. In so doing, OMB has "usurped the power of the legislature to determine spending and to set conditions on that spending." *City of Chicago v. Barr*, 961 F.3d 882, 920 (7th Cir. 2020). OMB's "use of extra-statutory conditions on federal grant awards as a tool to obtain compliance with [its] policy objectives strikes at the heart of … the separation of powers among the branches of the federal government." *Id.* at 892. Numerous courts have found that an agency's imposition of extra-statutory conditions on a federal spending program violates the separation of powers. *See,*

*e.g.*, *id.*; *San Francisco*, 897 F.3d at 1231; *Washington v. Trump*, 766 F. Supp. 3d 1138, 1154 (W.D. Wash. 2025); *City of Chicago v. Dep't of Just.*, 822 F. Supp. 3d 873, 887 (N.D. Ill. 2026); *Cnty. of Santa Clara v. Noem*, 815 F. Supp. 3d 979, 1025 (N.D. Cal. 2025); *Hous. Auth. of City & Cnty. of San Francisco v. Turner*, 2025 WL 3187761, at *10 (N.D. Cal. Nov. 14, 2025).

OMB's inclusion of conditions in apportionment footnotes is even more pernicious than in those cases, because OMB is undertaking this practice on a centralized basis and through obscure footnotes in apportionments that few members of the public will ever know about.

### B. The Executive Order Footnotes Are Arbitrary and Capricious

OMB's imposition of the policy footnotes must also be set aside as arbitrary and capricious. OMB flunks the most basic requirement of reasoned decisionmaking under the APA: it has not provided a "satisfactory explanation" for its action. *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). OMB has failed to "explain[] [its actions] at all." *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 888 (W.D. Wash. 2025), appeal pending, No. 25-3664 (9th Cir.) (agencies' adoption of new funding conditions, without any explanation, was arbitrary and capricious). The entire "Rationale" that OMB provided in adding these footnotes is: "Footnote specifies the purpose(s) for which the funds are available to be obligated." *See, e.g.*, Ex. 4 n.A3; Ex. 6 n.A2; Ex. 7 n.A3. That is not a "rationale."

OMB has also "entirely failed to consider an important aspect of the problem" and "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. OMB did not consider how it would carry out these programs in the manner Congress mandated with these conditions imposed, and OMB instead only considered its own policy agenda, not Congress's.

### III. OMB Has Failed to Publicly Disclose Apportionments as Required by Statute

By statute, OMB must publicly post its apportionments to an online database within two business days of making the apportionment. 31 U.S.C. § 1513 note. In March 2025, OMB

Director Russell Vought announced that OMB would immediately cease complying with this statutory mandate, and the public database went dark. *CREW*, 791 F. Supp. 3d at 40. A federal district court subsequently ruled that OMB's actions were unlawful and ordered the database to be restored. *Id.* at 60–61. Thereafter, it was revealed that OMB had begun incorporating "OMB-approved" spend plans into apportionment footnotes, such that the spend plans legally governed how the agency could use its funds. *Protect Democracy Proj. v. OMB*, No. 25-cv-1111 (D.D.C.), Dkt. 48. The district court then held that the apportionment disclosure statute mandated disclosure of such spend plans and ordered OMB to timely post them going forward. *Id.*

And yet, as described *supra* Section IV.A, in May 2026 OMB issued a new spend plan for FY2025/2026 IES funds that it claims apportioned more than $200 million, without posting it to the public database. It was only after Plaintiffs filed this case, and three days before Defendants' administrative record was due, that OMB posted the spend plan to the database. That delay unquestionably violates the apportionment disclosure statute.

The Court should grant declaratory relief to Plaintiffs for this violation. The failure to disclose this spend plan causes meaningful harm to Plaintiffs, *see, e.g.,* Dinkes Decl. ¶ 33, and this violation is "capable of repetition but evading review," *United States v. Chin*, 913 F.3d 251, 256–57 (1st Cir. 2019). Here, it is apparent that Defendants intentionally obfuscated the spend plan, with the IES Director commenting prior to this lawsuit being filed that the apportionment would not become public. Dinkes Decl. ¶ 36. But once Plaintiffs filed suit and Defendants had to respond to the claims, they made the spend plan public. Defendants could take similar action to moot out any claim challenging a failure to disclose a particular apportionment, rendering it critical that this violation be declared unlawful now.

26

**IV.    OMB's Policy of Designating Department Funds As Unallocated Is Unlawful**

OMB's apportionments of IES, Comprehensive Centers, and EIR funds reflect a broader policy that OMB has adopted of apportioning Department of Education funds to "Unallocated" lines when OMB has policy objections to the statutory programs that Congress has chosen to fund or the amounts that Congress has appropriated for them. Prior to this administration, OMB had never placed sizable percentages of appropriations on an "Unallocated" line, and certainly did not do so based on substantive policy disagreements with Congress's funding choices. But OMB has now undeniably adopted a policy to do just that. For example, OMB has used the Unallocated line for programs that they have asked Congress to eliminate or substantially reduce. For FY2026 and FY2027, the President's Budget Requests proposed to eliminate School Improvement Programs, including the Comprehensive Centers, as well as Safe Schools and Citizenship Education. Defendants also proposed deep cuts to Innovation and Improvement, Career, Technical and Adult Education, and Higher Education. Exs. 3, 22. For all of these accounts, OMB has approved apportionments in 2025 and 2026 that relegate significant amounts to Unallocated lines. Exs. 4–15, 21, 23–25.

In contrast, for programs for which Defendants have *not* sought cuts, such as Impact Aid, OMB has not used the Unallocated line in apportioning funds. Ex. 16. In fact, in accounts such as Rehabilitation Services and the Education for the Disadvantaged, where Defendants have proposed cutting some but not all programs covered by the appropriations account, OMB has relegated funds to the Unallocated lines only for the programs for which it sought cuts, and not the other programs covered by the same appropriation. See Ex. 17 (withholding funds for Migrant Education for the Disadvantaged programs proposed for elimination in FY2026 and FY2027); Ex. 18 withholding funds for Rehabilitation Services training programs proposed for elimination in FY2026 and FY2027).

27

OMB's policy violates the Anti-Deficiency Act in the same two ways described above with respect to individual apportionments designating funds as Unallocated. First, the policy violates the Act's requirements for when OMB must apportion the full amount of appropriations following the enactment of an appropriations act. *Supra* Section III. Second, the policy provides for the creation of reserves for reasons not permissible under the Anti-Deficiency Act. *Id*. Indeed, if there were legitimate, authorized grounds for this type of reserves for these programs, such reserves would be consistent across the years of publicly available apportionment data. But past apportionments of these accounts do not reflect consistent use of the unallocated line to withhold funds for entire programs or even significant portions of programs within an account.

OMB's policy of apportioning appropriations to Unallocated lines for programs that OMB disfavors also violates the constitutional separation of powers by usurping Congress's exclusive power of the purse as described *supra* Section II.A. This attack on the separation of powers is particularly acute given that OMB is targeting funding for programs for which there has been disagreement between Congress and the Administration, and Congress prevailed by continuing to fund the programs at similar levels to the past, notwithstanding the Administration's requests to eliminate or substantially cut the programs. OMB's policy of holding back Department of Education funds as Unallocated "strikes at the heart of … the separation of powers." *City of Chicago*, 961 F.3d at 892.

V.    **OMB's Failures to Comply with the Explanatory Statements Violate the APA**

Before this Administration, Defendants had long maintained a policy of apportioning and allocating IES funds across IES's programs in a manner consistent with the explanatory statements accompanying the appropriations acts, even where those explanatory statements were not legally binding because they were not incorporated by reference into the bill text. *See* Dinkes Decl. ¶ 8; Carlile Decl. ¶ 18, tbl. 3. That policy was consistent with Congress's intent: The

28

allocations in the explanatory statements reflect Congress's judgment as to the required spending levels for each IES program to fulfill the programs' statutory purposes and mandates.

Yet Defendants have now changed policies without explanation. For the FY2025/2026 appropriations, OMB has not apportioned—and the Department will not spend—the $53.7 million on the Regional Educational Laboratories as Congress instructed. Ex. 1; *see* Carlile Decl. ¶ 21 & tbl. 4. Instead, Defendants' apportionments and spend plans for IES shortchange the program by more than $6.5 million. Carlile Decl., tbl. 4. Defendants have not offered "a satisfactory explanation for [this] decision," *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019), or for their change in policies in following the explanatory statement more generally, even though both explanations are required under the APA. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And this program is one that Knowledge Alliance and MTA members heavily depend on. Dinkes Decl. ¶¶ 11, 13, 17, 20; Fadel Decl. ¶¶ 25–27; 31.

Defendants' deviations from the explanatory statement are even more egregious—and are contrary to law and arbitrary and capricious—for the FY2026/2027 IES funds. In the 2026 Appropriations Act, Congress incorporated by reference the IES explanatory statement table into the bill text, providing that the appropriations "shall be for the purposes and in the amounts specified in the 'Final Bill' column for Institute of Education Sciences in the … the explanatory statement." 140 Stat. 303. Yet the apportionments of the FY2026/2027 funds, and the spend plan for these funds agreed upon by the Department and OMB, utterly fail to adhere to the explanatory statement allocations. They provide $0 for the Regional Educational Laboratories (compared to $53.7 million in the explanatory statement), $0 for Statistics (compared to $121.5 million in the statement, $0 for the Statewide Data System (compared to $28.5 million), and just $403,622 for Special Education Studies (compared to $13.3 million). *Id.*; see Ex. 2. Defendants

29

have offered zero explanation for these deviations from the explanatory statement allocations, especially in light of the fact that Congress made the allocations legally binding for these funds.

**VI.    OMB Is Unlawfully Withholding or Unreasonably Delaying Obligating Funds**

Defendants' failure to timely obligate, or take the necessary steps toward timely obligation of, the soon-expiring FY2026 Comprehensive Centers funds and FY2025/2026 IES funds constitutes agency action unlawfully withheld or unreasonably delayed.

It is long settled that an appropriation is a mandate that an agency spend "the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). That applies to the appropriations for the Comprehensive Centers; indeed, Congress mandated that the $50 million "shall be available to carry out" the program. 140 Stat. 295; *see Child Trends, Inc. v. U.S. Dep't of Educ.*, 795 F. Supp. 3d 700, 721 (D. Md. 2025). But Defendants are unlawfully withholding $49.5 million of the $50 million, including by apportioning these funds to Unallocated, which legally bars the funds from being obligated to the program. *Supra* Section IV.A. Although Defendants now submit a declaration from an official stating that "my understanding is that the Department intends to spend all funds appropriated for the Comprehensive Centers program prior to the expiration of funds on September 30, 2026," ECF No. 41-7, ¶ 9, that wishy-washy statement is not a legal commitment, and cannot overcome the legally binding force of the existing apportionment.

Moreover, there is every reason to conclude that the Department intends to not spend some or all of these funds before they expire. A federal court found that the Department was set on impounding the Comprehensive Center funds that expired last year, until the court ordered the Department to obligate the money. *Child Trends*, 795 F. Supp. 3d at 720–22, 731. And Defendants' FY2026 budget request for the Comprehensive Centers program was $0. Ex. 3 at 19. Congress rejected that request, but Defendants are on track to zero out the program anyway.

30

For the FY2025/2026 IES funds, Defendants are, at minimum, unreasonably delaying the obligation of funds. IES's pace of obligating the funds expiring this September is anomalously slow—an extreme outlier compared to prior years. As of June 30, 2026, the Department had obligated just 68.64% of the expiring IES funds, whereas at this same point in the two-year IES funding cycle in the six prior years, the obligation rate was never below 84%, and the median across those six years was 95%. Carlile Decl. ¶ 16 & Appendix A.

That delay is unreasonable under the factors set forth in *Telecommunications Research and Action Center, et. al. v. Federal Communications Commission*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*"). The first factor, applying a "rule of reason," "asks whether the agency's response time is governed by an identifiable rationale," "and the second looks at whether Congress has provided a timetable that may supply content for the rule of reason." *Queiroz Gomes v. Bondi*, No. 25-CV-11964-ADB, 2026 WL 1815445, at *5 (D. Mass. June 24, 2026) (citations omitted). Here, Congress has provided an express timetable to obligate the funds, by September 30, 2026, and Defendants have identified no rationale for their historically slow pace of obligating funds given that deadline. The third and fifth factors also favor Plaintiffs: "Human health and welfare are at stake" because these education funds are intended to benefit children across the nation, including those with disabilities, and the "interests prejudiced by the delay" are enormously, as explained in the irreparable harm and public interest sections below. As for the fourth factor, IES has not articulated and could not articulate a "higher priority" than ensuring expenditure of its appropriations to carry out its statutory programs. *Am. Acad. of Pediatrics v. FDA*, 330 F. Supp. 3d 657, 667 (D. Mass. 2018). Finally, although "the court need not find impropriety" to find unreasonable delay, there is such impropriety here. *Queiroz Gomes*, 2026 WL 1815445, at *5 (quotations omitted). The Department has now repeatedly tried to impound some of these funds,

31

*Child Trends*, 795 F. Supp. 3d at 720–22, and Defendants' obfuscation of the May 2026 spend plan for these funds reflects an effort to hide their actions from the public.

Defendants' failure to obligate the FY2025/2026 IES funds is not just unreasonably delayed, but also is unlawfully withheld. As mentioned, the May 2026 spend plan appears to leave $10 million unapportioned, and those funds will expire unspent. Even for the apportioned money, the administrative record does not reveal specific plans for the Department to timely obligate the full $223.7 million of these funds that remained unobligated as of June 30, 2026.

## VII.     The Court Should Enter a Permanent Injunction In Addition to Other Relief

In addition to the declaratory relief and APA relief set forth in Plaintiffs' proposed order, the Court should enter a permanent injunction requiring Defendants to take all legally required apportionment and obligation actions for the relevant appropriations, both for the current funding cycles and for future fiscal years. The Court should also permanently enjoin OMB from committing the same legal violations present in this case in apportioning these funds in the future. The standards for a permanent injunction are the same as for a preliminary injunction, *Caroline T. v. Hudson Sch. Dist.*, 915 F.2d 752, 755 (1st Cir. 1990), except that Plaintiffs need only show irreparable harm if the relief were never entered, not immediate irreparable harm.

**1.** Plaintiffs and their members are suffering and will continue to suffer irreparable harm from Defendants' myriad legal violations. First, Plaintiffs and their members compete for these funds; Defendants' failure to timely apportion and obligate funds deprives Plaintiffs and their members of the opportunity to compete for money. *See* Dinkes Decl. ¶¶ 9–24, 28–29; Norford Decl. ¶¶ 3–5; Fadel Decl. ¶¶ 13, 16, 20, 30. Courts have consistently recognized that plaintiffs suffer cognizable harm from the "denial of the opportunity to compete for a pool of funds for which they are able and willing to compete," *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025), and that harm may be irreparable, *see AGMA Sec. Serv., Inc. v. United States*,

32

152 Fed. Cl. 706, 740 (2021) (citing dozens of cases). Losing a meaningful opportunity to compete for these funds would be devastating for some Plaintiffs. For example, IES grants and contracts make up 89% of Knowledge Alliance Member A's business and it anticipates having to close or lay off significant staff if it is not able to compete for IES awards. Dinkes Decl. ¶ 8.

Second, the relevant programs produce and widely disseminate research on which Plaintiffs and their members rely. NCLD, for example, relies heavily on data from NCES, NCSER and EIR data to produce its signature research products, annual white papers, and guidance for educators. Rodriguez Decl. ¶¶ 5–9, 11–12. NCLD does not have sufficient funding to undertake this research on its own, meaning lengthy delays or failures to spend the funds undercut NCLD's ability to carry out mission-critical work. *Id.* ¶ 13. MTA similarly relies heavily on data from IES's NCES for its work. Fadel Decl. ¶¶ 22; 28; 32. And MTA's members rely on IES NCES data and IES resources. *Id.* ¶ 32; *see also id.* ¶¶ 17, 21, 27 (MTA members' reliance on IES-funded data). Absent this data, MTA will either have to find alternative data of equal quality, scope, and reliability, which is unlikely, or rely on outdated information. *Id.* ¶ 33. Knowledge Alliance members also rely on IES and Department data. Dinkes Decl. ¶¶ 31–32.

Third, even if Defendants were to ultimately apportion and obligate all funds expiring this year, Plaintiffs will remain harmed by their delay. Competitions take significant time, generally between nine and eighteen months. Dinkes Decl. ¶ 30. Given this timeline and other constraints, organizations "rely on predictable competition schedules to determine where to assign their strongest staff" and make decisions in anticipation of future competitions. *See id.* Many Knowledge Alliance members have implemented layoffs, frozen hiring, and scaled back investments due to uncertainty over competitions. *Id.* Plaintiff BNP Education Partners, for example, "has invested over many years in developing and maintaining the specialized staff,

institutional knowledge, technical capabilities, and relationships with state and local education agencies needed to perform [Regional Educational Laboratories and Comprehensive Centers] work effectively." Norford Decl. ¶ 11. These irreparable harms will continue to persist for as long as Defendants maintain their current practice. *See Woonasquatucket River Watershed Council v. USDA*, No. 25-1428, 2026 WL 2279789, at *15 (1st Cir. Aug. 7, 2026).

Fourth, Plaintiffs have diverted time and funding from their core missions to tracking, understanding, and educating members and policymakers about Defendants' failure to timely apportion and obligate appropriated funds. Dinkes Decl. ¶¶ 26–27, 35; Norford Decl. ¶ 13.

Fifth, OMB's imposition of the unlawful footnotes distinctly harms Plaintiffs. The DEI footnotes will particularly harm NCLD. With respect to EIR funds, NCLD "incorporates and leverages EIR research to accomplish several specific goals." Rodriguez Decl. ¶ 12. For example, because "EIR grants specifically target high-need students" NCLD can use the data "to examine how systemic inequities affect students with disabilities, particularly focusing on racial/ethnic and socioeconomic gaps." *Id.* The DEI footnotes create uncertainty as to whether EIR grants can continue to fund this important research. The DEI footnotes also negatively impact IES's ability to use its funds to conduct disability-related research, given the Administration's view that disability-focused work constitutes impermissible "inclusion." *Supra* Section II.A. Hindering disability research cuts to the core of NCLD's mission and its ability to rely on IES research products. Rodriguez Decl. ¶ 16. This harm is not limited to NCLD or disability research—Knowledge Alliance and MTA members face uncertainty over whether their work involving equity, disability, achievement gaps, or disaggregated data will be frowned upon—despite relevance to statutory programs—when Defendants make funding decisions.

34

Dinkes Decl. ¶ 35; Fadel Decl. ¶ 15. Plaintiffs also face uncertainty from having political appointees, rather than education experts, control competitive grant decisions. Dinkes Decl. ¶ 35.

**2.** As for the balance of equities and public-interest factors, which merge where the federal government is the defendant, *Nken v. Holder*, 556 U.S. 418, 435 (2009), both favor relief.

Congress funded an interconnected education-research system in which research produced by one program supports evaluations, technical assistance, and innovation through others. Dinkes Decl. ¶ 31. Delaying or preventing education research funds from being used for the purposes Congress intended—or subjecting the funds to unlawful conditions—threatens that system and the educators, students, researchers, and policymakers who depend on it. The public also has a fundamental interest in lawful agency action, transparent administration, and respect for Congress's power of the purse. *See Rhode Island v. Trump*, 155 F.4th 35, 49 (1st Cir. 2025).

Defendants, by contrast, have no legitimate interest in continuing unlawful conduct. *New York v. Trump*, 171 F.4th 1, 25–26 (1st Cir. 2026). And relief would be no more burdensome on Defendants than the laws Congress enacted: Congress selected the programs, appropriated the funds, and prescribed their purposes and periods of availability. Injunctive relief would enforce those choices by requiring lawful apportionment and timely obligation, setting aside OMB's unlawful restrictions, and compelling required disclosures. Defendants would retain all discretion Congress gave them over recipient selection and program administration. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004); *Child Trends*, 795 F. Supp. 3d at 741–42. Any burden associated with acting before the funds expire results from Defendants' own delay and cannot justify allowing that delay to defeat Congress's commands.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion.

35

August 11, 2026                                Respectfully submitted,

                                               */s/ Daniel F. Jacobson*
                                               Daniel F. Jacobson*
                                               Lynn D. Eisenberg*
                                               Stephen Wirth*
                                               JACOBSON LAWYERS GROUP PLLC
                                               5100 Wisconsin Avenue NW, Suite 301
                                               Washington, DC 20016
                                               (301) 823-1148
                                               Dan@jacobsonlawyersgroup.com

                                               Benjamin L. Berwick (MA Bar No. 679207)
                                               PROTECT DEMOCRACY PROJECT, INC.
                                               15 Main Street, Suite 312
                                               Watertown, MA 02472
                                               Tel.: (202) 579-4582
                                               ben.berwick@protectdemocracy.org

                                               Cerin Lindgrensavage*
                                               Jacek Pruski*
                                               PROTECT DEMOCRACY PROJECT, INC.
                                               2020 Pennsylvania Ave. NW, Suite # 163
                                               Washington DC 20006
                                               Tel.: (202) 579-4582
                                               cerin.lindgrensavage@protectdemocracy.org
                                               jacek.pruski@protectdemocracy.org

                                               *Counsel for Plaintiffs*


                                               Alice O'Brien*
                                               Marissa Marandola (BBO #705609)
                                               National Education Association
                                               1201 16th Street NW
                                               Washington, DC 20036
                                               (202) 822-7035
                                               aobrien@nea.org
                                               mmarandola@nea.org

36

Ryan Leach (BBO # 706159)
Massachusetts Teachers Association
2 Heritage Drive, 8th Floor
Quincy, MA 02178
(617) 504-8774
rleach@massteacher.org

*Counsel for Plaintiff MTA*


\* Admitted pro hac vice

37

**CERTIFICATE OF SERVICE**

I certify that on August 11, 2026, I electronically filed the foregoing document using the Court's CM/ECF system and that service of this document will be accomplished on all counsel of record via CM/ECF.

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson

38