# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

NATIONAL CENTER FOR LEARNING
DISABILITIES, *et al.*,

        *Plaintiffs*,

    v.

OFFICE OF MANAGEMENT AND BUDGET,
*et al.*,

        *Defendants*.

Case No. 1:26-cv-13019

**LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS**

1.    Congress created IES to serve as the "statistics, research, and evaluation arm of the U.S. Department of Education." Education Sciences Reform Act of 2002 (ESRA), Pub. L. 107-279, 116 Stat. 1941, as amended by Pub. L. 117-286 (2022). IES must carry out its mission by compiling statistics, performing research, and conducting evaluations that support the development of widely disseminated materials and training to improve educational practices. *Id.* § 9511(b)(2).

2.    Congress mandated that in performing this work, IES must ensure that the activities it supports "(A) conform to high standards of quality, integrity, and accuracy; and (B) are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias." *Id.*

3.    Congress has also directed IES to administer four statutorily mandated and funded research centers and a range of programs that either directly produce data, research, and evaluations, or award federal grants, contracts, and cooperative agreements to do so.

4.    IES's National Center for Education Research (NCER) promotes research aimed at better understanding how to improve education across the country for all kinds of learners. Congress mandated that NCER take on several specific tasks in furtherance of this goal. For instance, NCER "shall support not less than 8 national research and development centers," each assigned at least one of 11 research topics such as "[a]dult literacy," "[e]arly childhood development and education," "English language learners research," or "[t]eacher quality." *Id.* § 9533(c).

5.      Congress established IES's National Center for Education Statistics (NCES) to, among other things, "collect, analyze, and report education information and statistics in a manner that[] (A) is objective, secular, neutral, and nonideological and is free of partisan political influence and racial, cultural, gender, or regional bias; and (B) is relevant and useful to practitioners, researchers, policymakers, and the public." 20 U.S.C. § 9541(b).

6.      NCES must annually provide the President and relevant Congressional committees "a statistical report on the condition and progress of education in the United States." *Id.* § 9545(b).

7.      NCES also operates a statutory program known as the Statewide Longitudinal Data Systems (SLDS) to award grants to States to "design, develop, and implement statewide, longitudinal data systems to efficiently and accurately manage, analyze, disaggregate, and use individual student data." *Id.* § 9607(a).

8.      Congress created IES's National Center for Special Education Research ("NCSER") to sponsor research regarding children with disabilities, as well as research to support implementation of the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 9567.

9.      NCSER is required to "carry out research activities" designed to achieve 17 congressionally identified objectives. *Id.* § 9567b. Like other programs within IES, Congress has required that NCSER ensure that research is both scientifically sound and "objective, secular, neutral, and nonideological, and … free of partisan political influence, and racial, cultural, gender, regional, or disability bias." *Id.* § 9567b(b)(3).

10.     The Regional Educational Laboratories (REL) program administered by IES, through the National Center for Education Evaluation and Regional Assistance (NCEE), assists education practitioners and policymakers by using research, evidence, and evidence-based practices to improve student outcomes.

11.     The Director of IES "shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States." 20 U.S.C. § 9564(a).

12.      Each REL contractor shall "support applied research, development, wide dissemination, and technical assistance activities" in its region and collaborate with key federal, state, and local stakeholders. *Id.* §§ 9564(f), (g).

13.     Through IDEA, Congress directed the Secretary of Education to "delegate to the Director of [IES] the responsibility to" carry out particular research activities related to special education. 20 U.S.C. § 1464(a).

14.     The Director of IES must "assess the progress in the implementation of [IDEA], including the effectiveness of State and local efforts to provide[] (A) a free appropriate public education to children with disabilities; and (B) early intervention services to infants and toddlers with disabilities…." *Id.* The Director of IES may undertake these responsibilities through direct research projects or through competitive awards. *Id.*

15.     The Comprehensive Centers program is a technical-assistance program that funds expert centers to help States, districts, and schools implement federal education programs and improve teaching, assessment, and school performance.

16.     On June 4, 2026, the Department announced that it was moving the Comprehensive Centers program from another component of the Department to IES.

17.    Congress mandated that the Secretary of Education award "not less than" twenty grants to local entities or groups to serve as Comprehensive Centers. 20 U.S.C. § 9602(a)(1).

18.    Comprehensive Centers must work with state and local educational agencies "on school improvement activities that take into account factors such as the proportion of economically disadvantaged students in the region." *Id.* § 9602(e).

19.    Comprehensive Centers must "give priority to": "(1) schools in the region with high percentages or numbers of students from low-income families … including such schools in rural and urban areas, and schools receiving [certain federal] assistance"; "(2) local educational agencies in the region in which high percentages or numbers of school-age children are from low-income families;"; and (3) schools in the region that have been identified for school improvement. *Id.*

20.    Congress also mandated that the Department administer the Education Innovation and Research (EIR) program. The Department recently moved this program to IES under the management of IES's NCER.

21.    Through EIR, the Department must issue grants to both study and implement innovative, evidence-based practices "to improve student achievement and attainment for high-need students." 20 U.S.C. § 7261(a)(1)(A). The Department must ensure that EIR program awards focus on rural areas and "that not less than 25 percent of funds made available for any fiscal year" go to programs for rural schools. *Id.* § 7261(c)(1).

22.    In its continuing resolution of 2025, Congress appropriated funds to IES at the same levels and subject to the same conditions as it had appropriated to IES in the Consolidated Appropriations Act of 2024, Pub. L. 118-47 (2024) ("2024 Appropriations Act"). *See* Pub. L. 119-4, §§ 1101–1102 (2025) ("2025 Continuing Resolution").

23. The 2024 Appropriations Act had appropriated $793 million for IES and directed that the funds "shall remain available through September 30, 2025." 2024 Appropriations Act, 138 Stat. at 690.

24. Unlike most appropriations that are available only for one fiscal year, the IES appropriations were made available for use over two fiscal years (*i.e.*, FY2024 and FY2025).

25. The 2025 Continuing Resolution carried forward the two-year period of availability for IES funds. 2025 Continuing Resolution,  139 Stat. 12, § 1103. Thus, in 2025, Congress appropriated another $793 million to IES, available over a two-year period until September 30, 2026 (the "FY2025/2026 IES funds").

26. In 2026, Congress appropriated $789 million to IES, again making the funds available over a two-year period, until September 30, 2027 (the "FY2026/FY2027 IES funds"). *See* Consolidated Appropriations Act of 2026, Pub L. 119-75, 140 Stat. 173, 303 (the "2026 Appropriations Act").

27. Congress has also included with the appropriation acts "explanatory statements" that set forth how it intends each agency to allocate funds among the programs that fall under each appropriation. Although Congress has not always made those explanatory statements binding on the agencies by incorporating them by reference into the text of the appropriations act, OMB has consistently apportioned, and IES has generally obligated, funds in line with Congress's intentions expressed in the explanatory statements.

28. In the 2026 Appropriations Act, Congress made the table in the explanatory statement for IES funds legally binding on IES, by expressly incorporating it into the Act. The Act provides that the obligation of IES funds "shall be for the purposes and in the amounts

6

specified in the 'Final Bill' column for Institute of Education Sciences in the … table in the explanatory statement." 2026 Appropriations Act, 140 Stat. 303.

29.     Congress appropriated money for the Comprehensive Centers program separately from the other IES programs. In the 2026 Appropriations Act, Congress provided that $50 million "shall be available" for the Comprehensive Centers program. *See* 140 Stat. 295 (appropriating $50 million "to carry out section 203 of the Educational Technical Assistance Act of 2002," which is the authorizing statute for the Comprehensive Centers). The Comprehensive Centers appropriations are single-year funds, meaning they expire at the end of September 30, 2026.

30.     Congress also separately appropriates funds for the EIR program, Congress provided in the 2026 Appropriations Act that $235 million "shall be available" for the EIR program. *See* 140 Stat. 296 ("$235,000,000 shall be available through December 31, 2026 for subpart 1 of part F of title IV"). EIR funds expire on December 31, 2026.

31.     The Anti-Deficiency Act (ADA) governs the process by which OMB must "apportion" congressional appropriated funds to agencies, to enable agencies to use the funds.

32.     In 1870, Congress first enacted what became known as the Anti-Deficiency Act, making it unlawful for officials and agencies to spend more funds than Congress had appropriated for a particular fiscal year. Act of July 12, 1870, ch. 251, § 7, 16 Stat. 230, 251 (codified as amended at 31 U.S.C. § 1341(a)(1)(A)–(B)).

33.     In 1905, Congress added penalties for violations of the 1870 Act and created the apportionment process. Act of Mar. 3, 1905, ch. 1484, § 4, 33 Stat. 1214, 1257–58.

34.     Congress enacted the modern version of the Anti-Deficiency Act in 1982. Pub. L. 97-258, 96 Stat. 877 (codified as amended at 31 U.S.C. §§ 1349(a), 1350, 1512(a), 1513(b)).

35.     Under the Anti-Deficiency Act, when Congress appropriates funds for an agency, OMB must apportion the funds to the agency in writing before the agency may obligate (i.e. commit to spend) those funds. 31 U.S.C. § 1513(b).

36.     For appropriations that are available for a definite period, which is all appropriations at issue in this case, OMB must apportion funds with the goal "to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." *Id.* § 1512(a).

37.     The Anti-Deficiency Act sets a firm deadline for OMB to apportion all appropriations. OMB must apportion an appropriation "not later than . . . "30 days after the date of enactment of the law by which the appropriation is made available." *Id.* § 1513(b)(2)(B).

38.     OMB may apportion funds to become available across "months, calendar quarters, operating seasons, or other time periods." *Id.* § 1512(b)(1)(A). OMB also may apportion funds by "activities, functions, projects, or objects," specifying when different portions of the funds will be available for the various purposes Congress authorized. *Id.* § 1512(b)(1)(B).

39.     Agencies are legally prohibited from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding" the amount apportioned by OMB or otherwise departing from the apportionment's terms. *Id.* § 1517(a).

40.     The Anti-Deficiency Act imposes both administrative and *criminal* penalties on agency officials who violate these restrictions. *See id.* §§ 1518–19.

41.     The sole exceptions to the mandate that OMB apportion all funds no later than 30 days after enactment of the law appropriating the funds provides that OMB may establish a "reserve" in the following three limited circumstances: "(A) to provide for contingencies; (B) to

achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (c) as specifically provided by law." *Id.* § 1512(c).

42. Prior to 1974, the Anti-Deficiency Act had an additional provision allowing reserves on broader grounds for establishing reserves. *City of New Haven v. United States*, 809 F.2d 900, 906 & n.18 (D.C. Cir. 1987). Congress repealed that provision to "preclude the President from relying on the Act as authority for implementing policy impoundments." *Id.*

43. OMB often includes "footnotes" in apportionments. *See Citizens for Resp. & Ethics in Wash. v. OMB*, 791 F. Supp. 3d 29, 40 n.5, 54 (D.D.C. 2025). Footnotes designated with the letter "A" impose legally binding conditions on the agency's use of the funds under the Anti-Deficiency Act. *See* OMB Circular No. A-11, §§ 120.1, 120.34, https://perma.cc/H466-36D6. Sometimes these binding footnotes refer to agency "spend plans."

44. An agency spend plan reflects how the agency intends to use apportioned funds. Beginning with this Administration, OMB has incorporated spend plans into apportionment footnotes in a manner that enables OMB to interfere with or micromanage agency spending. Specifically, OMB has mandated in binding "A" footnotes that agencies may spend apportioned funds only in accordance with a spend plan that must be "agreed upon" by OMB and the agency. *See Protect Democracy Project v. OMB*, No. 25-cv-1111, Order Granting Mot. to Enforce at 5–6, Dkt. 48 (D.D.C. Jan. 28, 2026).

45. Pursuant to laws enacted in 2022 and 2023, OMB must post its apportionments on a publicly accessible database within two business days. Pub. L. 117-103, div. E, tit. II, §§ 204(b)-(c), 136 Stat. 49, 256-57 (2022) (codified at 31 U.S.C. § 1513 note); Pub. L. 117-328, div. E, tit. II, § 204, 136 Stat. 4459, 4667 (2022) (codified at 31 U.S.C. § 1513 note).

46. In January 2026, a federal court held that this requirement includes posting spend plans incorporated into binding footnotes. *Protect Democracy*, No. 25-cv-1111, Dkt. 48. However, OMB's compliance with the Court's order to post spend plans has been tardy and incomplete. *Id.*, Dkt. 49.

47. The Anti-Deficiency Act's 30-day deadline to apportion the FY2025/2026 IES funds expired on April 14, 2025. But OMB did not apportion the funds until May 13, 2025, a full month after the statutory deadline. *See* Ex. 4 (May 13 IES Apportionment).

48. When OMB did apportion the funds, OMB apportioned $485 million of the FY2025/2026 funds to an "Unallocated" line of the apportionment, which renders the funds unavailable to use for any purpose. *Id.*

49. The funds that OMB did apportion for actual IES programming did not match the allocations that Congress specified in its explanatory statement for the FY2025/2026 funds. For instance, OMB apportioned $0 for Research in Special Education, $0 for Special Education Studies, and just $12,493 for Research, Development, and Dissemination. *See Id*.

50. The apportionment also included binding footnotes directing that the Department could use the funds only as "consistent with the latest agreed-upon spending plan for Fiscal Year 2025 between the Department of Education (ED) and the Office of Management and Budget (OMB)." *See Id*. n. A2. OMB also included a footnote directing that, "[a]s permissible by law, amounts apportioned shall be spent in a manner consistent with . . . Executive Order 14151, "Ending Radical And Wasteful Government DEI Programs." *Id.* n.A3.

51. On August 8, 2025, OMB approved a new apportionment for the same set of FY2025/2026 funds, which increased the amount in the "Unallocated" line to $500 million and apportioned the balance across IES's various programs and Program Administration. *See* Ex. 5.

The August 8, 2025 apportionment contained the same footnotes as in the May 13, 2025 apportionment. *See Id.*, n. A3, n. A5.

52.    On February 27, 2026, OMB apportioned $210.5 million of the $500 million previously relegated to the "Unallocated" line for the second and final year (FY2026) of the FY2025/2026 IES appropriation from the 2025 Continuing Resolution. *See* Ex. 6. This apportionment kept $289.5 million apportioned to the "Unallocated" line. *See id.* The February 27, 2026 Apportionment again included a spend-plan footnote, and it expanded the footnotes that limit spending to also mandate compliance with Executive Order 14332, "Improving Oversight of Federal Grantmaking." *Id.* n.A2.

53.    On June 18, 2026, OMB released a monthly "SF-133 Report" for the Department of Education. This report provides monthly data about how much money agencies have obligated, and for what purpose. The report also includes information about the amounts apportioned for each account, but these reports do not apportion funds, and the revelation of apportionments in these reports do not carry out OMB's statutory mandate to post apportionments and spend plans incorporated therein within two business days in OMB's public apportionment database.

54.    The June 2026 SF-133 Report indicated that OMB had apportioned roughly $250 million in FY2025/2026 IES funds at some point in May 2026. *See* Fiscal Year 2026 Dep't of Educ. SF-133 for TAFS 091-2025-2026-1100 (row 8759), https://tinyurl.com/2s3p8t5k. The June 2026 SF-133 did not reveal how this amount was apportioned among the different IES programs, nor does it reveal the footnotes attached to the purported apportionments.

55.    On August 1, 2026, after the filing of this case detailing this potentially undisclosed apportionment, OMB posted to its database a "May Update" to its "FY 2026 IES

11

spend plan." OMB015. By virtue of having been incorporated by reference into the February 2026 apportionment, the agreement upon this spend plan apportioned the FY2025/2026 IES funds.

56.     The spend plan reflects that OMB has finally apportioned all but about $10 million of the remaining FY2025/2026 IES funds, provided that the numbers in the March 5, 2026 spend plan, OMB014, totalling $232,904,876 are added to the numbers on the first sheet of the May Update, OMB015, which total $141,828,458 and then if those numbers are in turn added to the lines of funds apportioned for June, July and August in the supporting sheets of the May Update, OMB015 at 4-11, totaling $100,164,311.

57.     In total, this makes approximately $475 million of the FY2025/2026 IES funds available for obligation. As the account originally had $510 million before the $25 million rescission in Program Administration funds in the FY2026 Appropriations Act, that still leaves a gap of about $10 million for which an apportionment has not been disclosed. This means that either those $10 million remain unapportioned, or there is an additional apportionment or spend plan that has not been disclosed.

58.     The May Update also indicates that $17 million has been reprogrammed from the Statistics funds to the SLDS programs.

59.     The Anti-Deficiency Act's deadline for apportioning the FY2026 Comprehensive Centers program funds passed on March 5, 2026.

60.     As of today's date, OMB has apportioned only $500,000 of the $50 million appropriated for the Comprehensive Centers program. Ex. 7. his leaves $49.5 million unapportioned and legally unavailable for obligation. Those unapportioned funds will expire on September 30, 2026.

12

61.    At the time the $500,000 was apportioned on April 9, 2026, OMB included a binding footnotes requiring that the Department comply with the same two Executive Orders in using these funds as with the FY2025/2026 IES funds. *Id.*, n.A3. Those footnotes were removed when the account was reapportioned on July 21, 2026. Exs. 8, 9.

62.    For the EIR funds appropriated in 2026, the Anti-Deficiency Act's deadline for apportioning the funds was March 5, 2026, but OMB did not apportion any of the EIR funds by that date. On April 9, 2026, OMB apportioned a paltry $59,235 of the $235 million appropriated for the EIR program. Ex. 10. The remaining $234.94 million was apportioned to an "Unallocated line," legally prohibiting the Department from using these funds for their intended purposes. *Id.*

63.    On July 21, 2026, three weeks after this lawsuit was filed, OMB apportioned the remaining EIR funds. Ex. 11. OMB included a binding footnotes requiring that the Department comply with the same two Executive Orders in using these funds as with the FY2025/2026 IES funds. *Id.*, n.A3.

64.    Congress appropriated $789 million in FY2026/2027 IES funds in the 2026 Appropriations Act, and these funds expire on September 30, 2027. Pub. L. 119-75.

65.    On February 18, 2026, OMB apportioned a small portion of these funds, designating $584 million on the "Unallocated" line and apportioning almost all of the rest to the National Assessment of Education Progress. *See* Ex. 12.

66.    On July 27, 2026, OMB apportioned an additional $118.65 million in FY2026/2027 IES funds, but still apportioned *zero* FY2026/2027 IES funds for the Regional Educational Laboratories, Statistics, and Statewide Longitudinal Data System, and only $403,622 for Special Education Studies. Ex. 13.

67.    OMB apportioned $465.6 million of the FY2026/2027 IES funds as "Undistributed," with a footnote saying that "[a]mounts apportioned on this line are available for obligation" not as of this apportionment, but only "upon reapportionment to an applicable Category B line," where Category B provides the substantive purposes for which funds may be used. *Id.* n.A4. OMB included a binding footnote requiring that the Department comply in using these funds with Executive Order 14151, one of the two Executive Orders whose policy directives were imposed on the FY2025/2026 IES funds. *Id.*, n.A3.

68.    OMB included legally binding "A" footnotes in its initial FY2026 apportionments of FY2026/2027 IES funds, conditioning the Department of Education's use of funds on compliance with policy directives in Executive Order 14151, 'Ending Radical And Wasteful Government DEI Programs And Preferencing," and/or Executive Order 14332, "Improving Oversight of Federal Grantmaking." *See* Ex. 6, n. A2.

69.    Executive Order 14151 directs all agencies to eliminate government programs, grants, and contracts that, in the Administration's view, promote diversity, equity, inclusion, and accessibility initiatives.

70.    Executive Order 14332 directs agencies to (among other things) embed senior, politically appointed officials into the grantmaking process and to ensure that competitive grants advance the Administration's priorities.

71.    Plaintiffs and their members are organizations and associations dedicated to educators and education research that compete for funding under the programs at issue in this case and depend on the research, data, and studies produced through these programs to carry out their missions.

14

72.     Plaintiff Knowledge Alliance is a nonprofit, nonpartisan association composed of 19 education organizations that share the belief that high-quality, timely, and relevant research is essential to improving student outcomes. Decl. or Rachel Dinkes ¶¶ 2-3.

73.     Knowledge Alliance members operate under grants and contracts under the programs at issue in this case. *Id.* ¶ 9.

74.     Plaintiff BNP Partners has received awards under the REL program, has competed for awards through the Comprehensive Centers program, and relies on NCES data in its own work. Norford Decl. ¶¶ 4-5, 7.

75.     Plaintiff National Center for Learning Disabilities (NCLD) is a nonprofit that works with educators, students, families, and others to "advance research, share resources, build coalitions, and advocate for policies that reduce systemic barriers for individuals with learning disabilities." Decl. of Jacqueline Rodriguez ¶ 2. To do this, NCLD relies on IES-created data, research, and evaluations—primarily but not limited to data from NCSER and NCES—to undertake its own research and develop policy briefs. *Id.* ¶¶ 3-6.

76.     Plaintiff Massachusetts Teachers Association (MTA) represents 117,000 members including more than 12,000 members who work in higher education as, for example, faculty in the University of Massachusetts's colleges of education., Decl. of Mike Fadel ¶ 5. MTA's members and staff rely heavily on IES data and research projects in their work, and apply for IES- funded grants, and receive benefits through REL projects.. *Id.* ¶¶ 10, 12.

August 11, 2026                              Respectfully submitted,

                                            */s/ Daniel F. Jacobson*
                                            Daniel F. Jacobson*
                                            Lynn D. Eisenberg*
                                            Stephen Wirth*
                                            JACOBSON LAWYERS GROUP PLLC
                                            5100 Wisconsin Avenue NW, Suite 301
                                            Washington, DC 20016
                                            (301) 823-1148
                                            Dan@jacobsonlawyersgroup.com

                                            Benjamin L. Berwick (MA Bar No. 679207)
                                            PROTECT DEMOCRACY PROJECT, INC.
                                            15 Main Street, Suite 312
                                            Watertown, MA 02472
                                            Tel.: (202) 579-4582
                                            ben.berwick@protectdemocracy.org

                                            Cerin Lindgrensavage*
                                            Jacek Pruski*
                                            PROTECT DEMOCRACY PROJECT, INC.
                                            2020 Pennsylvania Ave. NW, Suite # 163
                                            Washington DC 20006
                                            Tel.: (202) 579-4582
                                            cerin.lindgrensavage@protectdemocracy.org
                                            jacek.pruski@protectdemocracy.org

                                            *Counsel for Plaintiffs*


                                            Alice O'Brien*
                                            Marissa Marandola (BBO #705609)
                                            National Education Association
                                            1201 16th Street NW
                                            Washington, DC 20036
                                            (202) 822-7035
                                            aobrien@nea.org
                                            mmarandola@nea.org

                                            Ryan Leach (BBO # 706159)
                                            Massachusetts Teachers Association
                                            2 Heritage Drive, 8th Floor
                                            Quincy, MA 02178
                                            (617) 504-8774
                                            rleach@massteacher.org

16

*Counsel for Plaintiff MTA*

\* Admitted pro hac vice