**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

NATIONAL CENTER FOR LEARNING DISABILITIES, et al.,

*Plaintiffs*,

v.

OFFICE OF MANAGEMENT AND BUDGET, et al.,

*Defendants*.

Civil Action No. 1:26-cv-13019

# DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Defendants move to dismiss under Federal Rule of Civil Procedure 12, or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56. In support of this motion, the Court is respectfully referred to Defendant's accompanying memorandum of points and authorities.

Dated: August 25, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

DIANE KELLEHER
Director

MICHELLE BENNETT
Assistant Branch Director

*/s/ Michael K. Velchik*
MICHAEL K. VELCHIK
Senior Counsel
Civil Division

United States Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
Phone: (202) 860-8388
E-mail: michael.velchik@usdoj.gov

PIERCE J. ANON
EITAN R. SIRKOVICH
Trial Attorneys
Federal Programs Branch

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

NATIONAL CENTER FOR LEARNING DISABILITIES, et al.,

*Plaintiffs*,

v.

OFFICE OF MANAGEMENT AND BUDGET, et al.,

*Defendants*.

Civil Action No. 1:26-cv-13019

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........ 1

LEGAL BACKGROUND ........ 3

STATEMENT OF FACTS ........ 4

LEGAL STANDARD ........ 6

ARGUMENT ........ 7

I. THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS ........ 8

A. Plaintiffs Fail To Establish Article III Standing ........ 8

B. Several Claims Are Moot ........ 11

C. Plaintiffs' Claims for Funding Not Set to Expire Until September 2027 are Not Ripe ........ 12

II. THRESHOLD DEFECTS DOOM PLAINTIFFS' CLAIMS ........ 13

A. Plaintiffs' Claims Are Precluded ........ 14

B. Plaintiffs Are Outside The Zones of Interest of the Statutes They Wish to Enforce ........ 18

C. The Funding Decisions at Issue Are Committed to Agency Discretion by Law ........ 19

D. Plaintiffs' APA Claims Fail on the Merits Because They Do Not Challenge a Discrete Final Agency Action ........ 20

III. PLAINTIFFS' CLAIMS FAIL ON THE MERITS ........ 22

A. Defendants' Conduct Was Not Contrary To Law ........ 22

B. Plaintiffs' Arbitrary and Capricious Claim Fails on the Merits ........ 25

C. Plaintiffs' Separation of Powers Claim Fails ........ 28

D. Plaintiffs Cannot Contest Their Public Posting Claim ..........29

E. Defendants' Apportionments Are Not Unlawful ..........30

F. There Has Been No Unreasonable Delay or Unlawful Withholding of Any Apportionment or Obligation ..........31

IV. PLAINTIFFS' REQUESTED RELIEF IS UNAVAILABLE AND OVERBROAD ..........33

CONCLUSION ..........35

## TABLE OF AUTHORITIES

### Cases

*Air Courier Conf. of Am. v. Am. Postal Workers Union*,
498 U.S. 517 (1991) ........ 18

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ........ 15, 16

*Alexander v. Trump*,
753 F. App'x 201 (5th Cir. 2018) ........ 24

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ........ 11

*Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*,
804 F. Supp. 3d 45 (D.D.C. 2025) ........ 29

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
659 F.3d 13 (D.C. Cir. 2011) ........ 23

*Amrhein v. eClinical Works, LLC*,
954 F.3d 328 (1st Cir. 2020) ........ 10

*Ancient Coin Collectors Guild v. CBP*,
801 F. Supp. 2d 383 (D. Md. 2011) ........ 24

*Ancient Coin Collectors Guild v. CBP*,
698 F.3d 171 (4th Cir. 2012) ........ 24

*Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ........ 20

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ........ 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 6

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 20

*Bldg. & Constr. Trade Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ........ 25, 26

*Block v. Community Nutrition Institute*,
467 U.S. 340 (1984) .......... 14, 17

*Bos. Bit Labs, Inc. v. Baker*,
11 F.4th 3 (1st Cir. 2021) .......... 11

*Brown v. Gen. Servs. Admin.*,
425 U.S. 820 (1976) .......... 18

*Burns v. Johnson*,
829 F.3d 1 (1st Cir. 2016) .......... 6

*Cangrejeros De Santurce Baseball Club, LLC v. Liga De Beisbol Profesional De P.R.*,
146 F.4th 1 (1st Cir. 2025) .......... 6

*Carney v. Adams*,
592 U.S. 53 (2020) .......... 8

*Castro v. Scanlan*,
86 F.4th 947 (1st Cir. 2023) .......... 9

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .......... 7

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......... 11

*City of New Haven v. United States*,
809 F.2d 900 (D.C. Cir. 1987) .......... 31

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 9, 10, 11

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388 (1987) .......... 18

*Clarke v. United States*,
915 F.2d 699 (D.C. Cir. 1990) .......... 11, 12

*Cmty. Action of Laramie Cnty., Inc. v. Bowen*,
866 F.2d 347 (10th Cir. 1989) .......... 20

*Coe v. McHugh*,
968 F. Supp. 2d 237 (D.D.C. 2013) .......... 7

*Dalton v. Specter,*
511 U.S. 462 (1994) .......... 28, 29

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) ....................................................................................................34

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ..........................................................................................................7

*Dep't of State v. Aids Vaccine Advoc. Coal.*,
146 S. Ct. 19 (2025) ............................................................................................. 14, 17

*Detroit Int'l Bridge Co. v. Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016) ..............................................................................24

*DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*,
76 F.3d 1212 (D.C. Cir. 1996) ....................................................................................21

*EPA v. Brown*,
431 U.S. 99 (1977) ......................................................................................................22

*Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
28 F.3d 1268 (D.C. Cir. 1994) ............................................................................ 11, 12

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ....................................................................................................25

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ....................................................................................................25

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ....................................................................................................10

*Feldman v. Bowser*,
315 F. Supp. 3d 299 (D.D.C. 2018) ............................................................................16

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) ....................................................................................................28

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ...................................................................................... 21, 24, 27

*Ghannad-Rezaie v. Laitinen*,
757 F. Supp. 3d 148 (D. Mass. 2024) .........................................................................32

*Glass Packaging Inst. v. Regan*,
737 F.2d 1083 (D.C. Cir. 1984) ..................................................................................19

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ................................................................................*passim*

*Golden v. Zwickler*,
394 U.S. 103 (1969) ....................12

*Gray v. Office of Pers. Mgmt.*,
771 F.2d 1504 (D.C. Cir. 1985) ....................12

*Harris v. Univ. of Mass. Lowell*,
43 F.4th 187 (1st Cir. 2022) ....................12

*Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*,
802 F.3d 99 (1st Cir. 2015) ....................7

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*,
746 F.2d 855 (D.C. Cir. 1984) ....................20

*Jensen v. Quality Loan Serv. Corp.*,
702 F. Supp. 2d 1183 (E.D. Cal. 2010) ....................29

*Karst Envtl. Educ. & Prot., Inc. v. EPA*,
475 F.3d 1291 (D.C. Cir. 2007) ....................12

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ....................19, 20, 28

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................... 8, 9

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ....................33

*Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*,
854 F.2d 40 (4th Cir. 1988) ....................32

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ....................18

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
453 U.S. 1 (1981) ....................16

*Milk Train, Inc. v. Veneman*,
310 F.3d 747 (D.C. Cir. 2002) ....................20

*Minuteman Health, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
291 F. Supp. 3d 174 (D. Mass. 2018) ....................7

*Moms Against Mercury v. FDA*,
483 F.3d 824 (D.C. Cir. 2007) ....................6

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ....34

*Murphy v. United States*,
45 F.3d 520 (1st Cir. 1995) ....6

*Murthy v. Missouri*,
603 U.S. 43 (2024) ....10

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025) ....26

*Narra v. Fannie Mae*,
2014 WL 505571 (E.D. Mich. Feb. 7, 2014) .... 29, 30

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) .... 12, 13

*Navajo Nation v. United States Dep't of Interior*,
852 F.3d 1124 (D.C. Cir. 2017) ....32

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
508 U.S. 656 (1993) ....8

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ....33

*NRDC v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) ....23

*Pol'y & Rsch., LLC v. Dep't of Health & Hum. Servs.*,
313 F. Supp. 3d 62 (D.D.C. 2018) ....20

*PPG Indus., Inc. v. United States*,
52 F.3d 363 (D.C. Cir. 1995) ....34

*Reddy v. Foster*,
845 F.3d 493 (1st Cir. 2017) ....12

*Reno v. Flores*,
507 U.S. 292 (1993) ....25

*River St. Donuts, LLC v. Napolitano*,
558 F.3d 111 (1st Cir. 2009) ....7

*Ruiz-Rivera v. United States*,
No. CIV. 10-1139 (JAF), 2010 WL 3069251 n. 2 (D.P.R. Aug. 2, 2010) ....6

*Salazar v. Ramah Navajo Chapter*,
567 U.S. 182 (2012) ....................16

*Sherley v. Sebelius*,
689 F.3d 776 (D.C. Cir. 2012) ....................26

*Sierra Club v. EPA*,
353 F.3d 976 (D.C. Cir. 2004) ....................25

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ....................6

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ....................27

*Telecomms. Rsch. & Action Ctr. v. F.C.C.*,
750 F.2d 70 (D.C. Cir. 1984) ....................32

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ....................6

*Texas v. United States*,
523 U.S. 296, (1998) .................... 12, 13

*Theodore Roosevelt Conservation P'ship v. Salazar*,
616 F.3d 497 (D.C. Cir. 2010) ....................33

*Thompson v. N. Am. Stainless, LP*,
562 U.S. 170 (2011) ....................18

*Thurston v. United States*,
696 F. Supp. 680 (D.D.C. 1988)....................16

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .................... 8, 10

*Trs. of Dennis Pines Condo. Tr. of Dennis v. Patten*,
2026 WL 539597 (D. Mass. Feb. 26, 2026) ....................16

*Trump v. AFGE*,
No. 24A1174, 2025 WL 1873449 (U.S. July 8, 2025)....................26

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ....................34

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026)....................27

*Tulare Cnty. v. Bush*,
306 F.3d 1138 (D.C. Cir. 2002) ....................24

*United States v. Richardson*,
418 U.S. 166 (1974) ....................9

*Waffenschmidt v. MacKay*,
763 F.2d 711 (5th Cir. 1985) ....................30

*Waite v. Macy*,
246 U.S. 606 (1918) ....................34

*Walpin v. Corp. for Nat'l & Cmty. Servs.*,
630 F.3d 184 (D.C. Cir. 2011) ....................23

*Washington v. Off. of Mgmt. & Budget*,
No. CV 25-1051 (EGS), 2025 WL 2025114 (D.D.C. July 21, 2025) .................... 23, 30

*Weiner v. Klais & Co., Inc.*,
108 F.3d 86 (6th Cir. 1997) .................... 30, 31

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
No. 25-1428, 2026 WL 2279789 (1st Cir. Aug. 7, 2026) .................... 9, 34

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ....................29

**Statutes**

2 U.S.C. § 681 ....................4

2 U.S.C. § 683(a) ....................4, 15, 17, 31

2 U.S.C. § 684(a) ....................15

2 U.S.C. § 686(a) ....................4, 17, 31

2 U.S.C. § 687 ....................4, 14, 15

2 U.S.C. § 688 ....................15

5 U.S.C. § 701(a)(1) ....................1, 14, 15, 16

5 U.S.C. § 701(a)(2) ....................19

5 U.S.C. § 706(1) .................... 7, 33

5 U.S.C. § 706(2) ....................33

5 U.S.C. § 706(2)(A) ....................7

31 U.S.C. § 1341 .......... 3
31 U.S.C. § 1349 .......... 16
31 U.S.C. § 1350 .......... 16
31 U.S.C. § 1351 .......... 16
31 U.S.C. § 1512 .......... 15, 16, 32
31 U.S.C. § 1512(a) .......... 3, 32
31 U.S.C. § 1512(b) .......... 3, 4
31 U.S.C. § 1512(b)(1) .......... 30
31 U.S.C. § 1512(b)(2) .......... 19, 30
31 U.S.C. § 1512(c) .......... 3, 4
31 U.S.C. § 1512(c)(1) .......... 31
31 U.S.C. § 1512(d) .......... 13, 21
31 U.S.C. § 1513 .......... 15, 16, 32
31 U.S.C. § 1513(a) .......... 3
31 U.S.C. § 1513(b) .......... 23, 35
31 U.S.C. § 1513(b)(1) .......... 3, 23, 30
31 U.S.C. § 1513(b)(2) .......... 3, 22, 23, 30
31 U.S.C. § 1517(b) .......... 16
Pub. L. No. 119-4 .......... 28
Pub. L. No. 93-344 .......... 4
Pub. L. No. 117-328 .......... 23

**Rules**

Fed. R. Civ. P. 56(a) .......... 6
Fed. R. Civ. P. 65(d) .......... 35
Fed. R. Civ. P. 56(e) .......... 8

**Other Authorities**

Executive Order 14151 .......... 25, 26

Executive Order 14332 .......... 25, 26

## INTRODUCTION

Plaintiffs seek to challenge an alleged impoundment of certain funds that neither has nor will occur. The record demonstrates that Defendants have been engaged in an iterative, ongoing process to apportion and obligate funds for the three programs at issue. Critically, Defendants have notified Congress, and averred in sworn declarations to this Court, that all funds *have been* apportioned, and that Defendants intend to obligate *all funds* consistent with statutory obligations. In that regard, this dispute is wholly artificial. There is no legal or practical basis to short-circuit this intra-Executive Branch process while there is still ample time to obligate the remaining funds before they expire September 30, 2026, or September 30, 2027, for the funds that do not expire until that date.

As a threshold concern, this Court lacks jurisdiction over Plaintiffs' claims. Plaintiffs have no contractual entitlement to any of the funds at issue. They fail to state a cognizable competitive injury, as they do not allege, and cannot show, that they are being denied an equal opportunity to compete for the funds—rather, they speculate that Defendants might not obligate the funds at all. They also fail to state a cognizable informational injury because they cannot identify any statute providing them with a right to information the government or third-parties may generate in the future with this funding. Furthermore, any decisions by Plaintiffs to reallocate staff to monitor the Government's apportionment and obligations decisions are self-inflicted and therefore cannot support standing. To the extent that Plaintiffs challenge outdated apportionment statistics or spend plans, those claims are moot. The remaining claims are unripe—a large fraction of the funds at issue do not expire until September 30, 2027, *more than a year from now*. There is no conceivable basis for this Court to micromanage agency administration of programs that far in advance of any statutory deadline.

Second, Plaintiffs' claims suffer from other threshold defects. Plaintiffs' claims rely on the Administrative Procedure Act ("APA"), but the APA does not apply where a "statute[] preclude[s] judicial review," 5 U.S.C. § 701(a)(1), and the Impoundment Control Act ("ICA") and Anti-Deficiency Act ("ADA") preclude review because of their comprehensive remedial schemes. And, in any event, Plaintiffs are outside the zones of interest for those statutes they wish to enforce.

Just as problematic—Plaintiffs fail to identify any *final* agency action. Actions that Plaintiffs say are "final" are plainly interlocutory. Indeed, their claim that not apportioning or obligating funds is "final" is belied by Defendants' record. Funding decisions have been made periodically in the lead up to September 30, as demonstrated by the sworn declarations submitted to the Court. These decisions, on when to submit an apportionment or obligate funds, are inherently made on a rolling basis, and are nevertheless discretionary. Plaintiffs' attempt to place this Court in the shoes of the agency and determine issues inherent to the agency, like when an allocation or obligation should be made before funds expire, is wholly impractical and without a legal basis.

Third, Plaintiffs' claims fail on the merits. Defendants have apportioned funds; Plaintiffs simply would prefer different labels and different numbers. But the statute vests the apportioning official with substantial discretion over how and when to make these apportionments. Plaintiffs cite nothing in the text of the ADA requiring Defendants to use their preferred labels. Moreover, Defendants' have not unreasonably delayed or unlawfully withheld the obligation of any funds—the funds do not expire until September 30, 2026, at the earliest so it is temporally impossible for any of these obligations to have been unlawfully withheld or delayed at this time. Moreover, Defendants' citation to Executive Orders in footnotes are not unlawful; by their very terms, the Executive Orders direct agency action only to the extent otherwise "consistent with law" And the footnotes provide guidance only "as permissible by law."

Finally, even if there were some basis for providing relief to Plaintiffs (and there is not), Plaintiffs' proposed relief is unwarranted and overbroad. Plaintiffs request this Court superintend core intra-Executive Branch administrative duties for three funds indefinitely, including over future appropriations that Congress may later enact. The APA does not permit this kind of programmatic attack.

Plaintiffs' claims, however framed, have no basis in law. Defendants' sworn declarations establish that every dollar subject to the September 30, 2026, expiration date has already been apportioned, and that the agency intends to obligate those funds in full before they expire. Plaintiffs offer no evidence to the contrary. They are equipped only with fear and speculation of what

Defendants might hypothetically do. But conjecture is no substitute for proof. Summary judgment should be entered for Defendants.

## LEGAL BACKGROUND

1. *The Anti-Deficiency Act.* The ADA 31 U.S.C. § 1341 *et seq.*, prohibits federal agencies from obligating or expending federal funds in advance or in excess of an appropriation. Under the ADA, "an appropriation available for obligation for a definite period shall be apportioned to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." *Id.* § 1512(a). "The official designated in section 1513 of this title to make apportionments [*i.e.* OMB] shall apportion an appropriation . . . as the official considers appropriate" and may so apportion by "(A) months, calendar quarters, operating seasons, or other time periods; (B) activities, functions, projects, or objects; or (C) a combination of ways." *Id.* § 1512(b, c). Further, the ADA provides an agency notification requirement:

> The official having administrative control of an appropriation . . . shall apportion the appropriation in writing. An appropriation shall be apportioned not later than the later of the following: (1) 30 days before the beginning of the fiscal year for which the appropriation is available; or (2) 30 days after the date of enactment of the law by which the appropriation is made available.

*Id.* § 1513(a).

> The President shall apportion in writing an appropriation available to an executive agency . . . that is required to be apportioned under section 1512 of this title. . . . The information shall be submitted not later than the later of the following: (A) 40 days before the beginning of the fiscal year for which the appropriation is available; or (B) 15 days after the date of enactment of the law by which the appropriation is made available.

*Id.* § 1513(b)(1).

> The President shall notify the head of the executive agency of the action taken in apportioning the appropriation under paragraph (1) of this subsection not later than the later of the following: (A) 20 days before the beginning of the fiscal year for which the appropriation is available; or (B) 30 days after the date of enactment of the law by which the appropriation is made available.

*Id.* § 1513(b)(2). Under the ADA, once Congress has appropriated funds, a reserve (*i.e.*, an appropriated amount withheld from obligation) may be established only: "(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater

efficiency of operations; or (C) as specifically provided by law." *Id.* § 1512(c)(1). The apportioning official "decides that an amount reserved will not be required to carry out the objectives and scope of the appropriation concerned," the official shall "recommend the rescission of the amount in the way provided in chapter 11 of this title for appropriation requests." *Id.* § 1512(b, c). Reserves established under this section shall be reported to Congress as provided in the Impoundment Control Act of 1974, 2 U.S.C. § 681 *et seq*. *Id.*

2. *The Impoundment Control Act.* Congress has sought to impose certain requirements on the Executive's decisions whether to obligate and expend appropriated funds through the Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 332. The statute requires the President to "transmit to both Houses of Congress a special message" whenever he "determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided or that such budget authority should be rescinded for fiscal policy or other reasons" or "whenever all or part of budget authority provided for only one fiscal year is to be reserved from obligation for such fiscal year[.]" 2 U.S.C. § 683(a).

Finally, the statute provides for various enforcement mechanisms by the Comptroller General, an official within the Legislative Branch. Thus, if the Comptroller General concludes that the "President has failed to transmit a special message with respect to" a particular deferral or decision to establish a reserve, the Comptroller General is directed to "make a report on such reserve or deferral and any available information concerning it to both Houses of Congress[,]" which report "shall be considered a special message." 2 U.S.C. § 686(a). And if "budget authority is required to be made available for obligation and such budget authority is not made available for obligation," the statute provides that the Comptroller General may "bring a civil action" in district court. *Id.* § 687. Such a suit may be brought, however, only after the Comptroller General submits an explanatory statement with the Speaker of the House of Representatives and the President of the Senate." *Id.*

## STATEMENT OF FACTS

Defendants provide this Statement of Material Facts in accordance with Local Rule 56.1. This case concerns challenges to the apportionment and obligation of appropriations for three Department

of Education ("ED") programs: (1) the Comprehensive Centers Program ("CCP"); (2) the Education Innovation and Research Program ("EIR"); and (3) the Institute of Education Sciences ("IES"), for which there are two appropriations set to expire at different times (bringing the total number of appropriations at issue to four).

Defendants complied with this Court's order requiring the certification of an administrative record but objected that no Defendant had taken any final agency action. ECF No. 41. The "administrative record" includes letters notifying Congress that ED "is committed to using these appropriated funds to meet our statutory obligations while supporting high-quality research through appropriate mechanisms, such as the award of grants." ED00094-111. Defendants also submitted declarations explaining the intention to obligate all funds by the statutory deadline. *See* ECF No. 41-7, Decl. D. Smith ¶ 9 ("my understanding is that the Department intends to spend all funds appropriated for the Comprehensive Centers program prior to the expiration of funds on September 30, 2026."); ECF No. 41-8, ¶ 12 (For EIR, "[t]he Department intends to fully expend this remaining amount by no later than December 31, 2026, when the funds expire."); ECF No. 41-9, ¶ 9 ("IES intends to spend all remaining funds appropriated by Congress in a timely manner, in full compliance with all statutory and regulatory requirements[.]").

| **Program** | **Appropriated Amount** | **Apportioned Amount** | **Obligated Amount** | **Unobligated Amount** | **Expiration** | **Link** | **Declaration** |
|---|---|---|---|---|---|---|---|
| Institute of Education Sciences (2026) | 768,106,000 | 768,106,000 | 587,574,710 | 180,531,290 | 9/30/2026 | Link | Suppl. Soldner-Decl. ¶ 12 |
| Comprehensive Centers | 50,000,000 | 50,000,000 | 441,890 | 49,558,110 | 9/30/2026 | Link | Danielle Smith Decl. ¶ 6 |
| Education Innovation and Research Program | 235,000,000 | 235,000,000 | 224,000,000 | 11,000,000 | 12/31/2026 | Link | Jamila Smith Decl. ¶12 |
| Institute of Education Sciences (2027) | 789,606,000 | 789,606,000 | 69,256,475 | 720,349,525 | 9/30/2027 | Link | |

Confirming Defendants' position that no final agency action has taken place, funds were still actively being apportioned and reprogrammed between line items (moving from unallocated to a more specific line item) at the time the "administrative record" was filed. The most recently available statistics are provided in the table above.

## LEGAL STANDARD

1. *Motion to Dismiss*. Plaintiffs bear the burden of establishing subject-matter jurisdiction. *See Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Under Rule 12(b)(1), a court "may consider information attached to or incorporated into the complaint, along with facts subject to judicial notice." *Cangrejeros De Santurce Baseball Club, LLC v. Liga De Beisbol Profesional De P.R.*, 146 F.4th 1, 11 (1st Cir. 2025). "Where both standing and subject-matter jurisdiction are at issue," the "court may inquire into either and, finding it lacking, dismiss the matter without reaching the other." *Ruiz-Rivera v. United States*, No. CIV. 10-1139 (JAF), 2010 WL 3069251 at *1 n. 2 (D.P.R. Aug. 2, 2010) (quoting *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007)).

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555. The Court may consider documents incorporated by reference under Rule 12(b)(6). *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

2. *Motion for Summary Judgment*. Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, courts must construe the evidence in the light most favorable to the non-movant and resolve all reasonable inferences in the non-movant's favor. *See Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016).

For APA claims, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Minuteman Health, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 291 F. Supp. 3d 174, 190 (D. Mass. 2018) (quoting *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013)). The "traditional Rule 56 standard does not apply" to APA claims "due to the limited role of a court in reviewing the administrative record." *Id.* at 189; *see also Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 106 (1st Cir. 2015) (explaining that summary-judgment review of administrative-law claims is narrower than traditional summary-judgment review). Under the APA, an agency action may not be set aside unless it is "arbitrary, capricious," or "not in accordance with law[.]" 5 U.S.C. § 706(2)(A). And a court may only compel "agency action unlawfully withheld or unreasonably delayed[.]" *Id.* § 706(1).

APA review of final agency action is highly deferential, and the agency's actions are presumed to be valid. *See River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009). "[A] court is not to substitute its judgment for that of the agency," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), instead it must only consider whether the action "was based on a consideration of the relevant factors and whether there has been a clear error of judgment[,]" *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Thus, a reviewing court's only role in assessing APA claims is to "determine whether the agency's decision is supported by a rational basis[.]" *River St. Donuts*, 558 F.3d at 114. If so, the court "must affirm." *Id.*

## ARGUMENT

The Court should deny Plaintiffs' motion for summary judgment and grant Defendants' motion to dismiss, or, in the alternative, for summary judgment because (I) this Court lacks jurisdiction over Plaintiffs' claims, (II) Plaintiffs cannot meet the APA's basic threshold requirements, and (III) Plaintiffs' claims fail on the merits. Even if the Court determines it has jurisdiction and rules for Plaintiffs on the merits (which it should not), (IV) Plaintiffs' proposed relief is unwarranted and overbroad.

## I. THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS

This Court may not reach the merits of Plaintiffs' claims because (A) Plaintiffs fail to establish standing, (B) some of their claims are moot, and (C) other claims are not ripe; indeed, some funds need not be obligated until September 2027—more than a year from now.

### A. Plaintiffs Fail To Establish Article III Standing

To establish standing, a plaintiff must prove (1) that it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations, citations, and quotation omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements[,]" *id.* at 561, and this burden increases "at the successive stages of litigation." *Id.*

At summary judgment, "the plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence specific facts[.]" *Id.* (quoting Fed. R. Civ. P. 56(e)). Critically, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Despite their burden to prove standing, Plaintiffs fail to explain with particularity how each Plaintiff has standing to challenge each discrete action they challenge, for example, how any plaintiff is harmed by an individual apportionment decision. Nor do the harms mentioned in their Complaint satisfy standing.

First, Plaintiffs invoke competitive injury. Compl. ¶ 120. Under this line of cases, a plaintiff must demonstrate that "it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). Plaintiffs do not show they are "able and ready" to bid on each fund at issue. *Compare* ECF No. 50 (failing to argue standing), *with Carney v. Adams*, 592 U.S.

53, 60 (2020) (finding no standing even where applicant stated he "would apply for any judicial position that [he] thought [he] was qualified for").

But even if they had done so, Plaintiffs are not unable to compete "on an equal basis" with other applicants. Plaintiffs make no allegations showing that they are differently situated from any other potential applicant for these competitive grants. Instead, their assertion is that all competitors are equally injured. *Cf.* Pls.' MSJ at 32 (implying that all who compete for funds are injured as a result). Thus, Plaintiffs are not disadvantaged *at all* relative to those with whom they would compete for funds, which is fatal to any competitive standing argument Plaintiffs seek to make. Furthermore, "the notion that a competitive injury can satisfy the injury-in-fact requirement is 'premised on the [plaintiff's] status as a *direct* and *current* competitor . . . .'" *Castro v. Scanlan*, 86 F.4th 947, 954 (1st Cir. 2023) (quotation omitted). A competitive injury of the kind Plaintiffs assert cannot plausibly arise from an award competition's delay (or even cancellation), because the Plaintiff would definitionally be neither a "direct" nor "current" competitor, notwithstanding their "'some day' intentions" of competing. *Lujan*, 504 U.S. at 563-64.

Second, Plaintiffs allege that Defendants' actions may "disrup[t] their research." Compl. ¶¶ 121-22. But this harm is speculative and certainly not "imminent[.]" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013). Plaintiffs currently have no legal right to these funds. *Cf. Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-1428, 2026 WL 2279789, at *5 (1st Cir. Aug. 7, 2026) (finding "grantees" and "subgrantees" had standing where government withheld funds and plaintiffs "did not receive their subgrant payments"). Plaintiffs cite *Glob. Health Council v. Trump*, but that case involved a categorical policy requiring a "funding freeze and suspension of [existing] contracts" that caused grantees to not receive payments to which they were entitled. 153 F.4th 1, 11 (D.C. Cir. 2025). Here, there is no comparable policy, and Plaintiffs have no entitlement to any funds that may be awarded in the future. Rather, their alleged harm flows from the possibility that the agency might not obligate the funds, notwithstanding Defendants' declarations to the contrary.

Third, Plaintiffs' allegations concerning the posting of spend plans and apportionments is foreclosed by *United States v. Richardson*, 418 U.S. 166 (1974) (denying standing to challenge the

Government's failure to disclose the CIA's expenditures). Plaintiffs' alleged harms from footnotes in these materials are not "certainly impending." Instead, Plaintiffs merely allege that they may "create uncertainty." Pls.' MSJ at 34. But under their theory of harm, ED must interpret the footnotes to prohibit funding research in a way that conflicts with statute—notwithstanding the EO's directive to act "consistent with law" and the footnotes' instruction to apply the EOs "as permissible by law"—and then apply that interpretation to a particular agency decision. The interpretation must then alter the selection, and no other funded product must produce comparable research. Article III does not permit standing on such a "highly attenuated chain of possibilities[.]" *Clapper*, 568 U.S. at 410.

Fourth, NCLD and Knowledge Alliance also suggest that they will be harmed because "they use IES data, research, and evaluations in their own work." Compl. ¶¶ 124, 131. Unlike the typical plaintiff asserting informational standing, however, Plaintiffs "do not claim that any statute gave them a right to have" this information. *Amrhein v. eClinical Works, LLC*, 954 F.3d 328, 333 (1st Cir. 2020); *see also TransUnion*, 594 U.S. at 441 (addressing "public-disclosure or sunshine laws that entitle all members of the public to certain information"). In addition, losing access to information the government or third parties may generate in the future is not a concrete injury traceable to any particular apportionment or obligation decision. Such a harm is also highly speculative, resting on the assumption that, contrary to their representations, OMB will not apportion funds, ED will not obligate funds, and that the programs will not generate the information that Plaintiffs seek. To the extent this information depends on the actions of intervening third parties, it is further barred. *Murthy v. Missouri*, 603 U.S. 43, 72 (2024); *see also Clapper*, 568 U.S. at 413 (courts are "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment").

Fifth, the same two plaintiffs alleging informational injuries also allege they are harmed by their decision to "divert staff time and organizational resources . . . to monitor Defendants' apportionments." Compl. ¶¶ 124-25, 131-32; Dinkes Decl. ¶¶ 26-27, 35; Norford Decl. ¶ 13. But a plaintiff cannot "manufacture its own standing" by "expending money." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). Voluntary decisions to reallocate staff to monitor government activities

are no basis for standing, particularly when Plaintiffs admit that the spend plan they wish to review was already published, *see* Pls.' MSJ at 12.

Finally, even past exposure to an allegedly unlawful practice does not itself establish standing for future injunctive relief. *Cf.* ECF No. 50 at 32 (requesting injunctive relief). To pursue such relief, Plaintiffs "must establish an ongoing or future injury that is 'certainly impending'"; they "may not rest on past injury." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Clapper*, 568 U.S. at 409 (emphasis omitted)); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects.") (second alteration in original) (citation omitted)); *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1273 (D.C. Cir. 1994) ("To pursue an injunction or a declaratory judgment," plaintiffs "must allege a likelihood of future *violations* of their rights by" the defendant, "not simply future *effects* from past violations."). The only present or prospective harm identified in Plaintiffs' pleadings is the *fear* that funds will not be obligated in the future. But this unfounded fear is in tension with sworn declarations by officials at the Department of Education attesting that all funds will be obligated in due course. Plaintiffs have not adequately alleged that such a "likelihood" of future injury is present, or that the non-obligation of funds is "certainly impending." Plaintiffs cannot attain future injunctive relief.

**B. Several Claims Are Moot**

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quotation omitted); *see Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 8 (1st Cir. 2021) (providing "primer" on mootness). Even if an action poses a live controversy when filed, mootness doctrine requires "a federal court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) (quotation omitted).

To the extent Plaintiffs sought to compel the posting of specific spend plans, the apportionment of these funds, or the obligation of these funds, those claims are moot. *Harris v. Univ. of Mass. Lowell*, 43 F.4th 187, 192 (1st Cir. 2022); *see also, e.g.*, *Gray v. Office of Pers. Mgmt.*, 771 F.2d 1504, 1514 (D.C. Cir. 1985) (concluding that petition to compel agency decision became moot when agency rendered its decision). OMB posted the disputed spend plan on August 1, 2026; and Plaintiffs expressly concede they now possess information they seek. Pls.' MSJ. at 26. A judicial decision opining on the legality of past alleged omissions or failures would be purely advisory. *Golden v. Zwickler*, 394 U.S. 103, 108 (1969); *see also Fair Emp. Council of Greater Wash., Inc.,* 28 F.3d at 1273. And even if an action poses a live controversy when filed, mootness doctrine requires "a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Clarke*, 915 F.2d at 701.

As for apportionments, all funds, save those that expire in 2027, have been apportioned; those claims for those fiscal years are now clearly moot. As for obligations, most funds have been obligated, and the agencies have stated their clear intention to obligate the remainder by September 30. To the extent Plaintiffs seek to compel apportionments or obligations that have now occurred, those claims are also moot. *See, e.g.*, *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1298-99 (D.C. Cir. 2007). As Plaintiffs have already received most of the relief they requested, their claims should be dismissed because they seek an order compelling the agencies to take the actions that they have already taken.

**C. Plaintiffs' Claims for Funding Not Set to Expire Until September 2027 are Not Ripe**

"A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300, (1998) (quotation omitted). "Determining whether administrative action is ripe for judicial review requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003); *see also Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017) (describing these "two prongs"). Both prongs counsel against ripeness here.

The FY 2026-2027 IES Funds do not expire until September 2027. In the meantime, OMB is statutorily required to periodically review its apportionment decisions. *See* 31 U.S.C. § 1512(d) (requiring "[a]n apportionment or a reapportionment shall be reviewed at least 4 times a year"). The agency may request reapportionments, announce competitions, and obligate funds during the period of statutory availability; the agencies may also engage in reprogramming, as has been recently announced. *See* Supp. Decl. Soldner ¶¶ 13-14. Moreover, Congress may well reappropriate or otherwise enact new legislation restricting or expanding the programs at issue here before the funds expire—as indeed it has already done once with the IES appropriations. *See id.* ¶ 10 (discussing Congress's rescission of $25,000,000).

At the very least, claims and requests for injunctive relief concerning "any future appropriations" to IES are obviously unripe. They concern appropriations that have not been made (and may never be), and may include terms substantially different from the terms governing the appropriations in this case. ECF No. 46-1 at 4-5. Plaintiffs' challenges to tentative, interim, and intra-Executive Branch decisions subject to revision and reconsideration are not ripe.

Second, withholding review imposes no present hardship. Plaintiffs remain free to challenge those actions (to the extent they are actually harmed) once the funds are set to expire next year, assuming their concerns have not already been addressed at that point. The possibility that later agency action could narrow or eliminate the dispute strongly militates against review now. *Nat'l Park Hosp.*, 538 U.S. at 811-12. All in all, Plaintiffs' claims at this point are "too speculative." *Texas*, 523 U.S. at 302. This Court should "conclude that judicial resolution of the question presented here should await a concrete dispute[.]" *Nat'l Park Hosp.*, 538 U.S. at 812.

## II. THRESHOLD DEFECTS DOOM PLAINTIFFS' CLAIMS

Plaintiffs cannot overcome threshold limits on their claims: (A) the ADA and ICA preclude plaintiffs' claims under the APA; (B) Plaintiffs are not within the zone of interests of the relevant statutes; (C) they challenge actions committed to agency discretion by law; and (D) they fail to challenge discrete, final agency action. Defendants address each defect in turn.

**A. Plaintiffs' Claims Are Precluded**

Plaintiffs advance claims under the APA for actions allegedly in violation of the ADA and various Appropriations Acts. But the APA does not apply where a "statute[] preclude[s] judicial review[.]" 5 U.S.C. § 701(a)(1). Here, the ADA, as well as the unpleaded ICA, preclude judicial review. In *Dep't of State v. Aids Vaccine Advoc. Coal.*, 146 S. Ct. 19 (2025) ("*AVAC*"), the Supreme Court stayed a district court's injunction after concluding that the Government had made a sufficient showing that the ICA precluded Plaintiffs' APA suit to enforce foreign assistance appropriations. *See id.* at 19. The D.C. Circuit has likewise held that the ICA establishes a carefully calibrated process of interbranch notice, congressional consideration, and enforcement by the Comptroller General that precludes review under the APA. *See GHC*, 153 F.4th 1, 7, 19 (D.C. Cir. 2025). The same reasoning precludes review of Plaintiffs' claims.

Congress may impliedly preclude some parties from seeking APA review by enacting a detailed scheme that provides for review only by other parties. For example, in *Block v. Community Nutrition Institute*, Congress provided for dairy "[h]andlers and producers—but not consumers"—to "participate in the adoption and retention of" certain orders. 467 U.S. 340, 346 (1984). In holding that the statute precluded consumers from challenging those orders under the APA, the Supreme Court explained that there was no "express provision for participation by consumers in any" administrative or judicial proceeding related to the orders and that, "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347.

Both the ICA and ADA contain such a comprehensive remedial scheme.

*Impoundment Control Act*: For the ICA, its political-branch procedures and specific judicial-review mechanism preclude APA review of Plaintiffs' claims in a straightforward manner: only the Comptroller General may bring claims that the Executive Branch engaged in unlawful impoundments by failing to obligate the funds at issue. Plaintiffs sue to compel Defendants to "ma[k]e available for obligation" appropriations that are purportedly "required to be made available" under the appropriations statutes but are "not made available for obligation" by the President. 2 U.S.C. § 687.

Consequently, Plaintiffs bring a suit of the type that the ICA assigned only to the Comptroller General, compelling the conclusion that the ICA "preclude[s] judicial review" of Plaintiffs' APA claims. *See* 5 U.S.C. § 701(a)(1).

As the D.C. Circuit recognized, the deferral of *any* budget obligation (*i.e.* a "reserve") falling within the ICA's scope is subject to the statute's "complex scheme of notification," potential "congressional action," and "suit by a specified legislative branch official" after notice to Congress. *GHC*, 153 F.4th at 18. The President must notify Congress when he proposes to defer or rescind the appropriated funds in a "special message" that meets particular statutory requirements. 2 U.S.C. §§ 683(a), 684(a). Congress then determines how to respond: discussion and negotiation between the political branches; Congress can disapprove the rescission or deferral; it can vote to rescind some parts of the package but not others; it can legislate further; and it can decline to respond. *See id.* § 688.

The ICA expressly permits judicial enforcement only at the end of that process and only by the Comptroller General. *Id.* § 687. Congress contemplated that those suits cover any instance in which, "under this chapter, budget authority is required to be made available for obligation and such budget authority is not made available for obligation," and it specifically chose to limit the venue to the U.S. District Court for the District of Columbia and "expressly empowered" the court to enter "any decree, judgment, or order which may be necessary or appropriate to make such budget authority available for obligation." *Id.* The ICA also requires such suits may happen only twenty-five in-session days after the Comptroller General provides Congress with a statement explaining the "circumstances giving rise to the action contemplated," allowing Congress the opportunity to avoid litigation. *Id.*

*Anti-Deficiency Act*: The same preclusive reasoning applied by the Supreme Court and D.C. Circuit with regard to the ICA applies to the ADA as well because of (A) the lack of private "rights-creating language" in the statute and (B) the comprehensive remedial scheme set forth by Congress.

For starters, in both relevant sections of the ADA, 31 U.S.C. §§ 1512-1513, the statutory language is framed as restrictions on actions by Executive Branch officers—*i.e.*, "The official designated in section 1513 of this title to make apportionments shall . . . ." *See id.* at § 1517. Thus, there is no "rights-creating language" present within the statutes. *See Alexander v. Sandoval*, 532 U.S.

275, 288-89 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.").

Indeed, the ADA impliedly "preclude[s] judicial review" of claims brought by private individuals. 5 U.S.C. § 701(a)(1); *see Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate."). And the Supreme Court has confirmed as much. *See, e.g., Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 197 (2012) ("[T]he Anti-Deficiency Act's requirements apply to the official, but they do not affect the rights in this court of the citizen honestly contracting with the Government.").

Turning to the comprehensive remedial scheme established by Congress: if an Executive Branch employee violates §§ 1512 or 1513, the head of the employee's agency must report the violation to the President, to Congress, and to the Comptroller General. *See* 31 U.S.C. §§ 1351, 1517(b). ADA violations are also punishable in several different ways—ranging from potential administrative discipline, *see id.* § 1349, up to and including criminal penalties, *see id.* § 1350.

This comprehensive remedial scheme for addressing violations—through after-the-fact reporting and enforcement—confirms that Congress did not also intend for private individuals to pursue alleged violations through civil lawsuits seeking prospective, injunctive relief. *See Alexander*, 532 U.S. at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."). No provision in the ADA remedial provisions provides for private parties to enforce the appropriations bar Plaintiffs seek to enforce under the APA against Defendants. Rather, reporting to Congress, criminal penalties, and the political processes are the appropriate means of enforcing its terms. *See, e.g.*, *Feldman v. Bowser*, 315 F. Supp. 3d 299, 305 (D.D.C. 2018) (Jackson, K.B., J.) (holding that no private right of action "exists under the Anti-Deficiency Act."); *Thurston v. United States*, 696 F. Supp. 680, 683 (D.D.C. 1988) ("The Anti-Deficiency Act explicitly sets forth procedures for reporting violations of the ADA and enforcing its provisions. No private right of action for declaratory, mandatory or injunctive relief exists under this statute."); *see also Trs. of Dennis Pines Condo. Tr. of Dennis v. Patten*, 2026 WL 539597, at *2 (D. Mass. Feb. 26, 2026) ("the

Anti-Deficiency Act does not appear to create a private right of action, and even if it did, sovereign immunity would likely bar such a claim against the United States here.").

Plaintiffs offer no reason to think that Congress created this enforcement scheme—after-the-fact reports to Congress; administrative discipline of employees; and potential criminal prosecution of violations—while simultaneously authorizing private parties to bring civil claims seeking to enforce the ADA's terms. Indeed, Plaintiffs' suit to force Defendants to apportion and obligate all funds, and to do so in the manner Plaintiffs desire—would "severely disrupt" the ADA's "complex and delicate administrative scheme." *Block*, 467 U.S. at 348. As the Supreme Court and D.C. Circuit have explained with respect to the ICA, "it does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits" under the APA. *Global Health Council v. Trump*, 153 F.4th 1, 19 (D.C. Cir. 2025) ("*GHC*"); *see also AVAC*, 146 S. Ct. at 19 (noting government's "showing that the Impoundment Control Act precludes [the] respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce [certain] appropriations"). Indeed, while Plaintiffs rely on *Global Health* for their standing arguments, they conspicuously ignore its central holding that the ICA precludes private rights of actions and APA claims—and yet Plaintiffs' suit is premised on a backdoor use of the ICA presented under the guise of the ADA.

Nor can Plaintiffs circumvent the holdings of *AIDS Vaccine* and *Global Health* by simply relabeling their impoundment and "reserve" claims as claims arising under the ADA or Appropriations Acts, as opposed to the ICA. The substance of the claims remains the same: Plaintiffs seek judicial enforcement of statutory expenditure obligations arising from the alleged reserve, withholding, or deferral of appropriated funds. Indeed, Plaintiffs expressly challenge the creation of a "reserve" of funds—*see* Pls.' MSJ at 28 (pleading that the "policy" providing for the "creation of reserve[]" is "not permissible under the Anti-Deficiency Act")—but that is an issue squarely governed by the ICA. It is the ICA that dictates the carefully prescribed process for "whenever all or part of budget authority provided for only one fiscal year is to be reserved from obligation for such fiscal year[.]" 2 U.S.C. § 683(a); *see also* § 686(a).

Plaintiffs fare no better by naming the Appropriations Acts themselves. Their claims still seek to impose limitations on how the Executive Branch spends certain funds in certain ways—precisely the subject comprehensively regulated by the ADA and the ICA. The fundamental point is that the ADA is the statute that provides the consequences for unlawful expenditures by Executive Branch officials. And the ICA, in turn, provides the consequences for the unlawful reserve or impoundment of funds. Plaintiffs cannot avoid the preclusive force of those statutes by attempting to enforce them through the APA. *See Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832-33 (1976) ("It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading.").

**B. Plaintiffs Are Outside The Zones of Interest of the Statutes They Wish to Enforce**

Plaintiffs also cannot find refuge in the APA for the independent reason that these private entities are outside the zone of interests for the ADA and the Appropriations Acts. To invoke the APA, a "plaintiff must establish that the injury" it complains of "falls within the 'zone of interests' sought to be protected by the statutory provision" at issue. *Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523-24 (1991). That limitation reflects the commonsense intuition that Congress does not extend causes of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011). Thus, where, as here, the plaintiff is not the object of a challenged regulatory action, the plaintiff has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). And when a plaintiff attempts to use the APA to challenge the government's compliance with a statute, the "interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Plaintiffs cannot do so. While they hope to be awarded some of the appropriated funds, they cannot point to a single statute that requires that education funds be specifically awarded to them.

And more generally, with limited exceptions, Plaintiffs cannot plausibly argue that these appropriations statutes reflect any congressional purpose to award funds to any particular grantee. Indeed, the appropriation statutes are directed at regulating the relationship between Congress and the Executive Branch and they are largely agnostic about the recipients of federal funding. Plaintiffs' interests are thus akin to ordinary taxpayers and fall outside the zones of interest of the Appropriations Acts and the ADA. *See Glass Packaging Inst. v. Regan*, 737 F.2d 1083, 1090 (D.C. Cir. 1984) (holding that a private party alleging "an injury to its competitive interests" was "not arguably within the zone of interests" of a statute intended "to regulate only a specific narrow governmental interest—protection of tax revenues").

### C. The Funding Decisions at Issue Are Committed to Agency Discretion by Law

Plaintiffs' APA claims should be denied for another, independent threshold reason: the challenged funding choices are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Under 31 U.S.C. § 1512(b)(2), "The official designated in section 1513 of this title to make apportionments shall apportion an appropriation under paragraph (1) of this subsection *as the official considers appropriate*." (emphasis added). The clear textual vesting of discretion in the official in charge of apportionment accordingly makes such apportionment decisions unreviewable under the APA.

Further, regarding the Department of Education's reprogramming of funds (*see* Suppl. Decl. of Matt Soldner at ¶¶ 13-14), an agency decision to reallocate those funds to other purposes within an appropriation is generally committed to agency discretion by law. *Lincoln v. Vigil*, 508 U.S. 182, 185-88 (1993). The "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion[,]" because the point of such appropriations "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. In making that allocation, the agency must engage in "'a complicated balancing of a number of factors . . . within its expertise,'" including "whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's

overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193 (quotation omitted).

Consistent with *Lincoln,* courts regularly find that funding decisions are committed to agency discretion. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan,* 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit."). This applies equally to an agency's decision to pause funding for one recipient and potentially redirect that funding elsewhere. *See Pol'y & Rsch., LLC v. Dep't of Health & Hum. Servs.,* 313 F. Supp. 3d 62, 76 (D.D.C. 2018) (Jackson, K.B., J.) ("[T]his Court has little doubt that HHS's decision to stop funding for Plaintiffs' projects, and to recompete the funds associated with those projects, is the type of agency action that is presumptively unreviewable."); *Milk Train, Inc. v. Veneman,* 310 F.3d 747, 751 (D.C. Cir. 2002) ("Insofar as Congress has left to the Secretary's sole judgment the determination of the manner for providing assistance to dairy farmers, we hold that the district court lacked jurisdiction to review Milk Train's challenge[.]"); *Cmty. Action of Laramie Cnty., Inc. v. Bowen,* 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are notoriously unsuitable for judicial review[.]") (quotations omitted). These authorities illustrate that there is nothing unlawful about agencies exercising discretion to time the allocation and obligation of funds in such manner that aligns with agency policy priorities, consistent with the law. *See Lincoln,* 508 U.S. at 192-93; *Pol'y & Rsch., LLC,* 313 F. Supp. 3d at 76; *Milk Train, Inc.,* 310 F.3d at 751.

**D. Plaintiffs' APA Claims Fail on the Merits Because They Do Not Challenge a Discrete Final Agency Action**

To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). An agency action must impose "direct and appreciable legal consequences" on the plaintiff, *Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016) (quoting *Bennett*, 520 U.S. at 178). If an action affects the challenger's rights only "on the contingency of future administrative action," it is not final.

*DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quotation omitted); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (action must "directly affect the parties.").

Plaintiffs' primary argument is that certain funds will not be apportioned—notwithstanding Defendants' contrary representations to Congress and to the Court. *See* Suppl. Decl. Soldner ¶ 16; *see also id.*, Congressional Notification, Attachment A to the Declaration; *see also* ED00094 (letter to Congress); Decl. D. Smith ¶ 9; Decl. J. Smith ¶ 12. But even assuming that OMB has not apportioned those funds at this time so as to make them available for obligation, *i.e.*, has not "released" them, and that ED has not obligated all of the appropriated funds at this time, that would not constitute reviewable final agency action. They cite no authority for the proposition that a *lack* of an obligation recorded by the agency or account-specific apportionment is itself a final agency action subject to review. An apportionment is simply an "OMB-approved plan to use budgetary resources." https://perma.cc/5CRD-VGZA at 4. It does not itself create legally binding obligations, like a contract or other funding mechanism might. Rather, it is a preliminary step that may ultimately lead to legal rights and obligations but does not impose any such binding mandates at present—just like a notice of proposed rulemaking does not create a binding rule, even though it may be a necessary preliminary step to such a rule. Point of fact: OMB is required to review and revise its apportionment decisions periodically, *see* 31 U.S.C. § 1512(d), rendering each apportionment inherently interim. It is a discretionary intra-Executive Branch activity subject to revision and reconsideration.

All funding has been apportioned. Plaintiffs do not point to any final decision proclaiming it never will be. Indeed, the administrative record evinces the exact opposite commitment, notwithstanding Plaintiffs' speculation the agencies are not on track to meet their statutory deadlines. *See, e.g., Franklin*, 505 U.S. at 797 ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."); *DRG Funding Corp.*, 76 F.3d at 1214 ("[C]ourts have defined a nonfinal agency order as one, for instance, that does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action[.]" (quotation marks omitted)); *EPA v. Brown*, 431 U.S.

99, 104 (1977) ("For [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel.").

Plaintiffs' alleged "final agency action" is based on nothing but *fear* that the apportionments and obligations will not be timely made. Plaintiffs point to nothing final. Only action (or inaction) that is plainly interlocutory in nature, and, as discussed above, is premature as the relevant funding does not expire until September 30, 2026, at the earliest. At bottom, no rights or obligations have yet to be determined, and no legal consequences have yet to result from Plaintiffs' consternation. Accordingly, Plaintiffs fail to establish the existence of any final agency action under the APA and their claims must be dismissed.

## III. PLAINTIFFS' CLAIMS FAIL ON THE MERITS

Even if this Court had jurisdiction, and even if Plaintiffs could overcome threshold barriers to their suit, their claims fail on the merits.

### A. Defendants' Conduct Was Not Contrary To Law

#### 1. Apportionment Decisions

Plaintiffs' claim that OMB's apportionment decisions are unlawful fail for three reasons. First, the plain text demonstrates that what Plaintiffs label as a requirement to apportion is merely an informational requirement to notify. Nothing more. Second, such reporting requirements uniquely do not constitute an agency action under the APA, as confirmed by D.C. Circuit. Third, as the claim touches on the President's obligations, that is another reason why it is unreviewable. Presidential actions, even those made on behalf of the President by the agency, are not reviewable under the APA.

*First*, Plaintiffs argue that OMB was required by 31 U.S.C. § 1513(b)(2) to "apportion the full amount of FY2026 Comprehensive Centers appropriations, by the 30-day deadline.'" Pls.' MSJ at 18. A full reading of the relevant statutory text Plaintiffs refer to is as follows:

> (2) The President shall notify the head of the executive agency of the action taken in apportioning the appropriation under paragraph (1) of this subsection not later than the later of the following:
>
> > (A) 20 days before the beginning of the fiscal year for which the appropriation is available; or
> >
> > (B) 30 days after the date of enactment of the law by which the appropriation is made available.

31 U.S.C. § 1513(b)(2). Plaintiffs rely on 31 U.S.C. § 1513(b) for the proposition that Congress required an apportionment by a certain date that Plaintiffs claim has elapsed without the requisite action. *See* Pls.' MSJ at 18. This is incorrect. Nothing in § 1513(b) ties the 30-day deadline to an apportionment decision; rather, it is a deadline for sending information to and from the President. *See* 31 U.S.C. § 1513(b)(1) & (2). This is best understood as an informational requirement. *See Citizens for Resp. & Ethics in Washington v. Off. of Mgmt. & Budget*, No. CV 25-1051 (EGS), 2025 WL 2025114 at *4, *9 (D.D.C. July 21, 2025) (citing § 1513 as a posting requirement to make apportionment decisions publicly available). Further confirmation of this limited understanding of § 1513(b) is found in appropriations law as well:

> In fiscal year 2023 and each fiscal year thereafter . . . [OMB] shall operate and maintain the automated system required to be implemented by [the 2022 Act] . . . and shall continue to post each document apportioning an appropriation, pursuant to section 1513(b) of title 31, United Sates Code[.])

Pub. L. No. 117-328, div. E, tit. II, § 204(1), 136 Stat. 4459, 4667 (Dec. 29, 2022) (codified at 31 U.S.C. § 1513 note). Plaintiffs are unable to proceed under the APA to challenge substantive apportionment actions using the theory that 31 U.S.C. § 1513 mandated disclosure of apportionment information. *See* Pls.' MSJ at 18; *see also Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 23 (D.C. Cir. 2011) (declining to find plaintiff has standing to pursue a claimed statutory violation based on an informational right arising under different statutory provision).

*Second*, regarding any potential reporting requirement—an Executive Branch report to Congress is not agency action under the APA. Rather, when an agency responds (or does not) to a statutory request for information, any deficiency is a problem for Congress to address, not private parties. *See Walpin v. Corp. for Nat'l & Cmty. Servs.*, 630 F.3d 184, 187–88 (D.C. Cir. 2011) (citing *NRDC v. Hodel*, 865 F.2d 288, 317–19 (D.C. Cir. 1988), as "declining to review adequacy of detail in agency's report to Congress pursuant to statutory reporting requirement that 'by its nature seems singularly committed to *congressional* discretion in measuring the fidelity of the Executive Branch actor to legislatively mandated requirements").

*Third*, any potential reporting requirement claim that an Executive Branch official was in dereliction of their duty by failing to provide the relevant required information for an apportionment to the President, thus causing the President to violate *his* obligation, is an argument that fares no better. Where the complaint is effectively seeking review of the President's action by suing an agency acting on behalf of the President, or asserting the President's authorities, the agency actions are not reviewable under the APA. *See Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 402 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012) (concluding that where the Department of State was acting on behalf of the President, their actions were not reviewable under the APA); *Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (noting that "several cases have concluded that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA" and that actions by an agency on behalf of the President was unreviewable under the APA).

Ultimately, § 1513(b)(2)(B) only obligates a duty to act on the President, *not* OMB Defendants. Presidential actions are not agency actions reviewable under the APA. *Franklin*, 505 U.S. at 801; *see Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002). Because the President is not an "agency" under the APA, his actions cannot meet the APA's requirement of a "final agency action." *Franklin*, 505 U.S. at 796; *Alexander v. Trump*, 753 F. App'x 201, 206 (5th Cir. 2018). Hence, Plaintiffs claims of a violation under the statute's provisions are unfounded.

**2. Use of Footnotes**

Plaintiffs wrongly assert that Executive Branch officials lack authority to employ apportionment footnotes. Pls.' MSJ at 22. Congress has expressly required OMB to publish apportionments "including any associated footnotes" in the very statutes Plaintiffs elsewhere invoke. 31 U.S.C. § 1513 note. This textual evidence confirms the agency's authority to use footnotes.

In any event, the footnotes Plaintiffs take issue with are also lawful. As Plaintiffs contrary to law claims regarding the use of footnotes are duplicative of their arbitrary and capricious claims regarding the footnotes, Defendants discuss the issue in more depth below. *See infra* Part III.B (explaining that the use of footnotes is not arbitrary and capricious). In brief, however, the agencies

are already required to comply with Executive Orders. Further they EOs themselves only require compliance as "consistent with applicable law." *See, e.g.*, Executive Order 14151, Ending Radical and Wasteful Government DEI Programs, § 4(b), 90 Fed. Reg. 8339, 8340 ("This order shall be implemented consistent with applicable law and subject to the availability of appropriations"); Executive Order 14332, Improving Oversight of Federal Grantmaking, § 7(b), 90 Fed. Reg. 38929 (same). Both Executive Orders likewise preserve statutory authority and require implementation with applicable law. And the apportionment footnotes further specify that compliance is "[a]s permissible by law." Pls.' MSJ at 11. So, whenever an education statute requires a particular activity, the EOs and the footnotes themselves direct the Department to follow the statute. *See Bldg. & Constr. Trade Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). Plaintiffs identify no grant decision in which a footnote has required Defendants to violate a statute.

Plaintiffs' bare speculation that an official might misapply the footnotes in the future does not establish that the footnotes are facially unlawful now. *Id.* (holding that "[t]he mere possibility that some agency might make a legally suspect decision" in the future is not a ground for an injunction.) (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)).

**B. Plaintiffs' Arbitrary and Capricious Claim Fails on the Merits**

"The APA's arbitrary-and-capricious standard requires" only that an "agency action be reasonable," and "[j]udicial review under that standard is deferential[.]" *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004). A reviewing court should not "substitute its judgment for that of the agency[.]" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted). Defendants' actions meet this exceedingly permissive standard.

Plaintiffs allege Defendants have acted arbitrary and capriciously by (1) including legally binding footnotes on apportionments directing compliance with Executive Orders, and (2) apportioning funds in ways that depart from explanatory statements accompanying appropriations.

Both actions are ordinary, reasonable exercises of executive power within the "minimum rationality standard" of arbitrary and capricious review; therefore, Plaintiffs' claims must fail.

Starting with the footnotes, each apportionment footnote reasonably requires compliance with the President's priorities to the extent they are permitted by law. Indeed, and as stated in brief above, the Executive Orders themselves explain that they must be implemented consistent with statutory and other laws. Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs*, § 4(b), 90 Fed. Reg. 8339, 8340 ("This order shall be implemented consistent with applicable law and subject to the availability of appropriations"); Executive Order 14332, *Improving Oversight of Federal Grantmaking*, § 7(b), 90 Fed. Reg. 38929 (same). "Thus, if an executive agency . . . may lawfully implement the [EO], then it must do so; if the agency is prohibited, by statute or other law, from implementing the [EO], then the [EO] itself instructs the agency to follow the law." *Bldg. & Constr. Trades Dep't*, 295 F.3d 28; *see also Trump v. AFGE*, No. 24A1174, 2025 WL 1873449, at *1 (U.S. July 8, 2025) (Sotomayor, J., concurring in grant of stay) (explaining that relief was not appropriate where "the relevant Executive Order directs agencies" to act "'consistent with applicable law'").

It hardly requires stating that "[a]gencies are bound to follow binding executive Orders." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 310 (D.D.C. 2025); *see also Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."). The President has directed OMB to "coordinat[e]" with the executive agencies on "creating a process to review new funding opportunity announcements and to review discretionary grants to ensure that they are consistent with agency priorities and the national interest[,]" Exec. Order 14332, *Improving Oversight of Federal Grantmaking,* and to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Exec. Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing.* Consistent with these Executive Orders, OMB has included footnotes on its apportionments to ED reiterating the requirements of the Executive Orders. It cannot be arbitrary and capricious for OMB to comply with

the Executive Orders in such a manner. Indeed, requiring a federal agency to articulate a rationale for its action—beyond simple compliance with the President's directives—would, in essence, subject the President's directive to arbitrary and capricious review, contrary to the principle that the President is not an agency under the APA. *Franklin*, 505 U.S. at 800-01.

Plaintiffs incorrectly assert that these footnotes contradict the purposes of the appropriations. None of the appropriations at issue here forbids political appointee involvement or mandates the funding of "illegal DEI." The requirement that research funding be administered "free from partisan influence," does not equate to a preclusion on review by political appointees, as such a reading would encroach upon the Constitution's vesting of all executive power in the President, who has ultimate responsibility for ensuring the laws are faithfully executed by those who he can readily remove. *See Trump v. Slaughter*, 146 S. Ct. 2283, 2293 (2026) ("To remain accountable to the President, those officers must be removable by the President."). And the Executive Order targeting "illegal DEI" does not contradict Congress's appropriation of funds "addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age;" instead, it works to ensure that such funding is not administered in a way that violates Title VI or the Equal Protection Clause. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 218 (2023) ("race may never be used as a 'negative' and [] it may not operate as a stereotype."). In any event, to the extent there were any conflict, the EOs themselves and the apportionment footnotes, respectively, make clear that the EOs priorities are to be pursued "consistent with law" and "as permissible by law."

Next, with respect to the explanatory statements (which Plaintiffs acknowledge are "not legally binding," Pls.' MSJ at 28, save for one that only applies to funding that expires in 2027), it is no more arbitrary and capricious for OMB or ED to depart from Congress's explanatory statements than it is to diverge from floor statements expressing preferences over funding allocations. Neither constitutes binding law. Further, regarding the application of explanatory statements towards the FY 2025 IES Funds, that act under Section 1111 specifically provided that "[a]ny language specifying an earmark in an appropriations Act for fiscal year 2024, or in a committee report or joint explanatory statement

accompanying such an Act, shall have no legal effect with respect to funds appropriated by this division." Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, March 15, 2025, 139 Stat 9, 13-14. To be sure, the agencies may be forced in the future to explain any departures from the explanatory statements *to Congress* as part of the give and take of the interbranch appropriations process, but there is no basis for the Court to short-circuit this process at the behest of Plaintiffs. *See Lincoln*, 508 U.S. at 193 ("[W]e hardly need to note that an agency's decision to ignore congressional expectations may expose it to grave political consequences.").

What is more, Plaintiffs misapply the APA's "change-in-position doctrine," by failing to make the threshold showing that the agency actually "changed existing policy." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 569 (2025). Any agency action can be artfully framed as a "change in position" from the previous status quo; therefore, courts must examine whether the record evinces a concrete change akin to "rescind[ing] a prior regulation, expand[ing] the scope of [an agency's] enforcement activity, [or] abandon[ing] a decades-old practice applied in enforcement actions." *Id.* (cleaned up). Courts have "traditionally applied the change-in-position doctrine when an agency shifts from a position expressed in a more formal setting." *Id.* at n. 5. Plaintiffs point to no such formal policy establishing a commitment to always follow the non-binding explanatory statements issued by Congress concurrent with a particular appropriation; thus, there is no position which Defendants can be credibly accused of reversing without explanation.

**C. Plaintiffs' Separation of Powers Claim Fails**

Plaintiffs' constitutional claims are barred at the outset because they are purely statutory. Plaintiffs allege that OMB Defendants violated the separation of powers because of the inclusion of policy footnotes when making apportionments. Pls.' MSJ at 24-25. Fatally, Plaintiffs rely on the ADA as the fountainhead of their separation of powers claims. *See* Pls.' MSJ at 22-24. But those arguments are clearly statutory in nature and, under *Dalton v. Specter*, they are not allowed to be advanced as constitutional claims. 511 U.S. 462 (1994).

The Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Dalton*, 511 U.S. at 472

(collecting cases). The Constitution may be implicated for example if—as is not true here—executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if—as is also not true here—the officers rely on a statute that itself violates the Constitution, *see Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" that can be asserted through a direct cause of action. *Id.* at 473. This is just such a case. *See* Pls.' MSJ at 24 (tacitly admitting that "[n]ot only do the footnotes exceed statutory authority; they violate the separation of powers").

In *Global Health*, the D.C. Circuit held that Plaintiffs likely could not assert a constitutional claim for alleged violations of separation-of-powers principles because under *Dalton*, Plaintiffs may not "recast statutory claims as constitutional ones" to evade any limitations to judicial review. *See GHC*, 153 F.4th at 14, 17. So too here. Plaintiffs' alleged constitutional claim is foreclosed by *Dalton* since it is a mere statutory violation dressed up in constitutional garb. *See also Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*, 804 F. Supp. 3d 45, 73 (D.D.C. 2025) ("Because Plaintiffs' claim is based on alleged violations of an appropriations statute, without which 'there could be no improper impoundment,' Plaintiffs have no cause of action to bring their constitutional claim."). Plaintiffs inferentially concede that their constitutional claims are statutory because their statutory claims perfectly overlap with their constitutional claims. *Compare* Pls.' MSJ at 22-23 (alleging that the imposition of policy footnotes exceeds the ADA's statutory authority) *with id.* at 24-25 (alleging that the imposition of policy footnotes is unconstitutional). That overlap speaks for itself. *Dalton* applies, and bars Plaintiffs' duplicative claims under the Constitution.

**D. Plaintiffs Cannot Contest Their Public Posting Claim**

The May 2026 spend plan for FY2025/2026 IES funds has been published, as Plaintiffs acknowledge; therefore, any APA claim for failing to publicly post the plan is moot. Regardless, Plaintiffs lack a cause of action to press their merits claims on this issue. Plaintiffs "cannot advance [their] request for [relief] without a legally cognizable underlying substantive cause of action." *Narra v. Fannie Mae*, 2014 WL 505571, at *3 (E.D. Mich. Feb. 7, 2014); *see also Jensen v. Quality Loan Serv. Corp.*, 702 F. Supp. 2d 1183, 1201 (E.D. Cal. 2010) ("A request for injunctive relief by itself does not state a

cause of action."). "It is not the remedy that supports the cause of action, but rather the cause of action that supports a remedy." *Narra*, 2014 WL 505571, at *3. Plaintiffs' APA claim is moot, so all they have left is a request for declaratory relief, which is not a cause of action. *See Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 91 (6th Cir. 1997) ("With regard to Count IV, in which plaintiff seeks declaratory relief, plaintiff has merely asserted a form of relief, not a cause of action. Plaintiff is not entitled to this relief in the absence of a viable claim."). Nor does anything in the text of the statutes confer a cause of action on Plaintiffs. 31 U.S.C. § 1513 note.

Further, another court has already issued an injunction requiring the posting of spend plans, which Defendants have appealed but are complying with in the meantime. *Citizens for Resp. & Ethics in Washington v. Off. of Mgmt. & Budget*, 791 F. Supp. 3d 29 (D.D.C. 2025), *on appeal* 25-5267 (D.C. Cir.). *Cf. Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) ("Enforcement of an injunction . . . must occur in the issuing jurisdiction[.]"). As a matter of prudence, the Court should refrain from issuing a ruling that necessarily requires resolving the question of compliance with another court's order.

**E. Defendants' Apportionments Are Not Unlawful**

Plaintiffs allege that Defendants' use of the term "unallocated" for apportionment lines in funding spreadsheets is unlawful, but they point to nothing in the text of the statute to support this argument. In fact, Defendants have apportioned these funds—just not the way Plaintiffs would prefer.

By statute, the President or his delegee must "apportion" funds "in writing." 31 U.S.C. § 1513(b)(1)-(2). That statute provides OMB with substantial discretion on how to allocate funds, including by their timing ("months, calendar quarters, operating seasons, or other time periods"), substance ("activities, functions, projects, or objects"), or "a combination of" these. 31 U.S.C. § 1512(b)(1). Further, the statute explicitly vests the agency with the discretion to "apportion an appropriation . . . as the official considers appropriate." 31 U.S.C. § 1512(b)(2). The Office of Legal Counsel has also explained that nothing in these provisions prevents OMB from making apportionments "in the amount of zero dollars." *Obligating Carryover Funds in Violation of OMB Zero-Dollar Apportionment Rule*, 40 Op. O.L.C. 90, 90 (2016). That is because "Nothing in the ADA forbids automatic zero-dollar apportionments, or requires OMB to issue account-specific apportionments in

non-zero amounts." *Id.* at 91-92. Consistent with the above, OMB's current guidelines state that an apportionment may even provide that funds are apportioned but only available after certain specified events occur. Circular No. A-11, § 120.12.

Here, Defendants have apportioned funding as "unallocated" pending the agency's determination on how best to utilize these funding sources. Just as OMB often requests additional information from an agency prior to making funds available for obligation, OMB considers it "appropriate" to require the agency to make these determinations and request reapportionment of "unallocated" funds for that particular purpose prior to those funds becoming available for obligation. This fiscally prudent management of funds is permitted under statute. *See City of New Haven v. United States*, 809 F.2d 900, 906 n.18 (D.C. Cir. 1987). These are not reserves, which are governed by a different statutory section entirely. 31 U.S.C. § 1512(c)(1) (ADA); 2 U.S.C. § 683(a) (ICA); *see also* § 686(a). What is more, the record also demonstrates programmatic administration. As described in the declarations, ED has engaged in grant competition announcements, spend plan implementation, peer review, congressional notification, contract awards, and funding decisions. *See* D. Smith Decl. ¶¶ 5-9; J. Smith Decl. ¶¶ 5-13; Soldner Decl. ¶¶ 4-10. These are actions consistent with staged grant obligation decisions, not the sort of actions that would create a reserve. ED's stated intent to obligate all funds is also inconsistent with a judicial finding that any funds have been "reserved."

### F. There Has Been No Unreasonable Delay or Unlawful Withholding of Any Apportionment or Obligation

Defendants have not unreasonably delayed or unlawfully withheld any apportionment or obligation. Plaintiffs' claims are trivial: none of the funds expire until September 30, 2026, at the earliest. Defendants have also submitted sworn declarations indicating their intent to obligate all funds in a timely manner. Plaintiffs make no meaningful argument to the contrary; they only observe that this year's rate of obligations "is anomalously slow" and ask this Court to speculate whether in fact Defendants will meet their deadlines. Pls.' MSJ at 30.

As a matter of textual interpretation, funds need not be apportioned as Plaintiffs would prefer. Nothing in the ADA requires the President to apportion all funds at some specific rate. The purpose

of the ADA is also not consistent with such a requirement; the ADA was enacted to prevent agencies from using *more funds* than Congress appropriated, not *less* (which is the purpose of the ICA). *See, e.g.*, *Navajo Nation v. United States Dep't of Interior*, 852 F.3d 1124, 1128 (D.C. Cir. 2017). This is supported by the text of 31 U.S.C. § 1512(a), which provides that "an appropriation available for obligation for a definite period shall be apportioned to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." *See Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.,* 854 F.2d 40, 42 (4th Cir. 1988) (upholding OMB's quarterly apportionment of social services block grant funds, rejecting the state's contention that it should receive its entire annual apportionment at the beginning of the fiscal year); *see also* 31 U.S.C. § 1512. And the ADA's provision that apportionments may be made by "months, calendar quarters, operating seasons, or other time periods," further undermines any suggestion of a deadline.

That aside, under *Telecomms. Rsch. & Action Ctr. v. F.C.C.*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*"), Plaintiffs lose on those factors: (1) Defendants are reasonably using their discretion under the statute to timely comply with congressional deadlines, which begin on September 30, 2026, as they have explained in declarations. *See* D. Smith Decl. ¶¶ 5-9 (explaining grant competitions announced, peer review applications, and contract awards for CCP); J. Smith Decl. ¶¶ 5-13 (explaining competition, decision to fund down slate, congressional briefing, and awards for EIR); Soldner Decl. ¶¶ 4-10 (explaining awards and communications with Congress and plaintiffs for IES). (2) "Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed," and the agencies are on time to comply with the statutory deadlines, which do not begin to run until September 30, 2026; (3) these funds concern only "economic regulation" and not "human health" and so Defendants are entitled to greater deference here than elsewhere; (4) "the effect of expediting delayed action" would necessarily interfere with the agencies' administration of these programs and the numerous other programs with deadlines expiring at the end of the fiscal year, not to mention the severe intrusion into the separation of powers by injecting premature judicial intervention at this point in the funding cycle; and (5) there has been no impropriety plausibly alleged here, other than Plaintiffs' claims that they can better administer Executive Branch functions. *TRAC*, 750 F.2d at 80; *see Ghannad-*

*Rezaie v. Laitinen*, 757 F. Supp. 3d 148, 154 (D. Mass. 2024) (explaining that "First Circuit has employed the six-factor test . . . to assess a claim of agency delay"). At the end of the day, Plaintiffs do not plausibly allege that Defendants have unreasonably delayed—or even *delayed* at all—the apportionment or obligation of funds. The only thing that Plaintiffs hold in support is speculation; conjecture that Defendants might in the future miss the deadline to obligate. That is insufficient as a matter of law.

To the extent that Plaintiffs rely on their own extra-administrative record evidence, *see* ECF No. 48, Declaration of Joseph Carlile, this Court should not consider it. *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010).

## IV. PLAINTIFFS' REQUESTED RELIEF IS UNAVAILABLE AND OVERBROAD

No relief should issue because this Court lacks jurisdiction, and Plaintiffs' claims fail for numerous threshold reasons and on the merits. But even if this Court rules in favor of Plaintiffs on any of their claims, the relief Plaintiffs request is unwarranted and far exceeds what the APA and this Court's equitable jurisdiction permit. Plaintiffs seek, among other things, injunctive relief compelling immediate apportionment of all challenged funds to specific line items, vacatur of any spend plans and apportionment footnotes, and declaratory relief.

First, the APA does not permit the relief requested under 5 U.S.C. §§ 706(1) and 706(2). Those provisions merely provide that a court may "compel agency action unlawfully withheld or unreasonably delayed" or "hold unlawful and set aside agency action." But these apply only to well-recognized, "circumscribed, discrete agency actions[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (*SUWA*). Plaintiffs' request that this Court set aside "decisions not to apportion and obligate the full amounts," "apportionments of less than the full amounts," "use of" footnotes, and "public posting" of spend plans, do not fit the bill. ECF No. 46-1 at 1. These are not final agency actions that a court may compel. Rather, Plaintiffs seek to wage the "broad programmatic attack" that the Supreme Court condemned in *Lujan* and *SUWA*. 542 U.S. at 64. Yet, a plaintiff "cannot seek wholesale improvement of [an agency] program by court decree[.]" *Lujan*, 497 U.S. at 891.

As previously stated, Plaintiffs' theory of the case rests on speculation that Defendants may not ultimately obligate the funds as required. But "[c]ourts will not issue injunctions against

administrative officers on the mere apprehension that they will not do their duty or will not follow the law." *Waite v. Macy*, 246 U.S. 606, 609 (1918). To be sure, "[n]o one disputes that the Executive has a duty to follow the law. But the Judiciary does not have unbridled authority to enforce this obligation—in fact, sometimes the law prohibits the Judiciary from doing so." *Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025). "[U]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995).

Second, injunctive relief is entirely unwarranted. Where vacatur or another APA remedy is "sufficient to redress [a plaintiff's] injury, no recourse to the additional and extraordinary relief of an injunction [i]s warranted." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 166 (2010). Even so, injunctive relief may not be "broader than necessary to provide complete relief to each plaintiff with standing to sue." *CASA*, 606 U.S. at 861. Yet the proposed order asks this Court to supervise and regulate every apportionment and obligation decision for three programs, in perpetuity, including over appropriations not yet enacted and for applicants not before the Court. Nothing in the record or the Complaint supports such a radical request for relief.

Plaintiffs request an order directing Defendants to apportion and obligate specific funds, ECF No. 46-1 at 4, is likewise improper. To the extent Plaintiffs' proposed injunction seeks application towards "any future appropriations" not yet enacted, ECF No. 46-1 at 4, it is unlawful because it is untethered to any funding at issue in this case and applies to funding that has not even been appropriated yet (and may never be appropriated, let alone appropriated on the same terms as the presently challenged funding). Further, the Supreme Court has repeatedly held, and the First Circuit just recently reaffirmed that a district court cannot compel Federal agencies to issue payments to grant recipients. *Dep't of Educ. v. California*, 604 U.S. 650, 651-52 (2025); *Woonasquatucket*, 2026 WL 2279789, at *17. At least in those cases, the plaintiffs had contracts that entitled them to the money at issue. Here, Plaintiffs have not been awarded any funds; yet they seek an injunction compelling Defendants to obligate specific funds. Such a command to "obligate" funds necessarily requires the Court to force

Defendants to enter into grants or contracts with unidentified recipients. That is far more intrusive than ordering specific performance to pay out grants already consummated.

Nor can Plaintiffs make the necessary showings for injunctive relief. On irreparable harm, Defendants have provided declarations that they will obligate all funds before they expire; even when they do, there is no guarantee that Plaintiffs will receive these funds. On the balance of the equities and public interest, there is no public interest in judicial supervision of agency administrative actions, which they intend to fulfill. The speculation that Defendants may not obligate these funds, contrary to their declarations, does not outweigh any potential pecuniary benefit that may redound to Plaintiffs.

Finally, Plaintiffs' proposed order is also unlawfully vague. Fed. R. Civ. P. 65(d) requires any injunction to "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." For example, the first paragraph is simply a "follow-the-law" injunction for 31 U.S.C. 1513(b); ECF No. 46-1 at 4. All these problems highlight the fact that Plaintiffs have not identified any final agency action and ultimately seek to commandeer the day-to-day administration of intra-Executive Branch functions before any of the funds expire.

## CONCLUSION

For the reasons stated, the Court should grant Defendants' motion to dismiss. In the alternative, the Court should grant summary judgment to Defendants and deny summary judgment to Plaintiffs.

Dated: August 25, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

DIANE KELLEHER
Director

MICHELLE BENNETT
Assistant Branch Director

*/s/ Michael K. Velchik*
MICHAEL K. VELCHIK
Senior Counsel
Civil Division
United States Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
Phone: (202) 860-8388
E-mail: michael.velchik@usdoj.gov

PIERCE J. ANON
EITAN R. SIRKOVICH
Trial Attorneys
Federal Programs Branch

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon Plaintiffs' counsel by the Electronic Case Filing system on August 25, 2026.

/s/Michael K. Velchik

MICHAEL K. VELCHIK