**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

NATIONAL CENTER FOR LEARNING DISABILITIES, *et al.*,

*Plaintiffs*,

v.

OFFICE OF MANAGEMENT AND BUDGET, *et al.*,

*Defendants.*

Case No. 1:26-cv-13019

# DEFENDANTS' RULE 56.1 RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Local Civil Rule 56.1, Defendants respectfully submit this statement responding to "Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts." ECF No. 54.

Defendants note that because this case arises under the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq., the "generally applicable" Rule 56 standard does not apply. If the Court reaches the merits of the challenged agency action, it must determine "whether[,] as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did." *Triplett v. Fed. Bureau of Prisons*, No. 3:08-cv-1252-K 2009 WL 792799, at *7 (N.D. Tex. Mar. 24, 2009) (quoting *Tex. Comm'n on Nat. Res. v. Van Winkle*, 197 F. Supp. 2d 586, 595 (N.D. Tex. 2002)); *see also Boston Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). Defendants object generally to reliance on statements of undisputed material facts to resolve the legal questions presented in this case. "[D]istrict courts reviewing agency action under the . . . [APA] do not resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. By Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996). The Court must rely upon "'the full administrative record that was before the [agency] at the time' it took the action under review." *SIH Partners LLLP v. Commissioner of Internal Revenue*, 923 F.3d 296, 302 (3d Cir. 2019) (quoting *C.K. v. N.J. Dep't of Health & Human Servs.*, 92 F.3d 171, 182 (3d Cir. 1996))).

Subject to the foregoing objections and discussion, and in an abundance of caution, the Defendants' responses to Plaintiffs' Local Rule 56.1 Statement follow in correspondingly numbered paragraphs.

1. Congress created IES to serve as the "statistics, research, and evaluation arm of the U.S. Department of Education." Education Sciences Reform Act of 2002 (ESRA), Pub. L. 107-279, 116 Stat. 1941, as amended by Pub. L. 117-286 (2022). IES must carry out its mission by compiling statistics, performing research, and conducting evaluations that support the development

of widely disseminated materials and training to improve educational practices. *Id.* § 9511(b)(2).

**Response: Disputed. This is a statement of law and not a statement of fact.**

2. Congress mandated that in performing this work, IES must ensure that the activities it supports "(A) conform to high standards of quality, integrity, and accuracy; and (B) are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias." *Id.*

**Response: Disputed. This is a statement of law and not a statement of fact.**

3. Congress has also directed IES to administer four statutorily mandated and funded research centers and a range of programs that either directly produce data, research, and evaluations, or award federal grants, contracts, and cooperative agreements to do so.

**Response: Disputed. This is a statement of law and not a statement of fact.**

4. IES's National Center for Education Research (NCER) promotes research aimed at better understanding how to improve education across the country for all kinds of learners. Congress mandated that NCER take on several specific tasks in furtherance of this goal. For instance, NCER "shall support not less than 8 national research and development centers," each assigned at least one of 11 research topics such as "[a]dult literacy," "[e]arly childhood development and education," "English language learners research," or "[t]eacher quality." *Id.* § 9533(c).

**Response: Defendants admit or have no basis to dispute the first sentence. Regarding the second sentence, disputed. This is a statement of law and not a statement of fact.**

5. Congress established IES's National Center for Education Statistics (NCES) to, among other things, "collect, analyze, and report education information and statistics in a manner that[] (A) is objective, secular, neutral, and nonideological and is free of partisan political influence

and racial, cultural, gender, or regional bias; and (B) is relevant and useful to practitioners, researchers, policymakers, and the public." 20 U.S.C. § 9541(b).

**Response: Disputed. This is a statement of law and not a statement of fact.**

6. NCES must annually provide the President and relevant Congressional committees "a statistical report on the condition and progress of education in the United States." *Id.* § 9545(b).

**Response: Disputed. This is a statement of law and not a statement of fact.**

7. NCES also operates a statutory program known as the Statewide Longitudinal Data Systems (SLDS) to award grants to States to "design, develop, and implement statewide, longitudinal data systems to efficiently and accurately manage, analyze, disaggregate, and use individual student data." *Id.* § 9607(a).

**Response: Disputed. This is a statement of law and not a statement of fact. Also not material; because Plaintiffs are not States.**

8. Congress created IES's National Center for Special Education Research ("NCSER") to sponsor research regarding children with disabilities, as well as research to support implementation of the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 9567.

**Response: Disputed. This is a statement of law and not a statement of fact.**

9. NCSER is required to "carry out research activities" designed to achieve 17 congressionally identified objectives. *Id.* § 9567b. Like other programs within IES, Congress has required that NCSER ensure that research is both scientifically sound and "objective, secular, neutral, and nonideological, and … free of partisan political influence, and racial, cultural, gender, regional, or disability bias." *Id.* § 9567b(b)(3).

**Response: Disputed. This is a statement of law and not a statement of fact.**

10. The Regional Educational Laboratories (REL) program administered by IES, through the National Center for Education Evaluation and Regional Assistance (NCEE), assists

education practitioners and policymakers by using research, evidence, and evidence-based practices to improve student outcomes.

**Response: Not disputed but immaterial.**

11. The Director of IES "shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States." 20 U.S.C. § 9564(a).

**Response: Disputed. This is a statement of law and not a statement of fact. Also not material.**

12. Each REL contractor shall "support applied research, development, wide dissemination, and technical assistance activities" in its region and collaborate with key federal, state, and local stakeholders. *Id.* §§ 9564(f), (g).

**Response: Disputed. This is a statement of law and not a statement of fact. Also not material.**

13. Through IDEA, Congress directed the Secretary of Education to "delegate to the Director of [IES] the responsibility to" carry out particular research activities related to special education. 20 U.S.C. § 1464(a).

**Response: Disputed. This is a statement of law and not a statement of fact. Also not material.**

14. The Director of IES must "assess the progress in the implementation of [IDEA], including the effectiveness of State and local efforts to provide[] (A) a free appropriate public education to children with disabilities; and (B) early intervention services to infants and toddlers with disabilities…." *Id.* The Director of IES may undertake these responsibilities through direct research projects or through competitive awards. *Id.*

**Response: Disputed. This is a statement of law and not a statement of fact. Also not material.**

15. The Comprehensive Centers program is a technical-assistance program that funds expert centers to help States, districts, and schools implement federal education programs and improve teaching, assessment, and school performance.

**Response: Not disputed but immaterial.**

16. On June 4, 2026, the Department announced that it was moving the Comprehensive Centers program from another component of the Department to IES.

**Response: Defendants admit or have no basis to dispute.**

17. Congress mandated that the Secretary of Education award "not less than" twenty grants to local entities or groups to serve as Comprehensive Centers. 20 U.S.C. § 9602(a)(1).

**Response: Disputed. This is a statement of law and not a statement of fact.**

18. Comprehensive Centers must work with state and local educational agencies "on school improvement activities that take into account factors such as the proportion of economically disadvantaged students in the region." *Id.* § 9602(e).

**Response: Disputed. This is a statement of law and not a statement of fact.**

19. Comprehensive Centers must "give priority to": "(1) schools in the region with high percentages or numbers of students from low-income families … including such schools in rural and urban areas, and schools receiving [certain federal] assistance"; "(2) local educational agencies in the region in which high percentages or numbers of school-age children are from low-income families;"; and (3) schools in the region that have been identified for school improvement. *Id.*

**Response: Disputed. This is a statement of law and not a statement of fact.**

20. Congress also mandated that the Department administer the Education Innovation and Research (EIR) program. The Department recently moved this program to IES under the management of IES's NCER.

**Response: Defendants admit or have no basis to dispute.**

21. Through EIR, the Department must issue grants to both study and implement innovative, evidence-based practices "to improve student achievement and attainment for high-need students." 20 U.S.C. § 7261(a)(1)(A). The Department must ensure that EIR program awards focus on rural areas and "that not less than 25 percent of funds made available for any fiscal year" go to programs for rural schools. *Id.* § 7261(c)(1).

**Response: Disputed. This is a statement of law and not a statement of fact.**

22. In its continuing resolution of 2025, Congress appropriated funds to IES at the same levels and subject to the same conditions as it had appropriated to IES in the Consolidated Appropriations Act of 2024, Pub. L. 118-47 (2024) ("2024 Appropriations Act"). *See* Pub. L. 119-4, §§ 1101–1102 (2025) ("2025 Continuing Resolution").

**Response: Defendants admit or have no basis to dispute.**

23. The 2024 Appropriations Act had appropriated $793 million for IES and directed that the funds "shall remain available through September 30, 2025." 2024 Appropriations Act, 138 Stat. at 690.

**Response: Defendants admit or have no basis to dispute.**

24. Unlike most appropriations that are available only for one fiscal year, the IES appropriations were made available for use over two fiscal years (*i.e.*, FY2024 and FY2025).

**Response: Immaterial what "most appropriations" provide for as the only funds at issue in this lawsuit are IES funds. Defendants admit or have no basis to dispute the remainder of this statement.**

25. The 2025 Continuing Resolution carried forward the two-year period of availability for IES funds. 2025 Continuing Resolution, 139 Stat. 12, § 1103. Thus, in 2025, Congress appropriated another $793 million to IES, available over a two-year period until September 30, 2026 (the "FY2025/2026 IES funds").

**Response: Disputed insofar as $25 million of the $789 million was**

**rescinded; Defendants admit or have no basis to dispute the remainder of the statement.**

26. In 2026, Congress appropriated $789 million to IES, again making the funds available over a two-year period, until September 30, 2027 (the "FY2026/FY2027 IES funds"). *See* Consolidated Appropriations Act of 2026, Pub L. 119-75, 140 Stat. 173, 303 (the "2026 Appropriations Act").

**Response: Defendants admit or have no basis to dispute.**

27. Congress has also included with the appropriation acts "explanatory statements" that set forth how it intends each agency to allocate funds among the programs that fall under each appropriation. Although Congress has not always made those explanatory statements binding on the agencies by incorporating them by reference into the text of the appropriations act, OMB has consistently apportioned, and IES has generally obligated, funds in line with Congress's intentions expressed in the explanatory statements.

**Response: Disputed. Defendants dispute that there exists a longstanding policy of following non-binding, precatory explanatory statements. Furthermore, Section 1111 of the 2025 Continuing Resolution specifically stated "Any language specifying an earmark in an appropriations Act for fiscal year 2024, or in a committee report or joint explanatory statement accompanying such an Act, shall have no legal effect with respect to funds appropriated by this division."**

28. In the 2026 Appropriations Act, Congress made the table in the explanatory statement for IES funds legally binding on IES, by expressly incorporating it into the Act. The Act provides that the obligation of IES funds "shall be for the purposes and in the amounts specified in the 'Final Bill' column for Institute of Education Sciences in the … table in the explanatory statement." 2026 Appropriations Act, 140 Stat. 303.

**Response: Defendants admit or have no basis to dispute but clarify that the binding explanatory statement applies only to the IES funds expiring in September 2027, not those expiring on September 30, 2026.**

29. Congress appropriated money for the Comprehensive Centers program separately from the other IES programs. In the 2026 Appropriations Act, Congress provided that $50 million "shall be available" for the Comprehensive Centers program. *See* 140 Stat. 295 (appropriating $50 million "to carry out section 203 of the Educational Technical Assistance Act of 2002," which is the authorizing statute for the Comprehensive Centers). The Comprehensive Centers appropriations are single-year funds, meaning they expire at the end of September 30, 2026.

**Response: Defendants admit or have no basis to dispute.**

30. Congress also separately appropriates funds for the EIR program, Congress provided in the 2026 Appropriations Act that $235 million "shall be available" for the EIR program. *See* 140 Stat. 296 ("$235,000,000 shall be available through December 31, 2026 for subpart 1 of part F of title IV"). EIR funds expire on December 31, 2026.

**Response: Defendants admit or have no basis to dispute.**

31. The Anti-Deficiency Act (ADA) governs the process by which OMB must "apportion" congressional appropriated funds to agencies, to enable agencies to use the funds.

**Response: Defendants admit or have no basis to dispute.**

32. In 1870, Congress first enacted what became known as the Anti-Deficiency Act, making it unlawful for officials and agencies to spend more funds than Congress had appropriated for a particular fiscal year. Act of July 12, 1870, ch. 251, § 7, 16 Stat. 230, 251 (codified as amended at 31 U.S.C. § 1341(a)(1)(A)–(B)).

**Response: Defendants admit or have no basis to dispute.**

33. In 1905, Congress added penalties for violations of the 1870 Act and created the apportionment process. Act of Mar. 3, 1905, ch. 1484, § 4, 33 Stat. 1214, 1257–58.

**Response: Defendants admit or have no basis to dispute.**

34. Congress enacted the modern version of the Anti-Deficiency Act in 1982. Pub. L. 97-258, 96 Stat. 877 (codified as amended at 31 U.S.C. §§ 1349(a), 1350, 1512(a), 1513(b)).

**Response: Defendants admit or have no basis to dispute.**

35. Under the Anti-Deficiency Act, when Congress appropriates funds for an agency, OMB must apportion the funds to the agency in writing before the agency may obligate (i.e. commit to spend) those funds. 31 U.S.C. § 1513(b).

**Response: Disputed. This is a statement of law and not a statement of fact. .**

36. For appropriations that are available for a definite period, which is all appropriations at issue in this case, OMB must apportion funds with the goal "to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." *Id.* § 1512(a).

**Response: Admit that the challenged appropriations in this case are for a definite period. Remainder of the statement is disputed as this is a statement of law and not a statement of fact.**

37. The Anti-Deficiency Act sets a firm deadline for OMB to apportion all appropriations. OMB must apportion an appropriation "not later than . . . "30 days after the date of enactment of the law by which the appropriation is made available." *Id.* § 1513(b)(2)(B).

**Response: Disputed. This is a statement of law and not a statement of fact. To the extent it is construed as a statement of fact, Defendants dispute that the 30 day requirement applies to making apportionments, which are governed more directly by 31 USC 1512; instead, it is simply an intra-Executive Branch notice requirement.**

38. OMB may apportion funds to become available across "months, calendar quarters, operating seasons, or other time periods." *Id.* § 1512(b)(1)(A). OMB also may apportion funds by

"activities, functions, projects, or objects," specifying when different portions of the funds will be available for the various purposes Congress authorized. *Id.* § 1512(b)(1)(B).

**Response: Disputed. This is a statement of law and not a statement of fact.**

39. Agencies are legally prohibited from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding" the amount apportioned by OMB or otherwise departing from the apportionment's terms. *Id.* § 1517(a).

**Response: Disputed. This is a statement of law and not a statement of fact.**

40. The Anti-Deficiency Act imposes both administrative and *criminal* penalties on agency officials who violate these restrictions. *See id.* §§ 1518–19.

**Response: Defendants admit or have no basis to dispute.**

41. The sole exceptions to the mandate that OMB apportion all funds no later than 30 days after enactment of the law appropriating the funds provides that OMB may establish a "reserve" in the following three limited circumstances: "(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (c) as specifically provided by law." *Id.* § 1512(c).

**Response: Disputed. This is a statement of law and not a statement of fact. To the extent it is construed as a statement of fact, Defendants dispute that the 30 day requirement applies to making apportionments; instead it is simply an intra-Executive Branch notice requirement.**

42. Prior to 1974, the Anti-Deficiency Act had an additional provision allowing reserves on broader grounds for establishing reserves. *City of New Haven v. United States*, 809 F.2d 900, 906 & n.18 (D.C. Cir. 1987). Congress repealed that provision to "preclude the President from relying on the Act as authority for implementing policy impoundments." *Id.*

**Response: Disputed. This is a statement of law and not a statement of fact.**

43. OMB often includes "footnotes" in apportionments. *See Citizens for Resp. & Ethics*

*in Wash. v. OMB*, 791 F. Supp. 3d 29, 40 n.5, 54 (D.D.C. 2025) (*CREW*). Footnotes designated with the letter "A" impose legally binding conditions on the agency's use of the funds under the Anti-Deficiency Act. *See* OMB Circular No. A-11, §§ 120.1, 120.34, https://perma.cc/H466-36D6. Sometimes these binding footnotes refer to agency "spend plans."

**Response: Defendants admit or have no basis to dispute, but clarify that not all spend plans are legally binding through incorporation by reference.**

44. An agency spend plan reflects how the agency intends to use apportioned funds. Beginning with this Administration, OMB has incorporated spend plans into apportionment footnotes in a manner that enables OMB to interfere with or micromanage agency spending. Specifically, OMB has mandated in binding "A" footnotes that agencies may spend apportioned funds only in accordance with a spend plan that must be "agreed upon" by OMB and the agency. *See Protect Democracy Project v. OMB*, No. 25-cv-1111, Order Granting Mot. to Enforce at 5–6, Dkt. 48 (D.D.C. Jan. 28, 2026).

**Response: Disputed. OMB's conduct is not "interfere[nce]" or "micromanage[ment]." The remainder of the statement reflects statements of law and not statements of fact.**

45. Pursuant to laws enacted in 2022 and 2023, OMB must post its apportionments on a publicly accessible database within two business days. Pub. L. 117-103, div. E, tit. II, §§ 204(b)-(c), 136 Stat. 49, 256-57 (2022) (codified at 31 U.S.C. § 1513 note); Pub. L. 117-328, div. E, tit. II, § 204, 136 Stat. 4459, 4667 (2022) (codified at 31 U.S.C. § 1513 note).

**Response: Disputed. This is a statement of law and not a statement of fact. .**

46. In January 2026, a federal court held that this requirement includes posting spend plans incorporated into binding footnotes. *Protect Democracy*, No. 25-cv-1111, Dkt. 48. However, OMB's compliance with the Court's order to post spend plans has been tardy and incomplete. *Id.*,

Dkt. 49.

**Response: Disputed. OMB's compliance has not been tardy and incomplete. The remainder of the statement reflects statements of law and not statements of fact**

47. The Anti-Deficiency Act's 30-day deadline to apportion the FY2025/2026 IES funds expired on April 14, 2025. But OMB did not apportion the funds until May 13, 2025, a full month after the statutory deadline. *See* Ex. 4 (May 13 IES Apportionment).

**Response: Disputed. Defendants dispute that such a deadline exists. Defendants dispute that funds were not apportioned until May 13, 2025. Instead, the funds were automatically apportioned under section 120.41 of OMB Circular A-11 after the FY 2025 Full-Year CR (Pub. L. 119-4) entered into law as a "newly-enacted full-year appropriation." Automatic apportionments are not reflected on SF-132s until an account-specific apportionment, which did take place on May 13, 2025.**

48. When OMB did apportion the funds, OMB apportioned $485 million of the FY2025/2026 funds to an "Unallocated" line of the apportionment, which renders the funds unavailable to use for any purpose. *Id.*

**Response: Disputed. Defendants dispute the implication that apportionment to the unallocated line is a final decision to make the funds "unavailable to use for any purposes." Rather, it is standard for agencies to seek "reapportionment" of these funds to a different line prior to their expiration, as has happened several times throughout this litigation. This is made explicit through 31 U.S.C. §1512(a) which states "An apportionment may be reapportioned under this section."**

49. The funds that OMB did apportion for actual IES programming did not match the

allocations that Congress specified in its explanatory statement for the FY2025/2026 funds. For instance, OMB apportioned $0 for Research in Special Education, $0 for Special Education Studies, and just $12,493 for Research, Development, and Dissemination. *See Id.*

**Response: Defendants admit or have no basis to dispute to the extent the allegations are supported by the May 13 IES Apportionment, which is the best evidence of its contents; otherwise, Defendants deny the allegations therein. For example, section 1111 of the 2025 Continuing Resolution specifically stated "Any language specifying an earmark in an appropriations Act for fiscal year 2024, or in a committee report or joint explanatory statement accompanying such an Act, shall have no legal effect with respect to funds appropriated by this division." Furthermore, no explanatory statement applied to the 2025 Continuing Resolution.**

50. The apportionment also included binding footnotes directing that the Department could use the funds only as "consistent with the latest agreed-upon spending plan for Fiscal Year 2025 between the Department of Education (ED) and the Office of Management and Budget (OMB)." *See Id.* n. A2. OMB also included a footnote directing that, "[a]s permissible by law, amounts apportioned shall be spent in a manner consistent with . . . Executive Order 14151, "Ending Radical And Wasteful Government DEI Programs." *Id.* n.A3.

**Response: Defendants admit or have no basis to dispute.**

51. On August 8, 2025, OMB approved a new apportionment for the same set of FY2025/2026 funds, which increased the amount in the "Unallocated" line to $500 million and apportioned the balance across IES's various programs and Program Administration. *See* Ex. 5. The August 8, 2025 apportionment contained the same footnotes as in the May 13, 2025 apportionment. *See Id.*, n. A3, n. A5.

**Response: Defendants admit or have no basis to dispute.**

52. On February 27, 2026, OMB apportioned $210.5 million of the $500 million previously relegated to the "Unallocated" line for the second and final year (FY2026) of the FY2025/2026 IES appropriation from the 2025 Continuing Resolution. *See* Ex. 6. This apportionment kept $289.5 million apportioned to the "Unallocated" line. *See id.* The February 27, 2026 Apportionment again included a spend-plan footnote, and it expanded the footnotes that limit spending to also mandate compliance with Executive Order 14332, "Improving Oversight of Federal Grantmaking." *Id.* n.A2.

**Response: Disputed. The footnotes were not expanded to mandate compliance with Executive Order 14332 beyond what was otherwise "permissible by law." Defendants admit or have no basis to dispute the remainder.**

53. On June 18, 2026, OMB released a monthly "SF-133 Report" for the Department of Education. This report provides monthly data about how much money agencies have obligated, and for what purpose. The report also includes information about the amounts apportioned for each account, but these reports do not apportion funds, and the revelation of apportionments in these reports do not carry out OMB's statutory mandate to post apportionments and spend plans incorporated therein within two business days in OMB's public apportionment database.

**Response: Disputed. This is a statement of law and not a statement of fact. .**

54. The June 2026 SF-133 Report indicated that OMB had apportioned roughly $250 million in FY2025/2026 IES funds at some point in May 2026. *See* Fiscal Year 2026 Dep't of Educ. SF-133 for TAFS 091-2025-2026-1100 (row 8759), https://tinyurl.com/2s3p8t5k. The June 2026 SF-133 did not reveal how this amount was apportioned among the different IES programs, nor does it reveal the footnotes attached to the purported apportionments.

**Response: Defendants admit the allegations contained in paragraph 54 to the extent supported by the June 2026 SF-133 cited therein, which are the best evidence of their contents; otherwise, Defendants deny the allegations therein.**

55. On August 1, 2026, after the filing of this case detailing this potentially undisclosed apportionment, OMB posted to its database a "May Update" to its "FY 2026 IES spend plan." OMB015. By virtue of having been incorporated by reference into the February 2026 apportionment, the agreement upon this spend plan apportioned the FY2025/2026 IES funds.

**Response: Defendants admit the allegations contained in paragraph 55 to the extent supported by the May Update cited therein and the *CREW* case pending appeal, which is the best evidence of its contents; otherwise, Defendants deny the allegations therein.**

56. The spend plan reflects that OMB has finally apportioned all but about $10 million of the remaining FY2025/2026 IES funds, provided that the numbers in the March 5, 2026 spend plan, OMB014, totalling $232,904,876 are added to the numbers on the first sheet of the May Update, OMB015, which total $141,828,458 and then if those numbers are in turn added to the lines of funds apportioned for June, July and August in the supporting sheets of the May Update, OMB015 at 4-11, totaling $100,164,311.

**Response: Disputed. All FY2025/2026 IES funds have been apportioned.**

57. In total, this makes approximately $475 million of the FY2025/2026 IES funds available for obligation. As the account originally had $510 million before the $25 million rescission in Program Administration funds in the FY2026 Appropriations Act, that still leaves a gap of about $10 million for which an apportionment has not been disclosed. This means that either those $10 million remain unapportioned, or there is an additional apportionment or spend plan that has not been disclosed.

**Response: Disputed. All FY2025/2026 IES funds have been apportioned, including the $10 million referenced by Plaintiffs. To date, $587,574,710 has been obligated.**

58. The May Update also indicates that $17 million has been reprogrammed from the

Statistics funds to the SLDS programs.

**Response: On August 20, 2026, consistent with Section 514(b) 2026 Appropriations Act, the Department notified Congress of its intent to reprogram $68,653,580.92 of FY 2025 IES funding towards other programs, projects or activities within the account.**

59. The Anti-Deficiency Act's deadline for apportioning the FY2026 Comprehensive Centers program funds passed on March 5, 2026.

**Response:** Disputed. **Defendants dispute that the 30 day requirement applies to making apportionments (and accordingly that the deadline to apportion passed on March 5, 2026); instead it is simply an intra-Executive Branch notice requirement.**

60. As of today's date, OMB has apportioned only $500,000 of the $50 million appropriated for the Comprehensive Centers program. Ex. 7. his leaves $49.5 million unapportioned and legally unavailable for obligation. Those unapportioned funds will expire on September 30, 2026.

**Response: Disputed. All Comprehensive Center funding has been apportioned.**

61. At the time the $500,000 was apportioned on April 9, 2026, OMB included a binding footnotes requiring that the Department comply with the same two Executive Orders in using these funds as with the FY2025/2026 IES funds. *Id.*, n.A3. Those footnotes were removed when the account was reapportioned on July 21, 2026. Exs. 8, 9.

**Response: Disputed. The $500,000 was apportioned on March 24, 2026.**

62. For the EIR funds appropriated in 2026, the Anti-Deficiency Act's deadline for apportioning the funds was March 5, 2026, but OMB did not apportion any of the EIR funds by that date. On April 9, 2026, OMB apportioned a paltry $59,235 of the $235 million appropriated for

the EIR program. Ex. 10. The remaining $234.94 million was apportioned to an "Unallocated line," legally prohibiting the Department from using these funds for their intended purposes. *Id.*

**Response: Disputed. Defendants dispute that such a deadline exists. Furthermore, Defendants dispute that funds were not apportioned by March 5, 2026. Instead, the funds were automatically apportioned under section 120.41 of OMB Circular A-11 following enactment of the appropriation. Defendants dispute the implication that apportionment to the unallocated line is a final decision to make the funds unavailable to use for their intended purposes. Rather, it is standard for agencies to seek "reapportionment" of these funds to a different line prior to their expiration, as has happened several times throughout this litigation. Furthermore, approximately $220 million has been made available to make new awards in the EIR Mid-Phase program at present.**

63. On July 21, 2026, three weeks after this lawsuit was filed, OMB apportioned the remaining EIR funds. Ex. 11. OMB included a binding footnotes requiring that the Department comply with the same two Executive Orders in using these funds as with the FY2025/2026 IES funds. *Id.*, n.A3.

**Response: Disputed. The footnotes do not require compliance with executive orders beyond what was otherwise "permissible by law." Defendants admit or have no basis to dispute the remainder.**

64. Congress appropriated $789 million in FY2026/2027 IES funds in the 2026 Appropriations Act, and these funds expire on September 30, 2027. Pub. L. 119-75.

**Response: Defendants admit or have no basis to dispute.**

65. On February 18, 2026, OMB apportioned a small portion of these funds, designating $584 million on the "Unallocated" line and apportioning almost all of the rest to the

National Assessment of Education Progress. *See* Ex. 12.

**Response: Defendants admit or have no basis to dispute.**

66. On July 27, 2026, OMB apportioned an additional $118.65 million in FY2026/2027 IES funds, but still apportioned *zero* FY2026/2027 IES funds for the Regional Educational Laboratories, Statistics, and Statewide Longitudinal Data System, and only $403,622 for Special Education Studies. Ex. 13.

**Response: Disputed. Defendants dispute the implication that there is a duty to have already apportioned the *entire sum* of funds that are not set to expire until September 30, 2027. That contradicts the whole purpose of the ADA, which is to prevent agencies from drawing down their appropriation too quickly.**

67. OMB apportioned $465.6 million of the FY2026/2027 IES funds as "Undistributed," with a footnote saying that "[a]mounts apportioned on this line are available for obligation" not as of this apportionment, but only "upon reapportionment to an applicable Category B line," where Category B provides the substantive purposes for which funds may be used. *Id.* n.A4. OMB included a binding footnote requiring that the Department comply in using these funds with Executive Order 14151, one of the two Executive Orders whose policy directives were imposed on the FY2025/2026 IES funds. *Id.*, n.A3.

**Response: Disputed. Defendants dispute the implication that apportionment to the unallocated line is a final decision to make the funds unavailable to use for their intended purposes. Rather, it is standard for agencies to seek "reapportionment" of these funds to a different line prior to their expiration, as has happened several times throughout this litigation. Further disputed that the footnote required compliance with the executive order beyond what was otherwise "permissible by law."**

68. OMB included legally binding "A" footnotes in its initial FY2026 apportionments of FY2026/2027 IES funds, conditioning the Department of Education's use of funds on compliance with policy directives in Executive Order 14151, 'Ending Radical And Wasteful Government DEI Programs And Preferencing," and/or Executive Order 14332, "Improving Oversight of Federal Grantmaking." *See* Ex. 6, n. A2.

**Response: Disputed that the footnotes required compliance with executive orders beyond what was otherwise "permissible by law." Defendants admit or have no basis to dispute the remainder.**

69. Executive Order 14151 directs all agencies to eliminate government programs, grants, and contracts that, in the Administration's view, promote diversity, equity, inclusion, and accessibility initiatives.

**Response: Disputed. This is a statement of law and not a statement of fact. Also, the Executive Order speaks for itself.**

70. Executive Order 14332 directs agencies to (among other things) embed senior, politically appointed officials into the grantmaking process and to ensure that competitive grants advance the Administration's priorities.

**Response: Disputed. This is a statement of law and not a statement of fact. Also, the Executive Order speaks for itself.**

71. Plaintiffs and their members are organizations and associations dedicated to educators and education research that compete for funding under the programs at issue in this case and depend on the research, data, and studies produced through these programs to carry out their missions.

**Response: Disputed. Defendants dispute to the extent this suggests Plaintiffs are actively or directly competing for funding at this time.**

72. Plaintiff Knowledge Alliance is a nonprofit, nonpartisan association composed of 19

education organizations that share the belief that high-quality, timely, and relevant research is essential to improving student outcomes. Decl. or Rachel Dinkes ¶¶ 2-3.

**Response: Defendants admit or have no basis to dispute.**

73. Knowledge Alliance members operate under grants and contracts under the programs at issue in this case. *Id.* ¶ 9.

**Response: Disputed. Defendants dispute to the extent this suggests Plaintiffs are actively or directly competing for funding at this time.**

74. Plaintiff BNP Partners has received awards under the REL program, has competed for awards through the Comprehensive Centers program, and relies on NCES data in its own work. Norford Decl. ¶¶ 4-5, 7.

**Response: Disputed. Defendants dispute to the extent this suggests Plaintiffs are actively or directly competing for funding at this time.**

75. Plaintiff National Center for Learning Disabilities (NCLD) is a nonprofit that works with educators, students, families, and others to "advance research, share resources, build coalitions, and advocate for policies that reduce systemic barriers for individuals with learning disabilities." Decl. of Jacqueline Rodriguez ¶ 2. To do this, NCLD relies on IES-created data, research, and evaluations—primarily but not limited to data from NCSER and NCES—to undertake its own research and develop policy briefs. *Id.* ¶¶ 3-6.

**Response: Defendants admit or have no basis to dispute.**

76. Plaintiff Massachusetts Teachers Association (MTA) represents 117,000 members including more than 12,000 members who work in higher education as, for example, faculty in the University of Massachusetts's colleges of education., Decl. of Mike Fadel ¶ 5. MTA's members and staff rely heavily on IES data and research projects in their work, and apply for IES- funded grants, and receive benefits through REL projects.. *Id.* ¶¶ 10, 12.

**Response: Disputed. Defendants dispute to the extent this suggests Plaintiffs are actively or directly competing for funding at this time.**

Dated: August 25, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

DIANE KELLEHER
Director

MICHELLE BENNETT
Assistant Branch Director

*/s/ Michael K. Velchik*
MICHAEL K. VELCHIK
Senior Counsel
Civil Division
United States Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
Phone: (202) 860-8388
E-mail: michael.velchik@usdoj.gov

PIERCE J. ANON
EITAN R. SIRKOVICH
Trial Attorneys
Federal Programs Branch

*Attorneys for Defendants*

**Certificate of Service**

I hereby certify that a true copy of the above document was served upon Plaintiffs' counsel by the Electronic Case Filing system on July 17, 2026.

/s/Michael K. Velchik
MICHAEL K. VELCHIK