**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL CENTER FOR LEARNING DISABILITIES, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>OFFICE OF MANAGEMENT AND BUDGET, *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-13019 |

**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

ARGUMENT ..... 2

I. This Court Has Jurisdiction Over All Claims ..... 2

A. Plaintiffs Have Standing ..... 2

1. Claims for Failure to Apportion (Counts 1, 2, 6, 7) and Failure to Obligate (Counts 7–8) ..... 2

2. EO Footnotes Claims (Counts 3 and 4) ..... 6

3. Non-Disclosure of Apportionment Claim (Count 5) ..... 7

B. No Claims Are Moot ..... 8

C. Plaintiffs' Claims Are All Ripe ..... 10

II. Defendants' Other Threshold Arguments All Fail ..... 10

A. Plaintiffs' Claims Are Not Precluded ..... 10

1. The ICA does not preclude Plaintiffs' claims ..... 11

2. The Anti-Deficiency Act does not preclude Plaintiffs' claims ..... 15

B. Plaintiffs Are Within the Zone of Interests ..... 16

C. The Decisions at Issue Are Not Committed to Agency Discretion by Law ..... 17

D. Plaintiffs Challenge Final Agency Action ..... 18

III. Plaintiffs Are Entitled to Judgment as a Matter of Law ..... 19

A. OMB Has Failed to Timely Apportion the Relevant Funds (Counts 1 and 2) ..... 19

B. OMB's Extra-Statutory EO Footnotes Violate the APA (Counts 3 and 4) ..... 22

1. The Footnotes Exceed Statutory Authority and Are Unconstitutional ..... 22

2. The Executive Order Footnotes are Arbitrary and Capricious ..... 24

C. OMB Has Failed to Publicly Disclose Spend Plans as Required (Count 5) ..... 25

D. OMB's Policy of Designating Funds as Unallocated Is Unlawful (Count 6) ..... 25

E. OMB Has Failed to Comply with Explanatory Statements (Counts 1 and 7) ..... 27

F. OMB Is Unlawfully Withholding or Unreasonably Delaying Obligating the Relevant Funds That Expire on September 30, 2026 (Count 8) ..... 28

IV. Plaintiffs' Requested Relief Is Appropriate ..... 29

CONCLUSION ..... 30

CERTIFICATE OF SERVICE ..... 32

## TABLE OF AUTHORITIES

### Cases

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
803 F. Supp. 3d 164 (D.D.C. 2025) .......... 14

*AFL-CIO v. Dep't of Lab.*,
778 F. Supp. 3d 56 (D.D.C. 2025) .......... 19

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 15

*Am. Fed'n of State Cnty. & Mun. Emps., AFL-CIO v. OMB*,
807 F. Supp. 3d 1004 (N.D. Cal. 2025) .......... 15

*Am. Pub. Health Ass'n v. NIH*,
145 F.4th 39 (1st Cir. 2025) .......... 18

*Amrhein v. eClinical Works, LLC*,
954 F.3d 328 (1st Cir. 2020) .......... 6

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*,
698 F.3d 171 (4th Cir. 2012) .......... 22

*Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*,
2026 WL 523023 (D.D.C. Feb. 25, 2026) .......... 5

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 18

*Bos. Bit Labs, Inc. v. Baker*,
11 F.4th 3 (1st Cir. 2021) .......... 9

*Bost v. Ill. State Bd. of Elections*,
146 S. Ct. 513 (2026) .......... 2

*Carney v. Adams*,
592 U.S. 53 (2020) .......... 4

*Castro v. Scanlan*,
86 F.4th 947 (1st Cir. 2023) .......... 4

*CC Distribs. v. United States*,
883 F.2d 146 (D.C. Cir. 1989) .......... 2, 5

*City of Chicago v. DHS*,
815 F. Supp. 3d 727 (N.D. Ill. 2025) .......... 17

*City of New Haven v. United States*,
809 F.2d 900 (D.C. Cir. 1987) .......... 10, 27

*City of New York v. Ruckelshaus*,
358 F. Supp. 669 (D.D.C. 1973) .......... 12

*Clinton v. City of New York*,
524 U.S. 417 (1998) ........................................ 26

*Coal. of MISO Transmission Customers*,
45 F.4th 1004 (D.C. Cir. 2022) ........................................ 5

*Cobell v. Norton*,
240 F.3d 1081 (D.C. Cir. 2001) ........................................ 18

*Cordeiro v. Grep Atl., LLC*,
2025 WL 889460 (D. Mass. Mar. 21, 2025) ........................................ 8

*CREW v. OMB*,
791 F. Supp. 3d 29 (D.D.C. 2025) ........................................ 7, 19

*CREW v. OMB*,
No. 25-5266 (D.C. Cir. Aug. 9, 2025). ........................................ 7

*Dalton v. Specter*,
511 U.S. 462 (1994) ........................................ 23, 24

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........................................ 17

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) ........................................ 30

*Dep't of State v. AIDS Vaccine Advoc. Coal.*,
146 S. Ct. 19 (2025) ........................................ 13, 14, 15

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
189 F. Supp. 3d (D.D.C. 2016) ........................................ 22

*FBI v. Fikre*,
601 U.S. 234 (2024) ........................................ 9

*FDA v. R.J. Reynolds Vapor Co.*,
606 U.S. 226 (2025) ........................................ 16

*FEC v. Cruz*,
596 U.S. 289 (2022) ........................................ 7

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........................................ 22

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ........................................ 3, 4, 5, 13

*Glob. Health Council v. Trump*,
No. 25-5097, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025) ........................................ 24

*Gomez v. Trump*,
485 F. Supp. 3d 145 (D.D.C. 2020) ........................................ 22

*Guadamuz v. Ash*,
368 F. Supp. 1233 (D.D.C. 1973) ........................................ 12

*Housatonic River Initiative v. EPA*,
75 F.4th 248 (1st Cir. 2023) ........ 28

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
980 F.3d 123 (D.C. Cir. 2020) ........ 30

*Kendall v. United States ex rel. Stokes*,
37 U.S. (12 Pet.) (1838) ........ 12

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
567 U.S. 298 (2012) ........ 8

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) ........ 26

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........ 17, 18

*Louisiana v. Weinberger*,
369 F. Supp. 856 (E.D. La. 1973) ........ 12

*Lowe v. Gagné-Holmes*,
126 F.4th 747 (1st Cir. 2025) ........ 8

*Marland v. Trump*,
498 F. Supp. 3d 624 (E.D. Pa. 2020) ........ 21

*Milligan v. Pompeo*,
502 F. Supp. 3d 302 (D.D.C. 2020) ........ 22

*Nat'l Council of Cmty. Mental Health Ctrs. v. Weinberger*,
361 F. Supp. 897 (D.D.C. 1973) ........ 12

*Nat'l Law Ctr. on Homelessness & Poverty v. VA*,
842 F. Supp. 2d 127 (D.D.C. 2012) ........ 29

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*,
2026 WL 1601790 (D. Mass. June 4, 2026) ........ 6

*New York v. Kennedy*,
155 F.4th 67 (1st Cir. 2025) ........ 5

*New York v. Trump*,
133 F.4th 51 (1st Cir. 2025) ........ 22, 24

*New York v. Trump*,
171 F.4th 1 (1st Cir. 2026) ........ 19

*Oliveira v. Edlow*,
No. CV 25-13228-BEM, 2025 WL 3492110 (D. Mass. Dec. 4, 2025) ........ 30

*Orr v. Trump*,
778 F. Supp. 3d 394 (D. Mass. 2025) ........ 22

*Pietrantoni v. Corcept Therapeutics Inc.*,
640 F. Supp. 3d 197 (D. Mass. 2022) ........ 29

*Presidents' All. on Higher Educ. & Immigr. v. Noem*,
824 F. Supp. 3d 168 (D. Mass. 2026) ........................................................................ 6

*Ramirez v. ICE*,
568 F. Supp. 3d 10 (D.D.C. 2021) .......................................................................... 30

*Reno v. Cath. Soc. Servs., Inc.*,
509 U.S. 43 (1993) .................................................................................................. 10

*R.I. Coal. Against Domestic Violence v. Kennedy*,
2026 WL 2364298 (D.R.I. Aug. 14, 2026) ............................................................. 24

*Sackett v. EPA*,
566 U.S. 120 (2012) ................................................................................................ 16

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
123 F.4th 1 (1st Cir. 2024) ...................................................................................... 16

*State Highway Comm'n of Mo. v. Volpe*,
347 F. Supp. 950 (W.D. Mo. 1972)........................................................................... 12

*Steir v. Girl Scouts of the USA*,
383 F.3d 7 (1st Cir. 2004) .......................................................................................... 2

*Tate v. Pompeo*,
513 F. Supp. 3d 132 (D.D.C. 2021) ......................................................................... 21

*Teton Historic Aviation Found. v. Dep't of Defense*,
785 F.3d 719 (D.C. Cir. 2015) ..................................................................................... 5

*TikTok Inc. v. Trump*,
507 F. Supp. 3d 92 (D.D.C. 2020) ........................................................................... 21

*Train v. City of New York*,
420 U.S. 35 (1975) .................................................................................................. 12

*Union of Concerned Scientists v. Wheeler*,
954 F.3d 11 (1st Cir. 2020) ....................................................................................... 17

*United States v. Chin*,
913 F.3d 251 (1st Cir. 2019) ..................................................................................... 10

*United States v. Richardson*,
418 U.S. 166 (1974) .................................................................................................... 7

*Venetian Casino Resort, LLC v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008) ................................................................................... 19

*W. Virginia v. EPA*,
597 U.S. 697 (2022) .................................................................................................. 26

*Walker v. Cheney*,
230 F. Supp. 2d 51 (D.D.C. 2002) ............................................................................ 11

*Washington v. FEMA*,
818 F. Supp. 3d 195 (D. Mass. 2025) ......................................................................... 2

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
586 U.S. 9 (2018) ........ 11

**Statutes**

2 U.S.C.
§ 681 ........ 12, 13, 15
§ 681(3) ........ 12, 13
§ 683(b) ........ 11
§ 683(a) ........ 11
§ 684(a) ........ 11
§ 687 ........ 11

5 U.S.C.
§ 701(a)(2) ........ 17
§ 704 ........ 19
§ 706(1) ........ 19, 29
§ 706(2) ........ 19
§§ 702, 704 ........ 16

20 U.S.C.
§ 9511(b)(2) ........ 6
§ 9512 ........ 6
§ 9533(a)(7) ........ 6
§ 9543(a) ........ 6
§§ 9564(a), (b), (f) ........ 18
§ 9564(f)(2) ........ 6
§ 9574 ........ 6
§ 9567b(e)(1) ........ 6
§ 9575 ........ 6
§ 9602(f)(B) ........ 6

31 U.S.C.
§§ 1341(a), 1349–51 ........ 16
§ 1512(a) ........ 17, 26
§ 1512(b)(2) ........ 17, 26
§ 1512(c) ........ 17, 26
§ 1513 ........ 8, 20, 21, 26
§ 1513(b) ........ 17, 20, 21
§ 1513(b)(1) ........ 21
§ 1513(b)(2) ........ 21
§§ 1517–19 ........ 16
§ 1519 ........ 23

**Executive Branch Materials**

Executive Order 11541,
35 Fed. Reg. 10,737 (July 2, 1970) ........ 21

GAO, *Principles of Federal Appropriations Law* (3d Ed.), 2006 WL 6179174 ........ 21

Notice; Delegation of Apportionment Authority,
90 Fed. Reg. 9737 (Feb. 18, 2025) .......... 21

OMB Circular No. A-11 §§ 20.3, 120.1 .......... 19, 20, 26

**Rules**

Fed. R. Civ. P. 65(d) .......... 30

## INTRODUCTION

The record proves that Defendants have used the machinery of the Executive Branch to override Congress's decisions about education-research spending. When Congress appropriated these funds, OMB had a simple task: apportion the money to the Department of Education within 30 days, in a manner that ensures the agency will not exhaust the funds too quickly. But OMB has exploited this limited role to place itself above Congress. It has delayed providing or outright refused to provide the funds to the agency, including by designating large amounts as "Unallocated," imposed substantive policy conditions through footnotes, and ignored Congress' directions on how to allocate the funds across programs. The Department, for its part, has dragged its feet on obligating the funds even once OMB provided them. Those actions violate the laws governing the appropriations and apportionment process, the APA, and the Constitution.

In response to Plaintiffs' suit, Defendants have now taken *some* of the actions the law required them to take months earlier. But those belated steps do not moot Plaintiffs' claims. Hundreds of millions of dollars remain unobligated; the illegal footnotes remain in force; and OMB continues the same policy of refusing to timely apportion education appropriations, including by withholding appropriated funds on Unallocated—or now, "Undistributed"—lines.

To avoid the merits, Defendants go through their rolodex of threshold objections, but none withstands scrutiny. Plaintiffs challenge concrete agency actions and discrete failures to act that directly injure them, and the APA provides a vehicle for reviewing those claims. On the merits, the governing statutes are equally straightforward: Congress required OMB to apportion the funds on time, required the Department to carry out the funded programs, and did not authorize either agency to withhold those funds or condition their use on the Administration's preferred policies. The Court should deny Defendants' motion and enter judgment for Plaintiffs.

## ARGUMENT

### I. This Court Has Jurisdiction Over All Claims

#### A. Plaintiffs Have Standing

Plaintiffs have standing. The core question in evaluating standing is whether plaintiffs have a "personal stake" in the litigation. *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 76 (2026). "They must, in other words, be able to answer a basic question: 'What's it to you?'" *Id.* (quotation omitted). Plaintiffs can readily answer that question for each claim they assert.[1]

##### *1. Claims for Failure to Apportion (Counts 1, 2, 6, 7) and Failure to Obligate (Counts 7–8)*

Plaintiffs have multiple forms of standing to challenge Defendants' failure to timely apportion and timely obligate the relevant education research funds.[2]

**a.** Plaintiffs and their members have economic injury from the lost opportunity to obtain the withheld funds through grants, contracts, and sub-awards. Courts have long held that parties have a personal stake, and thus have standing, where they have lost "an opportunity to pursue a benefit," "even though the plaintiff may not be able to show that it was certain to receive that benefit had it been accorded the lost opportunity." *CC Distribs. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989). For example, in *Washington v. FEMA*, 818 F. Supp. 3d 195 (D. Mass. 2025), the court held that states had standing to challenge the termination of a FEMA program under which they competed for funding. *Id.* at 202–03 (citing *CC Distribs.*, 883 F.2d at 150). And just last year, the D.C. Circuit held that organizations that previously received funding from USAID had standing to challenge the agency's refusal to spend appropriations for which the

---

[1] As relevant to the standing analysis below, "[s]tanding in the jurisdictional sense is based on the facts as they existed at the time the complaint was filed." *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 15 (1st Cir. 2004). Whether Defendants' post-complaint actions result in Plaintiffs no longer having a "stake in [the] case" bears on the related but distinct question of mootness. *Id.*

[2] Plaintiffs are no longer pursuing Count 9 of their complaint and hereby withdraw it.

plaintiffs would compete. *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025).

Here, Plaintiffs and their members compete for awards under every statutory research center and program at issue. Knowledge Alliance's members alone do so. Dinkes Decl. ¶¶ 9, 11, 14, 21–24 (members held grants or contracts with or for NCES, NCER, NCSER, RELs, Comprehensive Centers, and EIR); *see also* Norford Decl. ¶¶ 4–5; Fadel Decl. ¶¶ 13, 16, 20, 30.

For each of the four appropriations at issue, Plaintiffs have established injury from the lost opportunity to obtain the funds. OMB has still not apportioned $465,620,322 of the $789,606,000 in FY2026/2027 IES funds (*see* Pls. Br. 14), which legally precludes the Department from awarding the funds. For the FY2025/2026 IES funds, IES continues to unlawfully withhold or unreasonably delay obligating the funds or even taking the necessary steps toward obligating the funds, with $180,531,290 still not obligated as of July 31, 2026. *See* Suppl. Soldner Decl. ¶ 12. That deprives Plaintiffs of the opportunity to obtain these funds. And IES has now confirmed that it will not obligate the FY2025/2026 funds in accordance with Congress's intent as directed in the explanatory statement, most notably by shortchanging the Regional Educational Laboratories (REL) program by $16 million—a program for which Plaintiffs and their members consistently receive funding. *See* Dinkes Decl. ¶ 20; Norford Decl. ¶ 4. For the FY2026 Comprehensive Centers and EIR funds, OMB had apportioned almost none of the funds when Plaintiffs filed the complaint. That failure to apportion was depriving Plaintiffs of any chance of obtaining the money, and the mere delay substantially injured Knowledge Alliance's members who had to lay off staff, freeze hiring, and scale back investments due to the uncertainty of when, if ever, the money would be competed. Dinkes Decl. ¶ 30.

Plaintiffs also are suffering and will continue to suffer lost-opportunity injury from Defendants' ongoing policy of issuing apportionments to the Department of Education that

designate substantial amounts as Unallocated. Plaintiffs and their members consistently compete for Department funds, with some organizations entirely dependent on the funds to sustain their businesses. *See, e.g.*, Dinkes Decl. ¶ 10. OMB's policy of reserving enormous amounts as Unallocated will injure Plaintiffs and their members over and over again, by delaying when they will know how funds will be used, or denying access to the funds entirely.

Defendants' arguments against Plaintiffs' lost-opportunity injuries fall flat. Defendants cannot distinguish *Global Health Council* on the ground that the case "involved a categorical policy requiring a 'funding freeze and suspension of [existing] contracts.'" Defs. Br. 9 (quoting 153 F.4th at 11). While the funding freeze was one basis for standing the district court had found, the D.C. Circuit held that the plaintiffs independently had standing to challenge the withholding of funds based on "the prospect of competing for funds" in the future. 153 F.4th at 12. The injury in *Global Health Council* is exactly the same as the injury Plaintiffs assert here.

Contrary to Defendants' suggestion (at 8–9), Plaintiffs have readily established that they are "able and ready" to compete for funding under the relevant programs. Plaintiffs have submitted unrebutted declarations that they and their members compete for—and have received—funding under each program at issue. *See, e.g.*, Dinkes Decl. ¶¶ 9–24, 28–29; Norford Decl. ¶¶ 3–5, 7; Fadel Decl. ¶¶ 13, 16, 20, 30. Plaintiffs are nothing like the plaintiff in *Carney v. Adams*, 592 U.S. 53 (2020), whose "only evidence" that he was "able and ready" to compete for a judgeship was his statement that he "would apply" if given the chance. *Id.* at 60–61.

Nor must Plaintiffs show that they are "disadvantaged … relative to those with whom they would compete for funds." Defs. Br. 9. Defendants cite no case supporting that purported requirement,[3] and it is contrary to the long line of cases recognizing standing even where other

[3] Defendants cite *Castro v. Scanlan*, 86 F.4th 947 (1st Cir. 2023), but *Castro* concerned "economic competitor standing," which is rooted in the "law of economics that one direct

parties had also been denied an opportunity to compete. *See, e.g.*, *Glob. Health Council*, 153 F.4th at 12; *CC Distribs.*, 883 F.2d at 150; *Coal. of MISO Transmission Customers*, 45 F.4th 1004, 1015 (D.C. Cir. 2022); *Teton Historic Aviation Found. v. Dep't of Defense*, 785 F.3d 719, 724–25 (D.C. Cir. 2015). Defendants' assertion that Plaintiffs must show some "disadvantage" relative to other competitors also makes no sense as a matter of first principles. The injury to Plaintiffs is the lost chance to obtain money, and that pocketbook injury does not change based on whether other entities also lost the opportunity to obtain those benefits.

**b.** Plaintiffs independently have informational standing to challenge Defendants' failure to timely apportion and obligate the relevant funds, and to do so consistent with the explanatory statements. Plaintiffs and their members rely on the research and data produced and disseminated through the relevant programs to support Plaintiffs' own work, research, and advocacy efforts. *See* Pls. Br. 33 (citing declarations). Plaintiffs thus suffer "downstream consequences from failing to receive … information" as a result of alleged legal violations. *New York v. Kennedy*, 155 F.4th 67, 74 (1st Cir. 2025) (quotations omitted). In *Kennedy*, the plaintiffs had informational standing because they had relied on certain pregnancy risk data that was not made public because of the challenged reduction-in-force of agency staff. *See id.* And with respect to IES specifically, another district court held this year that organizations like Plaintiffs had standing to challenge IES actions that deprived the organizations of IES-sponsored research. *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, 2026 WL 523023, at *5–7 (D.D.C. Feb. 25, 2026). Similarly, here, Plaintiffs have informational injury from Defendants' failure to timely apportion and obligate the funds, which delays or prevents the publication of research and data upon which Plaintiffs rely.

---

competitor's gain of market share is another's loss." *Id.* at 954. That doctrine has nothing to do with the doctrine of standing based on lost opportunity to obtain government funding or benefits.

Defendants' sole argument on this informational injury is that "Plaintiffs 'do not claim that any statute gave them a right to have' this information." Defs. Br. 10 (quoting *Amrhein v. eClinical Works, LLC*, 954 F.3d 328, 333 (1st Cir. 2020)). But even assuming that is a requirement, *cf. Kennedy*, 155 F.4th at 74, there are myriad statutes requiring the Department to publish and disseminate research produced through the IES, Comprehensive Centers, and EIR programs. *E.g.,* 20 U.S.C. § 9574 ("data collected by [IES] … shall be made available to the public"); *id.* § 9511(b)(2) (IES must generally engage in "wide dissemination activities" in carrying out its mission); *id.* § 9512 (similar); *id.* § 9575 (similar); *id.* § 9533(a)(7) (similar for NCER); *id.* § 9543(a) (similar for NCES); *id.* § 9564(f)(2) (similar for RELs); *id.* § 9567b(e)(1) (similar for NCSER); *id.* § 9602(f)(B) (similar for Comprehensive Centers).

**c.** Defendants paint Plaintiffs' need to divert resources to address Defendants' unlawful activities as "manufactur[ing] … standing by expending money." Defs. Br. 10. But "the principle that a plaintiff may not 'manufacture' standing by voluntarily expending resources opposing a governmental action through lobbying or advocacy does not extend to cases in which a plaintiff is compelled to divert resources to counteract the effects of a government action on its existing operations and members." *Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*, 2026 WL 1601790, at *5 (D. Mass. June 4, 2026); *see also Presidents' All. on Higher Educ. & Immigr. v. Noem,* 824 F. Supp. 3d 168, 188 (D. Mass. 2026) (similar). That is the harm Plaintiffs Knowledge Alliance and NCLD face here. Dinkes Decl. ¶ 26; Rodriguez Decl. ¶¶ 2, 14.

*2. EO Footnotes Claims (Counts 3 and 4)*

Plaintiffs have standing to challenge the apportionment footnotes that legally require—on threat of criminal liability under the Anti-Deficiency Act—the Department to comply with two Executive Orders in using the funds. *See* Pls. Br. 14. NCLD is directly harmed because the Department—and particularly political appointees at the Department—have interpreted the

prohibition on "DEI" to require scrapping programs for children with disabilities, presumably because helping students with disabilities is perceived as "inclusion."[4] And Knowledge Alliance's members have been chilled from mentioning their work involving equity and disabilities in their funding applications, *see* Dinkes Decl. ¶ 35, placing them at a disadvantage.

To challenge the EO footnotes, Plaintiffs do not need to show that the Department will "interpret the footnotes to prohibit funding research in a way that conflicts with the statute." Defs. Br. 10. The footnotes will harm Plaintiffs in the ways described above whether or not the Department carries them out in a way that directly conflicts with any statute. Moreover, the Court must assume Plaintiffs are correct on the merits in assessing standing, *FEC v. Cruz*, 596 U.S. 289, 298 (2022), meaning the Court must assume that the footnotes are unlawfully restricting the Department's use of the funds and freedom from political influence in deciding whom and what to fund. Plaintiffs certainly have injury under that assumption.

*3. Non-Disclosure of Apportionment Claim (Count 5)*

Defendants include a single sentence disputing Plaintiffs' standing to challenge OMB's failure to timely disclose the May 2026 spend plan for IES funds, arguing that Plaintiffs' standing "is foreclosed by *United States v. Richardson*, 418 U.S. 166 (1974)." Defs. Br. 9. The district court in *CREW v. OMB*, 791 F. Supp. 3d 29 (D.D.C. 2025), thoroughly rejected this exact argument in holding that non-profit organizations had standing to challenge OMB's failure to disclose apportionments and spend plans incorporated into them. *Id.* at 46–51; *see also* Order at 10 & n.4, No. 25-5266 (D.C. Cir. Aug. 9, 2025) (denying stay and rejecting OMB's *Richardson* argument). By statute, OMB must disclose spend plans such as the May 2026 IES one within two

---

[4] *E.g.*, Compl. ¶ 126 (citing *Education Department Terminates Some 32 Grants for Deafblind Students*, K-12 DIVE, https://perma.cc/D3A9-6VWN; *Children with Disabilities Swept Up in DEI Fight, Advocates Say*, The Hill, https://perma.cc/KH62-WKVY).

business days, 31 U.S.C. § 1513 note, and OMB's failure to do so harms Plaintiffs.

**B. No Claims Are Moot**

Defendants limit their mootness arguments to the claims for non-disclosure of the spend plan (Count 5), failure to apportion the three appropriations that expire this year (parts of Counts 1–2), and failure to obligate the portions of funds that have now been obligated (parts of Count 8). Although they assert elsewhere that "all funds *have been* apportioned," Defs. Br. 1, they recognize in their mootness section that this is not true for "those that expire in 2027," *i.e.*, the FY2026/2027 IES funds, *id.* at 11. *But see id.* at 5 (table erroneously listing all FY2026/2027 funds as apportioned). For these funds, $465.6 million remains designated as Unallocated (where OMB has now changed the term to "Undistributed"). Pls. Br. 14. Where Defendants do argue mootness, they bear the "heavy burden of showing mootness [as] the party raising the issue." *Lowe v. Gagné-Holmes*, 126 F.4th 747, 755 (1st Cir. 2025) (quotations omitted).

Defendants' mootness argument makes no sense as to Plaintiffs' claim for unlawfully withholding or unreasonably delaying the obligation of funds expiring this year. That claim is that the Department must obligate *all* of the funds before they expire. Obligating some, but not all, of these funds does not moot that claim. And still today, Defendants have not obligated $49.5 million of the $50 million in FY2026 Comprehensive Centers funds, Pls. Br. 13, and more than $180 million in FY2025/2026 IES funds, Suppl. Soldner Decl. ¶ 11.

As for the OMB's belated disclosure of the May 2026 IES spend plan and way-too-late apportionments of funds expiring this year, Plaintiffs no longer need an order compelling those specific acts. But "[a] case becomes moot only when it is impossible for a court to grant any effectual relief." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (quotations omitted). Here, Plaintiffs have a "concrete interest" in obtaining declaratory relief regarding the unlawfulness of these actions. *Id.* Defendants "fail to admit the illegality of the

actions," *Cordeiro v. Grep Atl., LLC*, 2025 WL 889460, at *2 (D. Mass. Mar. 21, 2025), and for the apportionments, the failure to timely apportion the three appropriations that expire this year is part of an ongoing OMB policy—that harms Plaintiffs each time effectuated—to withhold apportionments of education funds. Pls. Br. 26–27. The lawfulness of OMB's actions with these three appropriations, as well as the non-disclosure of the May 2026 IES spend plan, presents a dispute of "sufficient immediacy and reality … to warrant the issuance of a declaratory judgment." *Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 9 (1st Cir. 2021) (quotations omitted).

These claims are also not moot under the voluntary cessation doctrine. A defendant's post-complaint "voluntary cessation of a challenged practice will moot a case only if the defendant can show that the practice cannot reasonably be expected to recur." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (citation modified). Here, OMB disclosed the missing May 2026 IES spend plan and apportioned the EIR and Comprehensive Centers funds only after Plaintiffs filed suit. Plaintiffs' opening brief noted that even for the FY2025/2026 IES funds that Defendants claimed had been all apportioned, $10 million still had not been, and lo and behold OMB apportioned those funds just 5 days ago.[5] Given that OMB plainly took these actions in response to this case, OMB cannot meet its "formidable burden" to show that these challenged practices "cannot reasonably be expected to recur." *Id.* OMB does not even dispute that it will continue its policy of apportioning education funds to Unallocated lines. *Infra* Section III.D.

In all events, the 30-day apportionment violations and delayed disclosure of the spend plan fall under the mootness exception for being capable of repetition yet evading review. *United States v. Chin*, 913 F.3d 251, 256–57 (1st Cir. 2019). These actions are not just capable of repetition—they will certainly be repeated absent court intervention. And the actions will evade

[5] https://openomb.org/file/11550395.

review if, each time a plaintiff sues over a particular failure to apportion funds or disclose an apportionment, OMB then takes the action before the court can adjudicate the claim.

### C. Plaintiffs' Claims Are All Ripe

Defendants argue that "Plaintiffs' claims for funding not set to expire until September 2027 are not ripe," Defs. Br. 12, but it is unclear what "claims" they are referencing. Plaintiffs do not assert a claim for failure to obligate the FY2026/2027 IES funds before they expire; Count 8 is limited to funds that expire this year. *See* Compl. ¶¶ 196–202. Plaintiffs' claims about the *apportionments* of FY2026/2027 are certainly ripe, as the legal violations have been committed. Defendants have missed the 30-day deadline, continue to withhold hundreds of millions of the FY2026–2027 funds on an Unallocated line, and have continued to attach the EO footnotes.

Defendants assert that "at the very least, claims and requests for injunctive relief concerning 'any future appropriations'" are not ripe. But Plaintiffs mention "any future appropriations" only in the requested injunction in their proposed order. Dkt. No. 46-1 at 3. Ripeness applies to claims, not forward-looking injunctive relief, and courts regularly grant permanent injunctions to prevent the same illegal conduct established in the liability phase.

## II. Defendants' Other Threshold Arguments All Fail

### A. Plaintiffs' Claims Are Not Precluded

Defendants argue that the Impoundment Control Act (ICA) and the Anti-Deficiency Act preclude Plaintiffs' APA claims. Defs. Br. 14–18. But Defendants cannot show by "clear and convincing evidence" that Congress intended either law to preclude APA claims such as those here, *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 64 (1993) (quotations omitted), as required to overcome the APA's "strong presumption favoring judicial review of administrative action," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22–23 (2018) (quotations omitted).

*1. The ICA does not preclude Plaintiffs' claims*

**a. "**[T]he ICA was passed at a time when Congress was united in its furor over presidential impoundments" by President Nixon. *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987). With one exception, the ICA itself does not mandate that agencies spend appropriations (referred to as "budget authority"). Congress' annual appropriations acts impose that mandate. The ICA instead provides procedures for the President to seek to get out from those spending mandates. Where the President seeks to not spend funds for policy reasons, the President must send a "special message" to Congress identifying the funds at issue and reasons for the withholding. 2 U.S.C. §§ 683(a), 684(a). The only instance where the ICA itself compels spending funds is if the President sends a special message to Congress seeking permanent rescission of funds and Congress does not enact it; in that case, the ICA requires that the funds "proposed to be rescinded … shall be made available for obligation." *Id.* § 683(b).

The ICA also purports to authorize the Comptroller General to sue in limited circumstances. "If, under this chapter [of the ICA], budget authority is required to be made available for obligation and such budget authority is not made available for obligation," the Comptroller General may sue "to require such budget authority to be made available for obligation." *Id.* § 687. The Comptroller General has never exercised this authority, and § 687 is almost surely inoperative because the Comptroller General lacks Article III standing to sue. *See Walker v. Cheney*, 230 F. Supp. 2d 51, 66 (D.D.C. 2002). Regardless, nothing in § 687 or the ICA more broadly suggests that Congress intended to displace the longstanding right of private parties to bring APA suits for violations of appropriations acts or other spending statutes.

To the contrary, the ICA expressly provides that "[n]othing contained in this Act … shall be construed as … affecting in any way the claims … of any party to litigation concerning any impoundment." 2 U.S.C. § 681(3). Congress enacted this clear textual command against the

backdrop of a long history of private plaintiffs successfully challenging agency refusals to spend funds as Congress directed, including under the APA. Almost 200 years ago, the Supreme Court approved a writ of mandamus compelling an agency to release appropriated funds, in an action brought by a private party. *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838). Nearly 150 years later, in *Train v. City of New York*, 420 U.S. 35 (1975), private plaintiffs brought an APA claim challenging an agency's refusal to spend the full amount of money that Congress directed "shall be allotted" under an appropriations statute. *See City of New York v. Ruckelshaus*, 358 F. Supp. 669, 673 (D.D.C. 1973) (noting that the plaintiffs brought an APA claim). The Supreme Court affirmed the district court injunction in favor of the private plaintiffs, compelling the agency to spend the full amounts Congress required.

*Train* was one of a series of cases brought during the Nixon administration where, prior to the ICA, private litigants had successfully challenged an agency's refusal to spend appropriations. *See, e.g., State Highway Comm'n of Mo. v. Volpe*, 347 F. Supp. 950, 954 (W.D. Mo. 1972), *aff'd*, 479 F.2d 1099 (8th Cir. 1973) (granting relief under 5 U.S.C. § 706); *Guadamuz v. Ash*, 368 F. Supp. 1233 (D.D.C. 1973); *Louisiana v. Weinberger*, 369 F. Supp. 856 (E.D. La. 1973); *Nat'l Council of Cmty. Mental Health Ctrs. v. Weinberger*, 361 F. Supp. 897 (D.D.C. 1973). It was against this long history of private parties bringing successful claims to compel the spending of appropriations that Congress made clear that "nothing contained" in the ICA "shall be construed" as "affecting in any way" such claims. 2 U.S.C. § 681(3).

Remarkably, Defendants do not even attempt to reconcile their implied preclusion theory with § 681(3)'s plain text, which they do not even acknowledge. But ignoring statutory text does not make it any less controlling. Plaintiffs are "any party," and Plaintiffs' claims for failure to apportion and obligate appropriations "concern[] any impoundment." 31 U.S.C. § 681(3).

And even looking beyond the text here, Defendants' argument that Congress *intended* to

preclude private litigation to prevent impoundments through the ICA is absurd. As its name suggests, the Impoundment Control Act's overriding purpose was to "control" impoundments. There is not a scintilla of evidence that Congress in the ICA wanted to make it *harder* to challenge and prevent impoundments, by stripping private litigants of their longstanding ability to bring APA suits over failures to comply with congressional spending mandates.[6]

**b.** Rather than address the statutory text, Defendants rely on misleading portrayals of two decisions from last year: *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), and *Department of State v. AIDS Vaccine Advocacy Coalition* (*AVAC*), 146 S. Ct. 19 (2025).

In *Global Health Council*, the D.C. Circuit held only that private parties could not use the APA to sue over violations *of the ICA itself*, because the ICA assigns its procedures to Congress and the Comptroller General. 153 F.4th at 18–19. The court expressly stated that it did "not decide whether the ICA precludes suits under the APA to enforce appropriations acts." *Id.* at 19 n.17; *see also id.* at 20 n.18. The D.C. Circuit's original opinion could have been read more broadly, but the court substantially amended its opinion to narrow its holding to cover only claims to enforce the ICA. *See* 2025 WL 2709437, at *3 (D.C. Cir. Aug. 28, 2025) (Garcia, J., statement respecting denial of rehearing *en banc*) (denying en banc review on this basis). Defendants obscure this from the Court, erroneously asserting that the "central holding [was] that the ICA precludes private rights of actions and APA claims." Defs. Br. 16.

Defendants' mis-portrayal of *AVAC* is just as bad. After the D.C. Circuit's mandate issued in *Global Health Council*, the President submitted a special message pursuant to the ICA proposing rescission of roughly $4 billion in foreign aid appropriations. Thereafter, the district court held that the plaintiffs were likely to succeed on their APA claims for violations of the

[6] Defendants' ICA preclusion arguments presumably apply only to Counts 1, 2, 6 and 8.

appropriations acts, and ordered the government to obligate approximately $10.5 billion before the funds expired. That $10.5 billion included: (1) the $4 billion in funds included in the ICA special message; and (2) another $6.5 billion not in the special message. *AVAC v. U.S. Dep't of State*, 803 F. Supp. 3d 164, 170 (D.D.C. 2025).

Defendants' stay request to the Supreme Court was "limited to the $4 billion that are the subject of the President's rescission proposal." Partial Stay Appl. at 17 n.4, *AVAC*, No. 25A269. Defendants made clear that "[t]he dispute over the new injunction has narrowed to the $4 billion that the President designated to Congress for proposed rescission, thereby triggering the Impoundment Control Act." Stay Reply at 1, *AVAC*.. Defendants' substantive arguments in seeking a stay thus focused on the unique circumstances of appropriations in "a rescission proposal that comports with the ICA." Stay Appl. at 22, *AVAC*. Defendants contended that "claims concerning the effect of an ICA rescission proposal are precluded, because they cannot be divorced from the ICA's reticulated procedures and limited remedial mechanisms." *Id.* at 23. The Solicitor General argued that "*this* APA suit is precluded, *regardless of how broadly the ICA precludes suits in other contexts*." *Id.* (second emphasis added).

In turn, the Supreme Court's order was expressly cabined to "the funding subject to the President's August 28 special message," and did not apply to APA claims relating to appropriations not included in a rescission proposal. *AVAC*, 146 S. Ct. at 19. The Court highlighted that, of the total $10.5 billion funds covered by this Court's preliminary injunction, "$4 billion was proposed to be rescinded in a 'special message' transmitted pursuant to the Impoundment Control Act." *Id.* (citing 2 U.S.C. § 681 *et seq.*). The Court then held that "[t]he Government, at this early stage, has made a sufficient showing that the Impoundment Control Act precludes respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce *the appropriations at issue here*." *Id.* (emphasis added). The "appropriations at issue

here" referred only to the funds in the rescission proposal. Indeed, the Court granted a stay only "as to the funding subject to the President's August 28 special message." 146 S. Ct. at 19.

Thus, the Supreme Court did not hold, as Defendants now suggest, that "the ICA precluded Plaintiffs' APA suit to enforce foreign assistance appropriations," writ large. Defs. Br. 14. The Court's "preliminary" holding was expressly limited to "the funding subject to the President's August 28 special message." 146 S. Ct. at 19. The government cannot now be heard to argue otherwise, having told the Court that its resolution of the stay application would not resolve "how broadly the ICA precludes suit in other contexts," Stay Reply at 2, *AVAC*, No. 25A269. Again, Defendants leave all of these details out of their motion to this Court.

Here, the President has not submitted any special message proposing rescission of the Department of Education funds at issue, and so the Supreme Court's order has no bearing at all.

*2. The Anti-Deficiency Act does not preclude Plaintiffs' claims*

Defendants also erroneously argue that the Anti-Deficiency Act itself precludes Plaintiffs from bringing APA claims for OMB's violations of the Act in failing to apportion funds.

For starters, Defendants attack a strawman by arguing the Anti-Deficiency Act does not provide a private right of action because it contains no "rights-creating language." Defs. Br. 15–16 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 288–89 (2001)). Plaintiffs are not asserting a private right of action under the Anti-Deficiency Act, but rather claims under the APA, which affords "aggrieved" parties a right of action to challenge final agency actions that violate another statute, 5 U.S.C. §§ 702, 704. The Anti-Deficiency Act is another statute. *See Am. Fed'n of State Cnty. & Mun. Emps., AFL-CIO v. OMB*, 807 F. Supp. 3d 1004, 1031 (N.D. Cal. 2025) (holding that the plaintiffs could bring APA claims over Anti-Deficient Act violations).

Defendants next argue that the Anti-Deficiency Act impliedly precludes APA suits to enforce the Act's requirements because the Act provides a "comprehensive remedial scheme" for

violations, including reporting to the President and Congress and administrative discipline and criminal penalties. Defs. Br. 16. Defendants are mistaken. The provisions to which they cite concern entirely different types of Anti-Deficiency Act violations than those Plaintiffs allege here. Those provisions impose reporting requirements and penalties where officials cause the obligation of *more money* than Congress appropriated (31 U.S.C. §§ 1341(a), 1349–51) or than OMB apportioned (*id.* §§ 1517–19). There are no statutory remedies where, as here, OMB violates the Anti-Deficiency Act by failing to timely apportion money as required under 31 U.S.C. §§ 1512–13. Adjudicating Plaintiffs' claims would not "disrupt" any statutory remedial scheme. Defs. Br. 17. The APA's strong "presumption favoring judicial review of administrative action" controls. *Sackett v. EPA*, 566 U.S. 120, 128 (2012) (citation omitted).

### B. Plaintiffs Are Within the Zone of Interests

Plaintiffs are within the zone of interests of the appropriations laws and apportionment provisions of the Anti-Deficiency Act. *Contra* Defs. Br. 18–19. The APA's zone-of-interests test is "not especially demanding" and permits suit by anyone even "arguably within the zone of interests to be protected or regulated by the statute." *FDA v. R.J. Reynolds Vapor Co.*, 606 U.S. 226, 233 (2025) (quotation omitted). The test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." *Id.* (quotation omitted).

Defendants apply the wrong standard when they fault Plaintiffs for identifying no statute that requires an award specifically to them. Defs. Br. 18. Plaintiffs need not show "any indication of congressional purpose to benefit the would-be plaintiff" specifically. *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 20 (1st Cir. 2024). And Plaintiffs' interests are far from "marginally related" to Congress's purposes in providing these education funds; Plaintiffs are educational research and advocacy organizations that directly compete for and benefit from the

funds. *See, e.g., City of Chicago v. DHS*, 815 F. Supp. 3d 727, 759 (N.D. Ill. 2025).

For the same reasons that Plaintiffs are within the zone of interests of the appropriations acts that require Defendants to spend funds on educational research, they are within the zone of interests of the provisions of the Anti-Deficiency Act that prevent Defendants from withholding such funds. *See* 31 U.S.C. §§ 1512(c), 1513(b).

**C. The Decisions at Issue Are Not Committed to Agency Discretion by Law**

Plaintiffs do not challenge actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court has repeatedly emphasized that, "to honor the [APA's] presumption of review," this exception must be read "quite narrowly." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quotations omitted). It applies only in the "rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"—*i.e.*, where there is "no law to apply"—"such as a decision not to institute enforcement proceedings." *Id.* at 772–73 (quotations omitted); *see Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020).

Defendants argue that "apportionment decisions [are] unreviewable under the APA" because § 1512(b)(2) states that OMB "shall apportion an appropriation … as the official considers appropriate." But this language does not alter the 30-day deadline to apportion funds. The language Defendants quote from § 1512(b)(2) is also cabined by § 1512(a), which specifies the sole purpose of apportioning funds like those here—"to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." OMB must apportion funds as it "considers appropriate" to carry out this sole purpose, which is a "meaningful standard" and "law to apply." *Dep't of Com.*, 588 U.S. at 772.

Citing *Lincoln v. Vigil*, 508 U.S. 182 (1993), Defendants also argue that the Department's reprogramming of funds across IES programs is committed to agency discretion by law. Defs.

Br. 19. This argument seems to be directed at Plaintiffs' arbitrary and capricious challenge to Defendants' decision not to adhere to the allocations for IES programs in Congress' explanatory statement. But *Lincoln* is inapposite. There, the plaintiffs challenged the Indian Health Service's decision not to use money from a lump-sum appropriation, provided for the Service generally, on a program that was not required or referenced in any statute. 508 U.S. at 184–86. Here, in contrast, the IES programs and centers listed in the explanatory statement are all required by statute. Those statutes impose requirements for each program or center that provide meaningful standards for assessing the reasonableness of how IES allocates its funds. For instance, for the Regional Educational Laboratories, the statute requires at least 10 Labs covering specific geographic regions, each of which must perform particular tasks. 20 U.S.C. §§ 9564(a), (b), (f). The statutory requirements for the IES programs and centers sufficiently "circumscribe agency discretion to allocate resources," *Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39, 53 (1st Cir. 2025), *stayed in part on other grounds by* 145 S. Ct. 2658 (2025), such that IES's decision of how to allocate resources may be reviewed under the APA's requirements for reasoned decisionmaking.

**D. Plaintiffs Challenge Final Agency Action**

Defendants' final agency action arguments conflate two distinct categories of claims. Under 5 U.S.C. § 706(2), Plaintiffs challenge completed actions: issued apportionments, binding footnotes in them, and an adopted policy. Under § 706(1), Plaintiffs seek to *compel* discrete actions that Defendants have unlawfully withheld or unreasonably delayed. Final agency action is not required for § 706(1) claims. *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001).

As for the § 706(2) claims, each issued apportionment is a final agency action because it "mark[s] the consummation of the agency's decisionmaking process" "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). As the district court in *CREW v. OMB* noted in rejecting OMB's argument that apportionments are predecisional and

deliberative, OMB itself states that all apportionments, including footnotes, are final "OMB-approved plan[s]" that are "legally binding." 791 F. Supp. 3d at 54 (quoting OMB Circular No. A-11 §§ 20.3, 120.1). An apportionment reflects OMB's final decision as to how much an agency may spend at any given time and for what purposes, and legal consequences attach immediately. Department of Education employees face criminal liability if they spend money that OMB designated Unallocated, or use funds in a way that contravenes footnotes that OMB included in an apportionment. That immediate, binding effect distinguishes an apportionment from Defendants' analogy to a proposed rule, which binds no one.

The fact that apportionments may be "revise[d] … periodically," Defs. Br. 21, does not make them preliminary. "No matter how many times an apportionment changes, each generated apportionment is 'legally binding.'" *CREW*, 791 F. Supp. 3d at 55 (quoting OMB Circular A-11 § 120.1). Simply because an agency "can change its decision … does not make the decision any less final." *Id.* (collecting cases). A re-apportionment is simply a *new* final action, like a new regulation. Section 704 confirms the principle: agency action that is "otherwise final" remains final notwithstanding the possibility of reconsideration. 5 U.S.C. § 704.

OMB's adoption of a policy to designate disfavored education appropriations as Unallocated in apportionments also reflects final agency action. The final decision "to adopt a policy" constitutes a final agency action where legal consequences flow from it, even where that policy is implemented through subsequent actions. *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008); *see New York v. Trump*, 171 F.4th 1, 17–18 (1st Cir. 2026); *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 77 (D.D.C. 2025).

## III. Plaintiffs Are Entitled to Judgment as a Matter of Law

### A. OMB Has Failed to Timely Apportion the Relevant Funds (Counts 1 and 2)

Defendants do not dispute that they failed to apportion all four relevant appropriations

within 30 days of the respective appropriations acts providing those funds. *See* Pls. Br. 18–21. Instead, they argue the Anti-Deficiency Act does actually not require apportioning funds within 30 days of an appropriations law. Defs. Br. 22–23. That is plainly wrong.

In purporting to provide the "full … relevant statutory text," Defendants crop the text. Defs. Br. 22. Reading § 1513 as a whole, § 1513(a) concerns apportionments to entities outside the Executive Branch; funds for such entities "shall be apportioned not later than … 30 days after the date of enactment of the [appropriations] law." Section 1513(b) covers apportionments to executive agencies, with paragraph (1) providing that OMB "shall apportion in writing an appropriation available to an executive agency … that is required to be apportioned." The section imposes the same 30-day requirement for executive agencies as for entities outside the Executive Branch, but for executive agencies it breaks down the process into two parts. First, agencies must provide information to OMB no later than "15 days after the date of enactment of the [appropriations] law." *Id*. § 1513(b)(1). Second, OMB "shall notify the head of the executive agency of the action taken in apportioning the appropriation under paragraph (1) … not later than … 30 days after the date of enactment of the law." *Id.* § 1513(b)(2).

OMB accordingly must both: (i) apportion an appropriation to an agency and (ii) notify the agency of that apportionment not later than 30 days after the relevant appropriations act. As such, OMB necessarily must make that apportionment by the 30-day deadline. Defendants' assertion that § 1513(b)(2) is merely "a deadline for sending information," Defs. Br. 23, ignores the *content* of the notification—that OMB has apportioned the funds. Congress obviously did not intend for OMB to lie in the notification about the apportionment happening. By analogy, if a parent tells a child both to complete his chores and that he must tell the parent by 5pm how he

completed the chores, the parent is clearly directing the child to complete his chores by 5pm.[7]

It has long been understood across government that § 1513(b) has this meaning. The Government Accountability Office (GAO) explains in its canonical Redbook that "[t]he Director of OMB has up to … 30 days after enactment of the appropriation act … to make the actual apportionment and notify the agency of the action taken." GAO, Principles of Federal Appropriations Law (3d Ed.), 2006 WL 6179174, at *9. The Congressional Research Service has explained the same. *See* Cong. Res. Serv., *Office of Management and Budget (OMB) Reporting on Apportionments* at 1 (Aug. 21, 2025), https://perma.cc/B82B-3CN7.

Defendants only remaining defense on Counts 1 and 2 is that OMB's apportionment actions are actually actions by the President unreviewable under the APA. Defs. Br. 24. The President has legally delegated his authority to make apportionments to the OMB Director, *see* E.O. 11541, § 1(a), 35 Fed. Reg. 10,737 (July 2, 1970), who in turn has delegated that authority to subordinate OMB officials, *see* Notice; Delegation of Apportionment Authority, 90 Fed. Reg. 9,737 (Feb. 18, 2025). Plaintiffs are challenging final agency actions taken by *OMB*, not the President, and Defendants cannot "bootstrap the nonreviewability of presidential actions to discretionary authority delegated to" OMB. *Tate v. Pompeo*, 513 F. Supp. 3d 132, 142 (D.D.C. 2021). Courts have repeatedly held that where a statute assigns the President responsibility to take a certain action, but the President delegates that responsibility to an agency, the agency's actions are subject to APA review. *See, e.g.*, *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 102, 110 (D.D.C. 2020); *Marland v. Trump*, 498 F. Supp. 3d 624, 634 n.3 (E.D. Pa. 2020); *Nation v. Dalton*, 107 F. Supp. 2d 37, 43 n.5 (D.D.C. 2000).

Indeed, the First Circuit recently rejected the argument that an OMB directive was

---

[7] Defendants falsely state that *CREW* "cit[ed] § 1513 as a posting requirement." Defs. Br. 23. The court was addressing 31 U.S.C. § 1513 *note*, a different provision. 791 F. Supp. 3d at 40.

unreviewable under the APA because it implemented an executive order. *New York v. Trump*, 133 F.4th 51, 70 n.17 (1st Cir. 2025). Similarly, in *Orr v. Trump*, 778 F. Supp. 3d 394 (D. Mass. 2025), *vacated on mootness grounds*, 178 F.4th 34 (1st Cir. 2026), Judge Kobick rejected the argument that State Department action was unreviewable because it was taken pursuant to authority delegated by the President. *Id.* at 419. AfR.s Judge Kobick explained, *Franklin v. Massachusetts*, 505 U.S. 788 (1992), does not bar review where an agency made "independent determinations" and exercised its own "judgment." 778 F. Supp. 3d at 419; *see also Milligan v. Pompeo*, 502 F. Supp. 3d 302, 313 (D.D.C. 2020) (collecting cases). OMB did just that here, deciding how much to apportion, when, and whether to designate amounts as Unallocated.

The two cases on which Defendants rely are readily distinguishable. In *Detroit International Bridge Co. v. Canada*, 189 F. Supp. 3d 85 (D.D.C. 2016), the President approved a bridge, and the State's Department actions "were mere 'ministerial implementation of presidential action.'" *Milligan*, 502 F. Supp. 3d at 314 (quotations omitted). Here, OMB's apportionment decisions "are in no sense a ministerial implementation of presidential action," *Gomez v. Trump*, 485 F. Supp. 3d 145, 178 (D.D.C. 2020), but involve OMB's own independent choices, *see Orr*, 778 F. Supp. 3d at 420. Defendants do not suggest the President played any role in the relevant apportionment actions here. And in *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 698 F.3d 171 (4th Cir. 2012), the Fourth Circuit did not adopt the district court's conclusion that the State Department ceased to be an "agency" when it exercised delegated presidential authority in the context of foreign affairs. Rather, it assumed that the agency was subject to the APA and resolved the claim on the merits. *Id.* at 181–82.

**B. OMB's Extra-Statutory EO Footnotes Violate the APA (Counts 3 and 4)**

*1. The Footnotes Exceed Statutory Authority and Are Unconstitutional*

**a.** OMB lacks any statutory authority to use apportionment footnotes to add legally

binding policy conditions on an agency's use of funds. Pls. Br. 22–25. Defendants do not meaningfully dispute that OMB has no such authority. The best they come up with is that Congress required OMB to *publish* footnotes, which Defendants say "confirms the agency's authority to use footnotes." Defs. Br. 24. A requirement to disclose footnotes does not constitute blanket approval of every footnote that OMB uses, regardless of its substance. It certainly does not confer any authority on OMB to *legislate* through footnotes. Defendants point to no other possible source of statutory authority for OMB to impose the EO footnotes at issue here.[8]

Instead, Defendants try to change the subject, arguing that the EO footnotes cannot be unlawful because they include caveats that the Department must comply only as "consistent with applicable law." Defs. Br. 25. But whether and how *the Department of Education* can lawfully comply with the Executive Orders is not the question. The question is what is *OMB's legal authority* to make compliance with the Executive Orders a legally binding condition of an apportionment pursuant to the Anti-Deficiency Act. OMB has no such authority.

Nor is it any answer that "agencies are already required to comply with Executive Orders." Defs. Br. 24–25. Apportionments, unlike Executive Orders, carry *criminal penalties* for failing to comply with them. 31 U.S.C. § 1519. Defendants clearly understand the substantive difference between Executive Orders alone and imposing E.O. policies through apportionment footnotes; otherwise they would have no reason to attach the footnotes in the first place.

**b.** OMB's imposition of the EO footnotes also violates the separation of powers by usurping Congress's exclusive power to set the terms and conditions of federal spending. *See* Pls. Br. 24–25. Defendants are wrong that this claim is "statutory in nature" and barred by *Dalton v.*

---

[8] That the conditions are in tension with congressional mandates for use of these funds, *see* Pls. Br. 23–24, is further evidence that OMB does not itself have the power to mandate them, but that inconsistency is not essential to Plaintiffs' exceeds statutory authority claim.

*Specter*, 511 U.S. 462 (1994). *See* Defs. Br. 28–29. *Dalton* held that an allegation that an executive official exceeded statutory authority does not *ipso facto* state a constitutional violation. *Id.* at 472–74. But *Dalton* did not hold that the Executive *never* violates the separation of powers where it acts without legal authority, and here the Executive has co-opted the spending power that the Constitution structurally commits to Congress. Moreover, *Dalton* distinguished *Youngstown*, where there was a "conceded absence of any statutory authority" for the challenged action, and the Executive instead invoked the President's inherent Article II power. *Id.* at 473.

There is likewise a "conceded absence of any statutory authority" here: as described above, Defendants do not claim that any statute affirmatively authorizes OMB to impose policy conditions via apportionments that Congress did not enact. And, as in *Youngstown*, Defendants invoke Article II authority to justify the footnotes. They argue that OMB is "bound to follow binding executive Orders," that presidential appointees must be able to direct grantmaking, and that the President is responsible for faithful execution of the laws. Defs. Br. 26–27 (quotations omitted). That squarely presents whether the Constitution authorizes OMB's actions. *See Global Health Council v. Trump*, No. 25-5097, 2025 WL 2709437, at *1 (D.C. Cir. Aug. 28, 2025) (Katsas, J., concurring in denial of rehearing en banc) (explaining that *Dalton* would not have precluded separation-of-powers claim if defendants had relied on constitutional authority).

### 2. *The Executive Order Footnotes are Arbitrary and Capricious*

OMB's imposition of the EO footnotes is also arbitrary and capricious, including for the basic reason that OMB failed to articulate any reasoned basis for adding them. Pls. Br. 25. Even now, Defendants point to no rationale for the footnotes beyond the Executive Orders. But "[m]ere compliance with an executive order does not satisfy the APA's demand for a showing of reasoned decision making." *R.I. Coal. Against Domestic Violence v. Kennedy*, 2026 WL 2364298, at *4 (D.R.I. Aug. 14, 2026); *see New York*, 133 F.4th at 69–71. Otherwise, the

Executive Branch could immunize any agency action from arbitrary-and-capricious review simply by having the President direct the agency to take the action. Defendants' sole merits argument against the arbitrariness and capriciousness of the EO footnotes thus fails.

### C. OMB Has Failed to Publicly Disclose Spend Plans as Required (Count 5)

Defendants offer no merits defense to their failure to disclose the May 2026 IES spend plan that apportioned funds by virtue of being incorporated into an apportionment footnote. Pls. Br. 25–26. Defendants do not deny that OMB was statutorily required to publicly post the spend plan within two business days and it did not. 31 U.S.C. § 1513 note. This was no oversight: Defendants do not dispute that IES Director Soldner told Knowledge Alliance's President, prior to this suit being filed, that the May apportionment would not become public. Dinkes Decl. ¶ 36.

Rather than contest the merits, Defendants fall back on their mootness argument, which fails as described *supra*, and ask this Court to let their legal violation slide because they are already subject to a different injunction requiring the posting of spend plans. Defs. Br. 30. But Plaintiffs are not parties to that other action, which is not specific to education funds, and clearly that injunction was not sufficient to cause Defendants to comply with their legal duty as to the IES spend plan here. Agencies do not enjoy double jeopardy protection for their unlawful acts.

### D. OMB's Policy of Designating Funds as Unallocated Is Unlawful (Count 6)

Defendants do not deny any of the salient facts to Plaintiffs' challenge to OMB's new policy of placing substantial amounts of Department of Education funds on Unallocated lines in apportionments. They do not deny that OMB has adopted a policy of selectively using the Unallocated line—so as to delay or prevent funds from being obligated—when OMB disfavors the programs that Congress has funded. *See* Pls. Br. 27. OMB has consistently designated funds as Unallocated for programs that OMB unsuccessfully asked Congress to stop funding, but has not used this designation with programs for which it has no policy objection. *See id.* This policy

violates the Anti-Deficiency Act's requirement to apportion funds within 30 days of the relevant appropriations act, unlawfully creates a "reserve" of funds for reasons not permitted under § 1512(c), and tramples on the separation of powers by vetoing Congress's funding decisions. *See* Pls. Br. 27–28; *see also Clinton v. City of New York*, 524 U.S. 417 (1998).

To defend their policy, Defendants point to the language in § 1512(b)(2) that OMB may apportion funds as it "considers appropriate," suggesting that gives OMB unbridled discretion to withhold funds via the Unallocated designation. But as already explained, OMB may exercise discretion in apportioning funds only as relevant to fulfilling the statutory purpose of an apportionment—to prevent the agency from exhausting the money too quickly within its period of availability, so the agency does not need to go back to Congress and ask for more money. 31 U.S.C. § 1512(a). Defendants do not contend that OMB's Unallocated policy is intended to serve this purpose. Moreover, placing money on the Unallocated line does not meet OMB's own basic definition of an "apportionment," which is an OMB-approved "plan" that "identifies amounts available for obligation and expenditure" by "specified time periods, programs, activities, projects, objects, or any combination thereof." OMB Circular No. A-11 § 20.3. Designating funds as Unallocated indefinitely makes them *unavailable* for obligation and expenditure.

Defendants' argument also proves too much. Under their theory, OMB could designate any or all appropriations as Unallocated right up until the minute before the money expires, as OMB "considers appropriate." But Congress would have provided "clear congressional authorization" before affording the Executive such power on a matter of "vast economic and political significance." *W. Virginia v. EPA*, 597 U.S. 697, 716, 723 (2022) (quotations omitted). Indeed, the considerations underlying the doctrine "apply with particular force" where, as here, the purported delegation involves "the core congressional power of the purse." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 243 (2026) (Opinion of Roberts, C.J.). There is no clear

authorization that Congress intended to give OMB such power via its apportionment authority.

Indeed, OMB's withholding funds via the Unallocated designation reflects the creation of a reserve, and Congress specifically amended the Anti-Deficiency Act in 1974 to make clear that OMB could not reserve funds to implement its spending policy preferences. *See New Haven*, 809 F.2d at 906 n.18. Defendants cannot explain how holding money in abeyance via the Unallocated line is not creating a reserve; their only response is to state without explanation: "These are not reserves." Defs. Br. 31. But holding back money indefinitely, until OMB takes some future action to release it, is literally a reserve.

Finally, Defendants point to an OLC opinion addressing "zero-dollar apportionments," but that opinion was limited to a unique context: OMB's use of an "automatic zero-dollar apportionment" "where an agency fails to submit an apportionment request for carryover funds before the start of a fiscal year." 40 Op. O.L.C. 90, 103 (2016). And key to OLC's analysis was the fact that the funds at issue had *no* expiration date, because the Anti-Deficiency Act sets forth a different statutory purpose for apportioning such funds than for funds of a limited duration like those funds here. *See id.* at 93 (OMB must apportion the money funds that do not expire "to achieve the most effective and economical use" of them). To the extent any language in the OLC opinion could be read to suggest that OMB's providing an agency $0 can meet the requirement to apportion funds, that cannot be reconciled with the statutory text or common sense.

**E. OMB Has Failed to Comply with Explanatory Statements (Counts 1 and 7)**

Defendants do not deny that they are not adhering to the allocations in Congress's explanatory statements in apportioning and obligating IES funds across various IES programs. Defendants focus on the FY2025/2026 IES funds (Defs. Br. 27–28), for which the explanatory statement was not legally binding, but they offer no merits defense for OMB's failure to apportion the FY2026/2027 IES funds in accordance with the explanatory statement for the

Consolidated Appropriations Act of 2026, which Congress *did* make legally binding. *See* Pls. Br. 29–30. OMB plainly is violating the 2026 Appropriations Act by apportioning funds not in accordance with the explanatory statement allocations.

As for the FY2025/2026 IES funds, Plaintiffs bring only an arbitrary-and-capricious claim. That the explanatory statement for these funds was not "binding law" does not resolve the claim. *Contra* Defs. Br. 27. Under arbitrary-and-capricious review, where an agency changes a policy, it must "display awareness that it is changing position," and provide a "detailed justification" for the change where "the agency's prior position has engendered serious reliance interests." *Housatonic River Initiative v. EPA*, 75 F.4th 248, 270 (1st Cir. 2023) (cleaned up). Defendants argue that Plaintiffs have failed to show "the agency actually changed existing policy," Defs. Br. 28, but Plaintiffs present unrebutted data that IES for years adhered to the allocations in the non-binding explanatory statements, until now. ECF No. 48 (Carlile Decl.) ¶ 18, tbl. 3; *see* Dinkes Decl. ¶ 8. And IES's deviation from the explanatory statement has only grown since Plaintiffs' opening brief; the reprogramming revealed in Soldner's new declaration shows that IES is now shortchanging the Regional Educational Laboratories by $16 million relative to the explanatory statement. ECF No. 58-1. IES's notification to Congress of this reprogramming does not display awareness that IES is departing from its prior policy of following the explanatory statements, and offers no explanation for this change in policy. *See id.*

### F. OMB Is Unlawfully Withholding or Unreasonably Delaying Obligating the Relevant Funds That Expire on September 30, 2026 (Count 8)

Plaintiffs' Section 706(1) claim concerns a discrete statutory duty: Defendants must obligate, by September 30, the full amounts of the FY2025/2026 IES and FY2026 Comprehensive Centers funds. Plaintiffs have demonstrated that Defendants' extraordinarily slow pace, and failure to take the necessary actions to obligate the funds by September 30,

constitutes unreasonable delay. *See* Pls. Br. 30–32. Defendants' own data confirms that this delay persists: as of August 26, with just over one month before funds expire, IES has not obligated more than $180 million in expiring FY2025/2026 funds. Suppl. Soldner Decl. ¶ 12. For Comprehensive Centers, only $441,890 of $50 million—0.88%—has been obligated. Defs. Br. 5.

Defendants have no persuasive response. September 30 is the deadline for *completing* the obligations, not, as Defendants bizarrely claim, when that deadline "begin[s]." Defs. Br. 32. Defendants' position would make delay unreviewable until *after* the funds expire. Plaintiffs do not claim that the Anti-Deficiency Act prescribes a specific obligation rate; Defendants' exceptionally slow rate of obligation is *evidence* that performance of an independently required duty has been delayed. And general assurances that Defendants "intend" to spend the money neither explain the extreme departures from prior practice nor identify a concrete plan for the remaining funds, especially with the September 30 deadline fast approaching.

Defendants' objection to the Carlile declaration fails. Defs. Br. 33. Carlile merely summarizes data that Defendants themselves make available on a government site, for which this Court may take judicial notice. *Pietrantoni v. Corcept Therapeutics Inc.*, 640 F. Supp. 3d 197, 205 (D. Mass. 2022). In any event, § 706(1) review is not confined to an administrative record. *Nat'l Law Ctr. on Homelessness & Poverty v. VA*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012).

**IV. Plaintiffs' Requested Relief Is Appropriate**

Plaintiffs' requested relief is appropriate and necessary to afford them complete relief.

*First*, Defendants contend that the Court cannot grant any relief under the APA because Plaintiffs have not challenged any final agency action. Defs. Br. 33. As explained above, that argument is wrong. Plaintiffs are not waging a "broad programmatic attack" or seeking "wholesale improvement of" an agency program, *id.*; they are challenging discrete, final agency actions under the APA. And to the extent that Defendants suggest that the Court should simply

"remand" to the agency "for further action" rather than vacate the challenged actions, *id.*, that too is wrong. "In the APA context, 'vacatur is the normal remedy.'" *Oliveira v. Edlow*, No. CV 25-13228-BEM, 2025 WL 3492110, at *12 (D. Mass. Dec. 4, 2025) (quotations omitted).

*Second*, injunctive relief is appropriate here. It is well-settled that after a finding that a final agency action is contrary to law, a district court may enter a permanent injunction to prevent future violations if the four-factor test for injunctive relief is satisfied. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 137 (D.C. Cir. 2020); *see also, e.g.*, *Ramirez v. ICE*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021) (collecting cases). Contrary to Defendants' suggestion, Plaintiffs are not seeking to "compel Federal agencies to issue payments" to any particular grant recipients, and so the Supreme Court's stay order in *Department of Education v. California*, 604 U.S. 650, 651–52 (2025), has no relevance here. Plaintiffs have also established all four elements for injunctive relief. *See* Pls. Br. 32–35. They have submitted unrebutted declarations that they would be devastated from the lost opportunity to compete for IES funding and access to the data that the funding produces. *See, e.g.*, Dinkes Decl. ¶ 8.

*Third*, Plaintiffs' proposed injunction is not vague or a "follow-the-law" injunction. Defs. Br. 35. It "describe[s] in reasonable detail … the act or acts restrained," Fed. R. Civ. P. 65(d), including failing to apportion the "Covered Appropriations" (a defined term) by the statutory deadline, making such appropriations unavailable on an Unallocated or Undistributed line, and conditioning such appropriations on compliance with Executive Orders 14151 or 14332, *see* Dkt. No. 46-1 at 4. The proposed injunction clearly lays out the enjoined conduct.

**CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion to dismiss or, in the alternative, for summary judgment.

September 1, 2026

Respectfully submitted,

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson*
Lynn D. Eisenberg*
Stephen Wirth*
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Avenue NW, Suite 301
Washington, DC 20016
Tel.: (301) 823-1148
Dan@jacobsonlawyersgroup.com

Benjamin L. Berwick (MA Bar No. 679207)
PROTECT DEMOCRACY PROJECT, INC.
15 Main Street, Suite 312
Watertown, MA 02472
Tel.: (202) 579-4582
ben.berwick@protectdemocracy.org

Cerin Lindgrensavage*
Jacek Pruski*
PROTECT DEMOCRACY PROJECT, INC.
2020 Pennsylvania Ave. NW, Suite # 163
Washington DC 20006
Tel.: (202) 579-4582
cerin.lindgrensavage@protectdemocracy.org
jacek.pruski@protectdemocracy.org

*Counsel for Plaintiffs*

Alice O'Brien*
Marissa Marandola (BBO #705609)
National Education Association
1201 16th Street NW
Washington, DC 20036
Tel.: (202) 822-7035
aobrien@nea.org
mmarandola@nea.org

Ryan Leach (BBO # 706159)
Massachusetts Teachers Association
2 Heritage Drive, 8th Floor
Quincy, MA 02178
Tel.: (617) 504-8774
rleach@massteacher.org

*Counsel for Plaintiff MTA*

* Admitted pro hac vice

## CERTIFICATE OF SERVICE

I certify that on September 1, 2026, I electronically filed the foregoing document using the Court's CM/ECF system and that service of this document will be accomplished on all counsel of record via CM/ECF.

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson